UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:23-CR-21-FL-RN-1

| | |
|---|---|
| UNITED STATES OF AMERICA | MOTION TO DISMISS INDICTMENT AND INCORPORATED MEMORANDUM OF LAW |
| v. | |
| CARLOS ALSTON | |

Defendant Carlos Alston, through undersigned counsel, respectfully asks this Court to dismiss the indictment pursuant to Fed. R. Crim. P. 12(b)(3)(B)(v) because 18 U.S.C. § 922(g)(3) and 18 U.S.C. § 922(n) violate Mr. Alston's Second Amendment right to keep and bear arms.

## I.    BACKGROUND

### A.  Procedural History

On January 24, 2023, Mr. Alston was charged in a two-count indictment with one count of being a person in receipt of a firearm while under indictment, in violation of 18 U.S.C. § 922(n), and one count of being a person in possession of a firearm while a drug user, in violation of 18 U.S.C. § 922(g)(3). [DE 11]. Arraignment is set for March 9, 2023.

### B.  Factual Background

Mr. Alston was waiting in the drive-thru line of a restaurant located in Henderson, North Carolina, when police approached his car. [DE 1]. Mr. Alston anticipates that the government will argue Mr. Alston brandished a weapon at the approaching police officer after the officer gave verbal commands for Mr. Alston to show his hands and notified him of outstanding warrants. [DE 1]. The officer then shot Mr. Alston once, striking him in the lower body. [DE 1]. After a foot chase, Mr. Alston collapsed from his injuries and was taken into

1

custody. [DE 1]. Police recovered a Smith & Wesson, SD9VE 9mm pistol near Mr. Alston's flight path, and they discovered marijuana in his car. Mr. Alston has a prior criminal conviction related to marijuana. [DE 1]. At the time of the shooting, Mr. Alston did not have any felony convictions.

## II.    LAW REGARDING SECOND AMENDMENT ANALYSIS UNDER *BRUEN*

The Supreme Court's recent opinion in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), issued on June 23, 2022, marked a dramatic shift in Second Amendment law. If "the Second Amendment's plain text covers an individual's conduct," then under *Bruen,* "the Constitution presumptively protects that conduct." *Id.* at 2129-30. To rebut the presumption, the government must show that a challenged law "is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129-30. The test for historical consistency is demanding: a firearm regulation is consistent with American tradition only if similar regulations were widespread and commonly accepted in the founding era. *Id.*

### A.    Before *Bruen*, lower courts evaluated Second Amendment challenges by applying means-ends scrutiny.

The Second Amendment provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment codified a pre-existing individual right to possess and use firearms for lawful purposes like self-defense. 554 U.S. 570, 592, 624 (2008). The Court therefore struck down District of Columbia statutes prohibiting the possession of handguns in the home and requiring that other guns in the home be kept inoperable. *Id.* at 628-34. Two years after *Heller*, in *McDonald v. City of Chicago*, the Court reaffirmed *Heller*'s "central holding": that "the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home." 561 U.S. 742, 780 (2010).

Following *Heller* and *McDonald*, the federal courts of appeals developed a two-step inquiry for deciding Second Amendment challenges. *See Bruen*, 142 S. Ct. at 2126-27 & n.4. The first step "ask[ed] whether the challenged law impose[d] a burden on conduct falling within the scope of the Second Amendment's guarantee as historically understood." *United States v. Chapman*, 666 F.3d 220, 225 (4th Cir. 2012). If not, the challenge failed. *Id.* But if the statute did burden Second Amendment conduct, courts then "appli[ed] the appropriate form of means-end scrutiny" whether strict or intermediate. *Id.*

## B. *Bruen* replaced means-ends balancing with a test rooted solely in the Second Amendment's "text and history."

The Supreme Court's recent opinion in *Bruen* disavowed the lower courts' framework, holding "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." 142 S. Ct. at 2127. In its place, the Court adopted a "text-and-history standard" more consistent with *Heller*'s methodology. *Id.* at 2138.

That standard directs courts to begin by asking whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 2126. If so, "the Constitution presumptively protects that conduct." *Id*. At issue in *Bruen* was a New York law providing that, to obtain a permit to carry a handgun in public, an applicant had to demonstrate "proper cause". *Id.* at 2122-23. The Court "ha[d] little difficulty concluding" that "the Second Amendment protects . . . carrying handguns publicly for self-defense." *Id.* at 2134. As the Court explained, "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." *Id.* The Second Amendment therefore "presumptively guarantees" a right to carry firearms in public. *Id.* at 2135.

To rebut the presumption of unconstitutionality, "the government may not simply posit that [a] regulation promotes an important interest." *Id.* at 2126. Only if [the government demonstrates that] a firearm regulation is consistent with this Nation's historical tradition

3

may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* This test requires courts to "consider whether historical precedent . . . evinces a comparable tradition of regulation." *Id.* at 2131-32. If "no such tradition" exists, the statute being challenged is unconstitutional. *Id.* at 2132. And insofar as there are "multiple plausible interpretations" of an ambiguous historical record, the Court indicated it would "favor the one that is more consistent with the Second Amendment's command." *Id.* at 2141 n.11.

The Court explained that "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Id.* at 2136 (emphasis in original). For that reason, the relevant "historical tradition" for purposes of a federal gun regulation is that which existed in 1791. *Id.* at 2136.[1] The farther forward in time one goes from 1791, the less probative historical evidence becomes. *See id.* at 2137 ("As we recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.").

The Court in *Bruen* held that, because New York could not point to a robust tradition of regulations distinctly similar to the "proper cause" requirement, the state's statute violated the Second Amendment. *Id.* at 2138-56. The Court did not provide a comprehensive scheme for evaluating historical evidence, but it did provide guideposts.

---

[1] The Court reserved the question whether courts entertaining challenges to state statutes should examine history as of 1868, when the Fourteenth Amendment was adopted. *Id.* at 2137-38.

### 1. Statutes addressing longstanding societal problems are subject to more rigorous scrutiny than statutes addressing historically "unprecedented" challenges.

To begin, the Court explained that the standard for reviewing historical evidence differs depending on what kind of problem a statute is intended to remedy—specifically, whether that problem is old or new. In "some cases," where a challenged statute "addresses a general societal problem that has persisted since the 18th century," the historical "inquiry will be fairly straightforward." *Id.* at 2131. The government can defend such statutes only by identifying a tradition of "distinctly similar" regulations from the founding era. *Id.* If "the Founders themselves could have adopted" a particular regulation to "confront" a problem that existed in 1791, but did not do so, then that regulation is unconstitutional today. *Id.*

In "other cases," a challenged statute will "implicat[e] unprecedented societal concerns or dramatic technological changes," or will be addressed to "challenges" that are "not . . . the same as those that preoccupied the Founders in 1791." *Id.* at 2132. Historical inquiry into such statutes "may require a more nuanced approach," which "will often involve reasoning by analogy." *Id.* Deciding "whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are *relevantly similar*." *Id.* (emphasis added).

### 2. The government must identify a "well-established and representative" tradition of comparable regulations.

Whether based on "distinctly similar" precursors or merely "relevantly similar" historical analogues, the "comparable tradition of regulation" must be robust. To carry its burden, the government must show that the historical tradition on which it relies is "well-established and representative." *Id.* at 2133; *see also id.* at 2137 (explaining that "a

governmental practice" can "guide [courts'] interpretation of an ambiguous constitutional provision" if that practice "has been open, widespread, and unchallenged since the early days of the Republic").

A handful of "outlier[]" statutes or cases from a small number of "outlier jurisdictions" do not make out a historical tradition. *Id.* at 2153, 2156. Moreover, even if certain statutes were widespread in the founding era, courts should not consider them determinative unless the historical record reveals the statutes were actually enforced. *See id.* at 2149 (dismissing surety laws, in part, because "respondents offer little evidence that authorities ever enforced [those] laws").

### 3. The government bears the burden of demonstrating that a statute is consistent with the Nation's historical tradition.

Finally, *Bruen* emphasized—repeatedly—that "the burden falls on [the government] to show that [a statute] is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2135; *see also id.* at 2127, 2130, 2141 n.11. Consistent with "the principle of party presentation," courts are "entitled to decide a case based on the historical record compiled by the parties." *Id.* at 2130 n.6. As a result, courts "are not obliged to sift the historical materials for evidence to sustain [a] statute. That is [the government's] burden." *Id.* at 2150; *see also id.* at 2149 n.25 ("[T]he burden rests with the government to establish the relevant tradition of regulation.").

## ARGUMENT

Under the framework announced in *Bruen*, § 922(g)(3) and § 922(n) violate Mr. Alston's Second Amendment right to keep and bear arms. Because possession of firearms comes within the Second Amendment's "plain text," Mr. Alston's conduct of possessing a firearm is presumptively protected. *Bruen* forecloses any argument, whether derived from *Heller* or elsewhere, that Mr. Alston's fundamental Second Amendment rights disappear

6

merely because of his drug use or his indictment. Instead, taking the *Bruen* court seriously demands that the Second Amendment right to bear arms be presumptively available to all of "the people," not meted out variably to different "subsets" of the people. The government can upset this presumption only by identifying a robust historical tradition of firearm regulation that disarmed citizens based on drug use or being under indictment, but it fails to do so. Therefore, the Court should dismiss Mr. Alston's indictment under § 922(g)(3) and § 922(n) as unconstitutional.

## III. MR. ALSTON'S INDICTMENT UNDER § 922(g)(3) FOR POSSESSION OF A FIREARM BY A DRUG USER VIOLATES HIS SECOND AMENDMENT RIGHT TO BEAR ARMS AND MUST BE SET ASIDE.

Section 922(g)(3) provides that it is unlawful for any person "who is an unlawful user of or addicted to any controlled substance" (as defined in Section 102 of the Controlled Substances Act (21 U.S.C. 802)) to "*possess* in or affecting commerce, any firearm . . . which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(g)(3) (emphasis added). Mr. Alston's indictment under § 922(g)(3) criminalizes his possession of a firearm, based merely on his use of marijuana, which presumptively violates his right to bear arms under the Second Amendment. Users of illicit substances possessing firearms is not a historically "unprecedented" challenge, and thus to rebut this presumption, the government is required to identify a "distinctly similar" regulation from the founding era that purported to address the societal challenge of intoxicated persons possessing firearms. The government fails this showing, and Mr. Alston's indictment under § 922(g)(3) should be set aside.

### A. Mr. Alston's conduct, prohibited by § 922(g)(3), is covered by the "plain text" of the Second Amendment.

*Bruen* directs courts to begin the Second Amendment analysis by asking whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 142 S. Ct. at 2126. The Second Amendment's operative clause contains three textual elements: it protects the

7

right of (1) "the people" to (2) "keep and bear" (3) "Arms." Here, Mr. Alston satisfies all three elements.

### 1. Mr. Alston's possession of a handgun is covered by the Second Amendment's protection of the right to "keep and bear Arms."

"The Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions." *Bruen*, 142 S. Ct. at 2111, 2156. Mr. Alston's possession of a firearm, the conduct prohibited by § 922(g)(3), categorically falls within the scope of the right to "bear arms." Furthermore, Mr. Alston's firearm was a handgun, which is a weapon "in 'common use' for self-defense today." *Id.* at 2143. Thus, his conduct is covered by the "plain text" of the Second Amendment.

### 2. Mr. Alston, as a substance user, is a member of "the people" entitled to Second Amendment rights.

#### a. *Heller* does not make the Second Amendment only available to the "law-abiding."

*Heller*, in its analysis of the Second Amendment's phrase the "right of the people," concluded that "the people" meant the same thing in the Second Amendment as in other parts of the Constitution. *Heller*, 544 U.S. at 580-81. In the other six Constitutional provisions "that mention 'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 544 U.S. at 580-81 (quoting *United States v. Verdugo–Urquidez*, 494 U.S. 259, 265 (1990)). The *Heller* Court characterized "the people" as a "term of art" referring to "persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Id.* at 580. *Heller* concluded that the Second Amendment belongs to "all Americans." *Id.* at 581.

Mr. Alston anticipates that the government will seize upon the following sentence in *Heller* to argue that certain subsets of people fall outside the protection of the Second

Amendment: "whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller*, 544 U.S. at 635. But while *Heller* made passing reference to "law-abiding, responsible citizens," it was not in the context of defining the term "the people." Only Justice Stevens' dissent described it as such. *Id*. at 644. Rather, *Heller* provides that, at the very least, such people are protected by the Second Amendment. By beginning the quoted passage with "whatever else it leaves to future evaluation," the Court made clear that its reference to "law-abiding, responsible citizens" was meant to establish a Second Amendment floor, not a ceiling. *See id.* at 635. The Court, in other words, held that law-abiding, responsible citizens have a right to possess firearms, but it did not address whether—much less rule out the conclusion that—other people have that right, too. In fact, Heller expressly left that question "to future evaluation." *Id*

Indeed, to insist that the Second Amendment protects only the rights of the law-abiding is inconsistent with *Heller's* decision to give the phrase "the people" in the Second Amendment the same meaning it carries in other amendments passed at the same time. For "even felons (and presumably irresponsible citizens as well) may invoke the protections" of the First and Fourth Amendments. *Heller*, 554 U.S. at 644 (Stevens, J., dissenting). Various courts and judges agree. According to then-Judge Barrett, *Heller* "interpreted the word 'people' as referring to 'all Americans.'" *Kanter v. Barr*, 919 F.3d 437, 453 (7th Cir. 2019) (Barrett, J., dissenting). So too Judge Bibas: "The text does not define 'the people' as 'the virtuous' or 'non-felons.'" *Folajtar v. Att'y Gen.*, 980 F.3d 897, 923 (3d Cir. 2020) (Bibas, J., dissenting). Discussing § 922(g)(1), the felon disarmament provision, Judge Bibas elaborated, "[f]elons are more than the wrongs they have done. They are people and citizens who are part of 'We the People of the United States.' U.S. CONST. pmbl. So, they too share in the Second

Amendment 'right of the people to keep and bear Arms,' subject only to the historical limits on that right." *Id*. at 912.

Rejecting the view that those with a criminal record or who engaged in criminal conduct (failing to pay taxes) are not among "the people" falling within the Second Amendment, the Seventh Circuit similarly explained:

> Many people, citizens and noncitizens alike, raising Fourth Amendment claims are likely to have a criminal record, but we see no hint in [Supreme Court precedent] that this is a relevant consideration . . . . Not only would this test be difficult to implement; it would also create the potential for a noncitizen to lose constitutional rights she previously possessed simply because she began to behave in a criminal or immoral way. The Second Amendment is not limited to such on-again, off-again protection.

*Meza- Rodriguez*, 798 F.3d at 671. Judge Barrett similarly observed, "[t]o say that certain people fall outside the Amendment's scope" means that "a person could be in one day and out the next…." *Kanter*, 919 F.3d at 452. Thus, that someone is a felon, or otherwise non-law-abiding, does not make him "categorically excluded from our national community," i.e., "the people." *Kanter*, 919 F.3d at 453 (Barrett, J., dissenting).

### b. Nor does *Bruen* make the Second Amendment only available to the "law-abiding."

*Bruen* only buttresses the conclusion that the Second Amendment is not a switchboard of rights to be turned on and off. In *Bruen*, the Court held that the right to bear arms extends outside the home, in part, because "nothing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." 142 S. Ct. at 2134. Just as the text of the Second Amendment does not "draw[] a home/public distinction with respect to the right to keep and bear arms," *id.*, it does not draw a drug-user/non-drug-user distinction. "[N]othing in the Second Amendment's text" suggests drug users are not among "the people" entitled to the amendment's protection. *See id*; *see also United States v.*

*Jimenez-Shilon*, 34 F.4th 1042, 1044-45 (11th Cir. 2022) (citing founding-era dictionaries and recognizing that felons and the mentally ill "are indisputably part of 'the people'").

Furthermore, whether "the people" refers only to "ordinary, law-abiding, adult citizens," was not at issue in *Bruen*, making any passing statement to that effect dicta. *Bruen*, 142 S. Ct. at 2134. Before addressing the question presented, *Bruen* simply explained that there was no dispute that petitioners—who alleged in "pleadings below" that they were "ordinary, law-abiding, adult citizens"—are part of "the people" whom the Second Amendment protects. *Id*. at 2124, 2134 (citing *Heller*, 544 U.S. at 580). It did not hold that non-law-abiding people are unprotected. That question was not presented. Instead, the court's resounding message was that "[t]he Second Amendment guaranteed to '*all Americans*' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions." *Id.* at 2156 (emphasis added).

Indeed, the context and briefs contributing to *Bruen* suggest that the Court's reasoning was at least informed by the extent to which the New York gun licensing scheme improperly divvied up Second Amendment rights for different groups. Most responsible for this contribution was the Brief for Black Attorneys of Legal Aid et al. as *Amici Curiae*, which revealed how New York's gun licensing scheme was in part motivated by racial fears. Brief for Black Attorneys of Legal Aid et al. as *Amici Curiae,* at 8-11. As the amici argued, the New York Police Department long lamented gun ownership as "a strong habit with both negroes and Italians," disproportionately prosecuted firearm possession in communities of color, and simultaneously granted police officers a permit upon leaving the force and accepting bribes from white business people to obtain firearm permits. *Id*. at 10, 11-12. Though only Justice Alito's concurrence cites the Black Attorneys' brief, acknowledging that fear of racial victimization understandably leads non-white Americans to possess a firearm,

*Bruen*, 142 S.Ct. at 2156 (Alito, J., concurring), the Black Attorneys' brief appropriately calls out the underlying context of the issue in *Bruen*: New York's law was essentially making the Second Amendment available only to "subsets" of the American people.

Acknowledging this context, the *Bruen* majority noted how Black Americans' exercise of the Second Amendment "was systematically thwarted" after the Civil War. *Bruen*, 142 S.Ct. at 2151; *see also McDonald*, 561 U.S. at 771, 130 S.Ct. 3020 (noting the "systematic efforts" made to disarm Blacks); *id.*, at 845–847, 130 S.Ct. 3020 (THOMAS, J., concurring in part and concurring in judgment); *see also* S. Exec. Doc. No. 43, 39th Cong., 1st Sess., 8 (1866) ("Pistols, old muskets, and shotguns were taken away from [freed slaves] as such weapons would be wrested from the hands of lunatics"). Thus, *Bruen* should be understood not only to eschew a law-abiding versus non-law-abiding distinction but also to broadly respond to legal paradigms which condition access to Second Amendment rights.

In the wake of *Bruen*, at least one court facing a Second Amendment challenge to § 922(g)(3) had no trouble concluding that drug users, like Mr. Alston, are part of "the people" to whom Second Amendment rights are guaranteed. *United States v. Harrison*, No. CR-22-00328-PRW, 2023 WL 1771138, at *4 (W.D. Okla. Feb. 3, 2023). The *Harrison* court noted that excluding drug users from the Second Amendment, as the government urged, represented "precisely the sort of carving out of a subset from 'all Americans' that the *Heller* Court rejected." *Id.* at 4. Indeed, in response to the government's insistence that drug users had traditionally been excluded from "the people," the court noted the government was jumping the gun by "shoehorn[ing]" the history and tradition inquiry of *Bruen*'s second step onto the first, which merely asks whether "the text of the Second Amendment" protects an individual's conduct. *Id.*; *see also United States v. Carrero*, No. 2:22-CR-00030, 2022 WL 9348792, at *2 (D. Utah Oct. 14, 2022) (holding, post-*Bruen*, that felons are among "the

people" protected by the Second Amendment); *United States v. Coombes*, No. 22-CR-00189-GKF, 2022 WL 4367056, at *4 (N.D. Okla. Sept. 21, 2022) (same).

Here, Mr. Alston is a member of "the people" to whom the Constitution extends Second Amendment rights. Following the lead of *Bruen*, *Heller*, *Harrison*, and others, Second Amendment rights are not unqualified, but nor are they turned on and off by an individual's conduct, especially at *Bruen*'s first step. Mr. Alston does not lose membership in our political community merely by way of using marijuana; such conduct does not carve him out from constitutional protection. To find otherwise would perpetuate the race- and class-based access to the Second Amendment that prompted *Bruen*'s landmark decision in the first place.

In sum, the Second Amendment presumptively protects Mr. Alston's possession of a firearm. The question becomes whether the government can identify a historical tradition of firearm regulation supports disarming drug users. See *Bruen*, 142 S. Ct. at 2135. It cannot.

### B. The government cannot identify a historical tradition of firearm regulation that supports disarming citizens based on using marijuana.

Because "the Second Amendment's plain text covers Mr. Alston's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2126. To rebut the presumption, the government must establish that § 922(g)(3) is "consistent with this Nation's historical tradition of firearm regulation." *Id.* Furthermore, because § 922(g)(3) addresses a problem that existed in 1791 and is not historically "unprecedented," the government must point to a robust tradition of "*distinctly similar* historical regulation[s]" as of 1791. *Id.* at 2131 (emphasis added). The government is unable to make that showing.

### 1. Firearm possession by users of illicit substance is not a new problem.

"[T]he societal problem addressed by § 922(g)(3), possession of firearms by users of substances with the potential for abuse, is not new." *Harrison*, 2023 WL 1771138, at *6.

"[T]he colonists brought with them from Europe a high regard for alcoholic beverages. Distilled and fermented liquors were considered important and invigorating foods, whose restorative powers were a natural blessing. People in all regions and of all classes drank heavily," from morning into the evening.[2]

Meanwhile, drugs such as opium, morphine, heroin, cocaine, and marijuana were considered effective pain killers, cures for ailments, and mood inhibitors.[3] The use of opium to treat various sicknesses was introduced by British settlers in the early 18th century but continued for most of America's early history. *See DEA History* at 12; Juan Joel Tovanche, *Dying to Wait: How the Abigail Court Got It Wrong*, 22 J.L. & HEALTH 53 (2009) (noting that Benjamin Franklin was a major proponent of drug use, and explaining that opium was used to treat soldiers during the American Revolution). Indeed, Southern Whites had the highest addiction rate of any regional racial group in the country according to documents from addiction centers and pharmacy records. David T. Courtwright, *The Hidden Epidemic: Opiate Addiction and Cocaine Use in the South*, 1860-1920, 49 THE JOURNAL OF SOUTHERN HISTORY, 57-72 (1983).

Such widespread use of intoxicating or addictive substances suggests that the problem of mixing guns and substances was present for policymakers and citizens at the time of the founding. But, importantly, they chose not to pass regulations disarming "the people" based on substance use. As is demonstrated below, state and federal regulations attempting to disarm drug users did not appear until many generations after 1791.

---

[2] Paul Aaron and David Musto, *Temperance and Prohibition in America: A Historical Overview*, 131 (1981) (last accessed Feb. 27, 2023), available at https://www.ncbi.nlm.nih.gov/books/NBK216421/pdf/Bookshelf_NBK216421.pdf.

[3] Drug Enforcement Administration, DEA History: The Early Years at 12, (last accessed Feb. 27, 2023), available at https://www.dea.gov/documents/1919/1919-12/1919-12-17/dea-history-early-years.

14

2. **The government cannot identify a "distinctly similar" historical tradition of firearm regulation that supports disarming citizens based on purported drug use.**

Mr. Alston is unable to identify a single historical source from the time of the American Colonies and the early Republic which disarmed citizens, in the home or elsewhere, based on being a user of intoxicants. *See Bruen*, 142 S. Ct. at 2135. Indeed, in *Harris*, which faced this exact question, the government's brief acknowledged that "no similar provision" to § 922(g)(3)'s prohibition on firearm possession by an "unlawful user" of any controlled substance or addict "existed at the time of ratification." *Harris*, 2023 WL 1771138, Government's Brief, at 17-18. Here, the lack of a "distinctly similar" historical regulation prohibiting users of intoxicants from possessing firearms establishes that § 922(g)(3) is inconsistent with the Second Amendment. Though some statutes related to drug or alcohol use did exist, they all fail to represent a sufficiently robust historical tradition under the *Bruen* framework.

a. **No state or federal law from the time of the American Colonies and the early Republic supports disarming users of intoxicants.**

Based on independent research, state regulations regarding the possession or use of guns by people under the influence of drugs or alcohol only arose in the late 19th century. Where they did arise, they overwhelmingly prohibited firearm use or possession while intoxicated. They did not disarm American's merely based on their status as a substance user. Mr. Alston is aware of the following 19th century statutes that prohibited *carrying* or *using* firearms *while* under the influence, some applicable only to public or peace officers:

> **General Statutes of Kansas 1868**: Prohibiting "any person under the influence of intoxicating drink" from "carrying… [a] deadly weapon."

> **Ordinance No. 1, Jul. 2, 1877, reprinted in THE MINING ECHO, Jul. 7, 1877, at 1 (Empire City, Kansas):** "Any person

15

who shall, while exercising the right to carry firearms, not concealed, be intoxicated…shall be deemed guilty of a misdemeanor…."

**1883 Mo. Laws 76, An Act to Amend Section 1274, Art. 2, Ch. 24, §1**: Prohibiting persons from "carry[ing] certain weapons "upon or about his person when intoxicated or under the influence…."

**1890 Okla. Laws 495, art. 47**: "Public officers while in the discharge of their duties…shall be permitted to carry arms…Provided, however, That if any public officer be found carrying such arms while under the influence of intoxicating drinks, he shall be deemed guilty of a violation of this article as though he were a private person."

**1907 Ariz. Sess. Laws 15, ch. 16, §1**: "It shall be unlawful for any constable or other peace officer in the Territory of Arizona, while under the influence of intoxicating liquor…to carry or have on his person a…firearm…."

**1909 Id. Sess. Laws 6, §1**: Prohibiting persons from carrying certain weapons "when intoxicated, or under the influence…."

**1916 N.J. Laws 275-76, ch.130, §§1-2**: "It shall be unlawful for any person to go into the woods…with a gun…when intoxicated or under the influence of any drug…."

**1931 Mich. Pub. Act 671, Michigan Penal Code, ch. 36, §237**: "Any person under the influence of intoxicating liquor or any exhilarating or stupefying drug who shall carry, have in possession or under control, or use… any firearm within this state, shall be guilty of a misdemeanor."

Meanwhile, the federal government did not explicitly proscribe "drug users" from possessing guns until the Gun Control Act of 1968, the predecessor of 18 U.S.C. § 922. At the time of enactment, this law prohibited people under indictment for, or who were convicted of a crime punishable by imprisonment of at least one year from receiving, shipping, or transporting a firearm. 82 Stat. §§ 922(d)(1), (g)(1). This same section also prohibited the sale or receipt of firearms to "unlawful user[s] of or addicted to marihuana or any depressant or stimulant drug . . . or narcotic drug" and those who "ha[d] been adjudicated

16

as a mental defective or ha[d] been committed to any mental institution." 82 Stat §§ 922(d)(3)-(4), (g)(3)-(4). Most importantly, the Gun Control Act of 1968, as written in 1968, did not prohibit firearm *possession*. Instead, the Act prohibited the transfer, sale, shipping, and receipt of firearms by these populations of people. See 82 Stat. §§ 922(d), (g)-(h). Later, it prohibited the possession of guns by felons and "drug users."[4]

Though related to substance use, these laws fail on a number of fronts: (1) They address the societal problem in a materially different manner as they prohibit carrying or using a firearm publicly while intoxicated, instead of possessing a firearm while having the status of a user, *see Bruen*, 142 S. Ct. at 2131; (2) they "come too late" to establish a historical tradition, *see id.* at 2137; and (3) the regulations are not enough to satisfy the government's significant burden to identify a "well-established and representative historical analogue," *id.* at 2133.

### i.  The cited regulations are materially different.

The cited 19th and 20th century statutes do not evince a "comparable" burden to that of § 922(g)(3). *Bruen*, 142 S. Ct. at 2131-32. Section 922(g)(3) denies the right to possess any gun at all, in any setting, and for any purpose. It thus represents a total infringement of the core right to possess guns in the home for self-defense. By contrast, the burden imposed by the older statutes is much more modest. The older statutes only apply outside the home, and only when someone is carrying or using a firearm while actively intoxicated. It therefore leaves intact the core right recognized by *Heller*. That post-ratification generations addressed

---

[4] United States Department of Justice, *History of Federal Firearms Laws in the United States*, (last accessed Feb. 27, 2023), available at https://www.justice.gov/archive/opd/AppendixC.htm.

the societal problem "through materially different means" is further evidence the modern regulation in § 922(g)(3) is unconstitutional. *Bruen*, 142 S. Ct. at 2131.

### ii. The cited regulations "come too late."

Even if they imposed comparable burdens, state regulations from the 1860s-1880s, and certainly federal regulations from the 1960s, "come too late" to establish a historical tradition of disarming users of intoxicants. *Id*. at 2137. Justice Barrett's Bruen concurrence, like the opinion itself, suggests that 1791 (when the Bill of Rights was ratified) is the correct date for assessing the scope of permissible federal regulation of an individual right. *Bruen*, 142 S. Ct. at 2137-39, 2163 (Barrett, J., concurring). Sources from "75 years after the ratification of the Second Amendment" provide little insight into original meaning. *Id*. The Court viewed 19th-century evidence as relevant only insofar as it provided "confirmation" of earlier sources. *Id*. Here, Mr. Alston is not aware of any earlier sources.

### iii. The cited regulations do not constitute a "well-established and representative historical analogue."

Even if the cited regulations are considered, they are not enough to satisfy the government's significant burden to identify a "well-established and representative historical analogue." *Id*. at 2133. The *Bruen* majority "doubt[ed]" that "*three* colonial regulations" proffered by respondents were sufficient to show a tradition of public carry regulation. *Id*. at 2142. Here, Mr. Alston cannot identify *any* colonial regulations prohibiting users of intoxicants from possessing guns. As for the few 19th- and 20th-century restrictions, none restricts firearm possession by users of intoxicants comparable to § 922(g)(3). These statutes are exactly the kinds of "outliers" on which the *Bruen* Court refused to rely. *Id*. at 2153.

### 3. Even if substance users' possession of a firearm was an "unprecedented" challenge "unimaginable" to the Founders, § 922(g)(3) is not sufficiently analogous—or "relevantly similar"—to any purported historical regulations to pass Constitutional muster.

Given the widespread use of substances at the time of the founding—from alcohol to opium, from the battlefield to the pharmacy—it is doubtful that mixing firearms and substances was a societal challenge "unimaginable" to the Founders. But even if it were, the government cannot identify a "relevantly similar" tradition of firearm regulation to justify § 922(g)(3). Mr. Alston anticipates the government will project a historical tradition of disarming the "unvirtuous" or the "dangerous," but both claims should fail as they lack historical pedigree.

### a. No "relevantly similar" tradition existed.

The founding generation did not view virtuousness as limiting the right to keep and bear arms. To the extent that some courts concluded prior to *Bruen* that the right to bear arms was tied to the concept of a virtuous citizenry, *but see Folajtar v. Att'y Gen. of the United States*, 980 F.3d 897 (3d Cir. 2020) 980 F.3d at 913, 915 (Bibas, J., dissenting) (explaining it was the *Binderup* plurality that espoused the virtue theory); *Boyd*, 999 F.3d at 185-86 (discussing historical limitations tied to dangerousness without referencing virtue), others acknowledged that the "relevance of virtue" remained an "ongoing debate." *Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, 5 F.4th 407, 436 (4th Cir.), as amended (July 15, 2021), vacated as moot, 14 F.4th 322 (4th Cir. 2021), cert. denied sub nom. *Marshall v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 212 L. Ed. 2d 540 (Apr. 4, 2022).

*Bruen* demands a new answer. *Bruen*, 142 S. Ct. at 2126-28 ("the government must affirmatively prove that its firearms regulation" is consistent with the historical tradition of firearms regulation by pointing to analogous regulations that preceded and immediately followed ratification). As Judge Bibas explains in his *Folajtar* dissent, the virtue theory of disarmament "is

not supported by history." *Folajtar*, 980 F.3d at 915; *see also Binderup v. Att'y Gen.*, 836 F.3d 336, 371-73 (3d Cir. 2016) (Hardiman, J., concurring) ("We have found no historical evidence" "indicating that 'virtuousness' was a limitation on one's qualification for the right—contemporary insistence to the contrary falls somewhere between guesswork and *ipse dixit*."). It derives from the *Binderup* plurality, which itself relied on "academic sources" lacking any historical foundation. *Folajtar*, 980 F.3d at 915-20 (Bibas, dissenting). "The focus on virtue rests on strained readings of colonial laws and ratifying conventions perpetuated by scholars and courts' citing one another's faulty analyses. The only piece of historical evidence that comes close to endorsing a ban of all former felons is a Pennsylvania *minority* proposal that was rejected. None of this proves that the Founders limited the Second Amendment right to virtuous citizens . . . ." *Id*. (explaining that although a *minority* of the Pennsylvania ratifying convention proposed to guarantee the right of arms "unless for crimes committed," the minority "failed to persuade its own state, let alone others"; a "single failed proposal is too dim a candle to illuminate the Second Amendment's scope."); *see also* Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 HASTINGS L.J. 1371, 1375 (2009) (the strongest support offered for felon-dispossession is the minority report by Pennsylvania Anti-Federalists, "opponents of the Constitution, and its text is not reflected in the Second Amendment").

Drawing on then-Judge Barrett's *Kanter* dissent and Judge Hardiman's *Binderup* concurrence, Judge Bibas marshaled historical evidence showing that English and early American restrictions on firearm possession were tied to dangerousness, "not some vague notion of 'virtue.'" *Folajtar*, 980 F.3d at 914-20. The few colonial and early American regulations cited as support disarmed (at least temporarily) those who refused to swear a loyalty oath (while at times exempting weapons for defense of house and self). *See Kanter*, 919 F.3d at 457-58 (Barrett, J.,

dissenting). People loyal to another sovereign were disarmed because they posed a danger to the government in power. In short, dangerousness throughout English and early American history was tied to disloyalty, *e.g.*, those sympathetic to the Crown during the Revolution. *Folajtar*, 980 F.3d at 913 (Bibas, dissenting); *ibid*, 914-15. *See Kanter*, 919 F.3d at 455-56 (Barrett, dissenting). *See also* Joseph G.S. Greenlee, *The Historical Justification For Prohibiting Dangerous Persons From Possessing Arms*, 20 Wyo. L. Rev. 249, 263-65 (2020). Section 922(g)(3)'s burden on drug users is not "comparably justified" by a threat to sovereignty or nationhood, and thus is not "relevantly similar" to those regulations. *See Bruen,* 142 S. Ct. at 2133.

Mr. Alston expects the government to take the position that if there is a tradition of disarming the dangerous, that tradition included those who pose a threat to public safety. But the historical record does not reveal that statutes disarming those posing a threat to public safety were widespread. And even assuming for sake of argument that "dangerousness" sweeps in persons who commit non-political acts of violence, users of intoxicants do not fall within that category.

Furthermore, the government's anticipated assertion regarding the potential danger arising from carrying a firearm while impaired is inapposite, as § 922(g)(3) does not require that the person possessing the firearm actually be under the influence. Rather, the challenged regulation prohibits "unlawful users" of any controlled substance from possessing firearms even in the home for self-defense and does not require users be actively under the influence of a controlled substance or actively possessing of a firearm. *See United States v. Augustin*, 376 F.3d 135, 139 (3d Cir. 2004) (explaining that § 922(g)(3) outright forbids possession based on *status* as an "unlawful user" at or about the time he or she possessed the firearm).

> **b. The government's anticipated focus on "virtue" and "dangerousness" is misplaced and merely replicates the means-ends scrutiny that *Bruen* rejected.**

*Bruen* established, in discussing firearm regulations in sensitive places, that any exceptions to "the Second Amendment's unqualified command" must be defined narrowly. *Bruen*, 142 S. Ct. at 2130. As noted, Mr. Alston anticipates that the government will argue that unlawful drug users are unvirtuous or dangerous and are not entitled to Second Amendment protections. But the Second Amendment exceptions that the government's approach would produce are grossly overbroad and in direct conflict with *Bruen*.

The category of "dangerous" persons, for example, is neither "well-defined," *Bruen*, 142 S. Ct. at 2156, nor "narrowly limited," *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 791 (2011). "Dangerous" is an elastic, malleable term that, in the wrong hands, could be applied to virtually any group of people—and therefore one that the government could use to "shoehorn" historically protected groups into unprotected status. *Brown*, 564 U.S. at 793. The term "dangerous," in other words, is the kind of "highly manipulable" metric that the Supreme Court has said governments may not use to limit citizens' fundamental constitutional rights. *United States v. Stevens*, 559 U.S. 460, 472 (2010). The "unvirtuous" label is even less "well-defined" and "narrowly limited."

More importantly, applying the "dangerous" and "unvirtuous" labels would require precisely the "judge-empowering interest-balancing inquiry" that *Bruen* forbids. 142 S. Ct. at 2129. After explaining its metrics for "relevantly similar," *Bruen* cautioned, "[t]his does not mean that courts may engage in independent means-end scrutiny under the guise of an analogical inquiry." *Id.* at 2133 n.7. But that is what is happening here. When the government defines "dangerous" or "virtuous" at a high level of generality, as it does here,

it is attempting to embroil courts in exactly the kind of means-ends balancing *Bruen* rejected. That approach cannot be right.

Section 922(g)(3) violates the Second Amendment as it was understood at the time of its adoption. The Court should therefore dismiss the indictment against Mr. Alston.

## IV. MR. ALSTON'S INDICTMENT UNDER § 922(n) FOR POSSESSION OF A FIREARM WHILE UNDER INDICTMENT VIOLATES HIS SECOND AMENDMENT RIGHT TO BEAR ARMS AND MUST BE SET ASIDE.

Section § 922(n) provides that it is unlawful for any person "who is under indictment for a crime punishable by imprisonment for a term exceeding one year to . . . receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(n). Mr. Alston's indictment under § 922(n) criminalizes his receiving a firearm based merely on his status as a person under indictment, which presumptively violates his right to bear arms under the Second Amendment. Receipt or possession of a firearm by a person under indictment is not a historically "unprecedented" challenge, and thus to rebut this presumption, the government is required to identify a "distinctly similar" regulation from the founding era that purported to address the societal challenge of indictees possessing firearms. As the government fails this showing, Mr. Alston's indictment under § 922(n) should be set aside.

### A. Mr. Alston's conduct, prohibited by § 922(n), is covered by the "plain text" of the Second Amendment.

The question of whether Mr. Alston's conduct—possession of a firearm by an indictee—is covered by the "plain text" of the Second Amendment largely repeats the analysis set forth above with respect to § 922(g)(3). Those arguments are incorporated herein for reference.

### 1. Mr. Alston's receipt of a handgun is covered by the Second Amendment's right to "keep and bear Arms."

"The Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions." *Bruen*, 142 S. Ct. at 2111, 2156. Mr. Alston's receipt of a firearm, the conduct prohibited by § 922(n), categorically falls within the scope of the right to "bear arms." To suggest otherwise would be absurd, because how could one bear arms without first receiving them? Mr. Alston's firearm was a handgun, which is a weapon "in 'common use' for self-defense today." *Id.* at 2143. Thus, his conduct is covered by the "plain text" of the Second Amendment.

### 2. Mr. Alston, as an indictee, is a member of "the people" entitled to Second Amendment rights.

As argued above, the Second Amendment is not a switchboard of rights to be turned on and off. It is presumptively available to all. And just as drug user is a member of the people, so too is an indictee—who has not even been convicted of unlawful conduct.

Indeed, the issue seems even clearer for indictees, as several courts interpreting *Bruen* have held that felony indictees are members of "the people" entitled to Second Amendment rights. *See United States v. Gore*, No. 2:23-CR-04, 2023 WL 2141032, at *2 (S.D. Ohio Feb. 21, 2023) (felony indictees are covered by plain text of Second Amendment); *United States v. Kelly*, No. 3:22-CR-00037, 2022 WL 17336578, at *2–3 (M.D. Tenn. Nov. 16, 2022) (same); *United States v. Rowson*, No. 22 CR. 310 (PAE), 2023 WL 431037 (S.D.N.Y. Jan. 26, 2023) (same); *United States v. Kays*, No. CR-22-40-D, --- F.Supp.3d ----, 2022 WL 3718519 (W.D. Okla. Aug. 29, 2022) (same); *United States v. Quiroz*, No. PE:22-CR-00104-DC, --- F.Supp.3d ----, 2022 WL 4352482 (W.D. Tex. Sept. 19, 2022) (same); *United States v. Holden*, No. 3:22-CR-30 RLM-MGG, --- F.Supp.3d ----,

2022 WL 17103509 (N.D. Ind. Oct. 31, 2022) (same); *United States v. Hicks*, No. W:21-CR-00060-ADA, --- F.Supp.3d ----, 2023 WL 164170 (W.D. Tex. Jan. 9, 2023) (same).

Finally, as emphasized in Subsection III(A)(2) of this Motion, *Heller* and *Bruen* do not make the Second Amendment only available to the "law-abiding" by excluding subsets of "the people," such as indictees. The words "the people" in the Second Amendment and throughout the Constitution "unambiguously refer[] to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580. Mr. Alston is a member of that community and is entitled to Second Amendment rights.

**B. The government cannot identify a historical tradition of firearm regulation that supports disarming citizens based on indictee status.**

Because the plain text of the Second Amendment protects receipt and possession of a firearm, the Government bears the burden to show that the restriction in § 922(n) is "consistent with the Nation's historical tradition of firearm regulation." *See Bruen*, 142 S.Ct. at 2130. Specifically, the government must point to a robust tradition of "*distinctly similar* historical regulation[s]" as of 1791, because § 922(n) addresses a problem that existed in 1791 and is not historically "unprecedented." *Bruen*, 142 S.Ct. at 2131 (emphasis added).

The government cannot meet this burden. There is no such historical tradition of depriving an individual of their Second Amendment right, based solely on an indictment. After all, to deprive a subset of "the people" of their right to bear arms without consideration of the nature of the underlying offense, a particularized assessment of an individual's dangerousness, or any other process bearing on the person's guilt would constitute a remarkable limit on a person's Second Amendment liberties, inconsistent with the Nation's history or its jurisprudence as announced in *Heller* and *Bruen*. *See also Estelle*

*v. Williams*, 425 U.S. 501, 503 (1976) ("The presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice").

      **1.   The government fails its burden to identify a "distinctly similar" historical tradition of firearm regulation that supports disarming citizens based on indictee status.**

As in *Heller* and *Bruen*, historical examples of regulations proffered by the Government must be "distinctly similar" to § 922(n) because the restriction does not address "unprecedented societal concerns or dramatic technological changes[.]" *Bruen*, 142 S.Ct. at 2132–33. Section 922(n) creates a total ban on firearm receipt based on an individual's indictment—a criminal legal process older than and expressly discussed in the Fifth Amendment of the Constitution. *See* U.S. CONST. amend. V. Given the existence of indictments at the time of the founding, as well as the Framers' profound concern for the criminal legal process in general, the receipt of a firearm by a person indicted under such criminal legal processes was not an "unprecedented" or "unimaginable" challenge at the time of the Founding.

The Government cannot meet its burden to show that the Nation's history, particularly in the late 18th century, supports firearm restrictions for individuals under indictment or "distinctly similar" restrictions. "Indictment has historically had a limited effect on an individual's constitutional rights." *United States v. Laurent*, 861 F.Supp.2d 71, 91 (E.D.N.Y 2011). And the impact on an indicted person's rights has generally been limited to detention or certain pre-trial conditions only after a judicial determination that such conditions are necessary. *Id.* at 90–93 (citing *United States v. Salerno*, 481 U.S 739, 764 (1987); 18 U.S.C. § 3142).

### a. Federal prohibitions of indictees' firearm possession "come too late" under the *Bruen* framework to be "distinctly similar."

Only centuries after the Founding did Congress begin barring indicted individuals from receiving firearms. Congress first passed a law prohibiting transporting firearms for individuals under indictment for a crime of violence in 1938. *See* Federal Firearms Act of 1938, 75 Cong. Ch. 850, § 2(e), 52 Stat. 1250, 1251 (repealed). It was not until 1961 that Congress expanded the prohibition to include all individuals under indictment. *See* Act of Oct. 3, 1961, Pub. L. No. 87–342, 75 Stat. 757 (repealed). The statute was again clarified in 1968, to include indictments in state and federal court, but only for those felonies punishable by more than one year in prison. *See* Gun Control Act of 1968, Pub. L. 90–618, 82 Stat. 1213 (codified at 18 U.S.C. §§ 921–928).

The Government cannot rely on the passage of § 922(n) in the mid-20th century to establish a long-standing historical tradition back to the enactment of the Second Amendment, particularly where it contradicts the plain language of the Constitution's text. *See Bruen*, 142 S. Ct. at 2136–37. The Supreme Court specifically declined to consider any 20th century evidence offered by the respondents in *Bruen*, noting it "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id.* at 2154 n.28.

### b. No state laws from the founding era are "distinctly similar."

Mr. Alston anticipates the government will point to state felon-in-possession laws or surety laws as "distinctly similar" historical traditions, but both fall short.

*Felon-in-possession laws*

Though English law had a "long history of disarming citizens for any reason or no reason at all," the colonies' attitude toward disarming individuals diverged from its English

roots. *United States v. Quiroz*, No. PE:22-CR-00104-DC, 2022 WL 4352482, at *6 (W.D. Tex. Sept. 19, 2022) (citing Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & HIST. REV. 139, 155 (2007)). "Indeed, when Virginia disarmed all citizens who refused to take an allegiance test, it did so only partially, allowing citizens to keep "such necessary weapons as shall be allowed him by order of the justices of the peace at their court, for the defense of his house and person." *Id.* (citing 1 George I, stat. 2, c. 13 (1714); "An Act for Disarming Papists and Reputed Papists, refusing to take the oaths to the Government," (1756), Hening, STATUTES AT LARGE, 7:35). By the time the Second Amendment was up for adoption, the colonies had "consistently refrained from exercising such a power over citizens." *Id.* (citing Churchill, *Gun Regulation* at 157).

Not until 1886 did a state court even rule on a firearm regulation that regulated "the condition of a person"—such as his status as an indictee—rather than "directly regulating his manner of carrying." C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 HARV. J.L. & PUB. POL'Y 695, 711 (2009). That case, *Missouri v. Shelby*, upheld a ban on carrying a deadly weapon while intoxicated. 90 Mo. 302, 2 S.W. 468 (1886). "And even though other state courts eventually ruled on laws regulating the condition of a person, very few states prohibited felons—or any other type of person for that matter—from possessing a firearm." *Quiroz*, 2022 WL 4352482, at *7. In fact, "by the mid-1920s, only six states had laws banning concealed carry by someone convicted of a crime involving a concealed weapon. And zero states banned possession of long guns based on a prior conviction." *Id.* (citing Marshall, *Why Can't Martha Stewart Have A Gun?*, at 708). These findings suggest that the colonies and the early Republic, though not monolithic, did not

have a "longstanding" tradition of disarming even convicted felons, much less those merely indicted.

### Surety statutes

Several states adopted surety laws in the mid-19th century as a way of limiting certain persons' access to weapons. *United States v. Holden*, No. 3:22-CR-30 RLM-MGG, 2022 WL 17103509, at *4 (N.D. Ind. Oct. 31, 2022). The statutes required a person "reasonably likely to 'breach the peace,' and who, standing accused, could not prove a special need for self-defense, to post a bond before publicly carrying a firearm." *Quiroz*, 2022 WL 4352482, at *7. In other words, an accused person could overcome the prohibition if he showed an individualized need to carry a weapon for self-defense, or if he posted a bond. *Holden*, 2022 WL 17103509, at *4.

These surety statutes, raised in *Bruen*, are not "distinctly similar" to § 922(n). Whereas § 922(n) amounts to a total deprivation of the right to bear arms for those under certain forms of indictment, there is "little support in the historical record" to suggest that surety statutes even came close to a "severe restraint." *Holden*, 2022 WL 17103509, at *4 (citing *Bruen*, 142 S. Ct. at 2149). Justice Thomas, writing for the *Bruen* majority, frankly doubted that the surety statutes were regularly enforced or even meant as "punishment" at all. *Bruen*, 142 S. Ct. at 2149. Thus, compared to § 922(n), the surety statutes fall far short of "distinctly similar."

The lack of a "distinctly similar historical regulation" restricting firearm receipt for individuals under indictment demonstrates that § 922(n) is inconsistent with the Second Amendment. *See Bruen*, 142 S. Ct. at 2131.

**2. Even if indictees' possession of a firearm was an "unprecedented" challenge "unimaginable" to the Founders, § 922(n) is not sufficiently**

**analogous—or "relevantly similar"—to any purported historical**
**regulations to pass Constitutional muster.**

Even if § 922(n) were construed to be addressing a uniquely modern social problem, such that the Court could expand its historical analysis to include "relevantly similar" historical analogues, the Government still cannot prove § 922(n)'s consistency with historical tradition. *See Bruen*, 142 S. Ct. at 2132–33.

As noted, several district courts have faced this question, and several have held § 922(n) to be unconstitutional under *Bruen*. *United States v. Hicks*, No. W:21-CR-00060-ADA, 2023 WL 164170, (W.D. Tex. Jan. 9, 2023); *United States v. Quiroz*, No. PE:22-CR-00104-DC, ⸺ F.Supp.3d ⸺, 2022 WL 4352482 (W.D. Tex. Sept. 19, 2022); *United States v. Holden*, No. 3:22-CR-30 RLM-MGG, ⸺ F.Supp.3d ⸺, 2022 WL 17103509 (N.D. Ind. Oct. 31, 2022); *United States v. Stambaugh*, No. CR-22-00218-PRW-2, ⸺ F.Supp.3d ⸺, 2022 WL 16936043 (W.D. Okla. Nov. 14, 2022). Each found that no "relevantly similar" tradition existed to support § 922(n).

In particular, each condemned the government's assertion that surety laws, mentioned above, amounted to a "relevantly similar" tradition. *See, e.g.*, *Holden*, 2022 WL 17103509, at *4 (holding that § 922(n) is "meaningfully different than surety laws, so surety laws don't provide the historical support needed" to sustain § 922(n)). Surety laws restricted firearm possession, but their prohibition was surmountable: the regulated person could bear a firearm if he had an individualized need for self-defense or if he posted a bond. *Id.* Section 922(n), on the other hand, imposes an absolute prohibition. Anyone under indictment is prohibited from receiving a firearm no matter how grave their need for armed self-defense and no matter their willingness and ability to pay a bond. *Id.* "Although an analogy needn't be a 'historical twin' and the government's burden isn't a 'regulatory

straightjacket,' the difference between surety laws and § 922(n) is substantial because the laws address the same societal problem . . . through materially different means." *Id.*

Also condemned was the government's pointing to *United States v. Yancey*, 621 F.3d 681, 684–85 (7th Cir. 2010), to argue that legislatures have long had the right to disarm "unvirtuous citizens." *Yancey*'s reasoning on "unvirtuous citizens" quotes an influential 1868 constitutional treatise, which stated constitutional rights did not apply to "the idiot, the lunatic, and the felon." *Yancey*, 621 F.3d at 685 (citing Thomas M. Cooley, *A Treatise on Constitutional Limitations* 29 (Boston, Little Brown & Co. 1868). But omitted is how blacks were treated the same as lunatics: "Pistols old muskets, and shotguns were taken away from [freed slaves] as such weapons would be wrested from the hands of lunatics." Justice Thomas included the same omission in *Bruen*. 142 S. Ct. at 2151.

Suffice it to say that laws based on disarming unvirtuous citizens—wherein the term unvirtuous meant blacks as much as lunatics—is not a "relevantly similar" historical analog to § 922(n). And if it is, the government arguably has other problems. *See Quiroz*, 2022 WL 4352482, at *11 ("Another reason that § 922(n) warrants skepticism is the historical misappropriation of law to pretextually and unlawfully disarm unfavored groups.").

The government cannot meet its burden to identify a "relevantly similar" historical tradition of firearm regulation that supports disarming individuals who have been merely indicted.

V.    **CONCLUSION**

The government has failed to demonstrate that § 922(g)(3) and § 922(n) are supportable by any historic tradition of firearm regulation in the United States, rendering

them unconstitutional under *Bruen* and the Second Amendment. This Court should dismiss both counts of the indictment against Mr. Alston.

Respectfully requested this 28th day of February, 2023.

G. ALAN DUBOIS
Federal Public Defender

/s/ Edward D. Gray
EDWARD D. GRAY
Assistant Federal Public Defender
Attorney for Defendant
Office of the Federal Public Defender
150 Fayetteville Street, Suite 450
Raleigh, North Carolina 27601
Telephone: 919-856-4236
E-mail: Edward_Gray@fd.org
N.C. State Bar No. 37539
LR 57.1 Counsel Appointed

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was served upon:

> Sarah E Nokes
> Assistant United States Attorney
> United States Attorney's Office
> Eastern District of North Carolina
> 150 Fayetteville Street, Suite 2100
> Raleigh, NC 27601

by electronically filing the foregoing with the Clerk of Court on February 28, 2023, using the

CM/ECF system which will send notification of such filing to the above.

This the 28th day of February, 2023.

> G. ALAN DUBOIS
> Federal Public Defender
>
> /s/ Edward D. Gray
> EDWARD D. GRAY
> Assistant Federal Public Defender
> Attorney for Defendant
> Office of the Federal Public Defender
> 150 Fayetteville Street, Suite 450
> Raleigh, North Carolina 27601
> Telephone: 919-856-4236
> E-mail: Edward_Gray@fd.org
> N.C. State Bar No. 37539
> LR 57.1 Counsel Appointed