IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:23-CR-21-FL-RN-1

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | GOVERNMENT'S RESPONSE IN |
| v. | ) | OPPOSITION TO DEFENDANT'S |
| | ) | MOTION TO DISMISS THE |
| CARLOS ALSTON | ) | INDICTMENT |

The United States of America, by and through the United States Attorney for the Eastern District of North Carolina, hereby responds in opposition to Defendant's motion to dismiss the Indictment (D.E. 17). The Indictment charges the defendant with possession of a firearm by an unlawful user of, or person addicted to, controlled substances, in violation of 18 U.S.C. § 922(g)(3) and receipt of a firearm by a person under felony indictment, in violation of 18 U.S.C. § 922(n). D.E. 11. The defendant has moved to dismiss the Indictment, arguing that 18 U.S.C. §§ 922(g)(3) and (n) are unconstitutional under the Supreme Court's recent decision in *New York State Rifle & Pistol Assoc., Inc. v. Bruen*, 142 S.Ct. 2111 (2022). For the reasons that follow, the motion should be denied.

## FACTS AND PROCEDUARAL SUMMARY

On the evening of January 4, 2023, a Henderson Police Department (HPD) officer approached the defendant as he waited in a restaurant drive-thru lane in Henderson, North Carolina. The officer told the defendant that there were active warrants for his arrest and commanded the defendant to show his hands. The

1

defendant did not comply with the officer's commands, and instead reached for an item inside of the vehicle. Defendant then brandished the item, which was a firearm, at the officer. The officer, recognizing that the defendant was brandishing a firearm at him, drew his duty weapon and fired a shot at the defendant, striking him in the lower body. The defendant then ran from the officer but was apprehended a short time later. The firearm possessed by the defendant was recovered from his route of flight and found to be a loaded, 9mm Smith and Wesson handgun. The firearm was later examined by an interstate nexus expert, who opined that it was not manufactured in North Carolina.

Officers investigated the vehicle the defendant had left behind when he fled from HPD. The vehicle emitted an odor of marijuana, and they found a marijuana cigarette on the passenger seat of the vehicle. A plastic baggie containing approximately 26 grams of marijuana was collected from the driver-side door pocket. Officers also recovered digital scales and plastic baggies, both items commonly used in the drug trade.

The defendant's criminal history revealed a state probation revocation in 2021, resulting from a positive drug screen indicating the presence of marijuana and failure to register for drug treatment classes, among other violations. The defendant's criminal record also revealed that he was then under state indictment – and had been since December 2021 – for assault with a deadly weapon with intent to kill inflicting serious injury (AWDWIKISI).

On January 6, 2023, Defendant was charged by Criminal Complaint with being an unlawful drug user in possession of a firearm, in violation of 18 U.S.C. § 922(g)(3). (5:23-MJ-1028-BM). On January 18, 2023, the defendant was taken into custody and interviewed by Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) agents after provision of *Miranda* warnings. During the interview, Defendant admitted to using marijuana daily. He also admitted to obtaining the firearm at issue in this case in December 2022, roughly a year after he was indicted by the state court for AWDWIKISI. Defendant admitted knowledge of the pending state indictment.

On January 24, 2023, a federal grand jury returned an Indictment against Alston charging him with possession of a firearm by an unlawful user of, or person addicted to, controlled substances, in violation of 18 U.S.C. § 922(g)(3) and receipt of a firearm by a person under indictment, in violation of 18 U.S.C. § 922(n). D.E. 11. On February 28, 2023, the defendant filed a motion to dismiss the Indictment (D.E. 17), to which the government now responds.

## ARGUMENT

### I.     TITLE 18 UNITED STATES CODE SECTION 922(g)(3) IS CONSTITUTIONAL.

Defendant argues 18 U.S.C. § 922(g)(3) is facially unconstitutional because its prohibition of unlawful drug users' possession of firearms is not deeply rooted in this nation's history and tradition. In making this argument, the defendant faces a heavy burden, because "[a] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish

3

that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). Section 922(g)(3) proscribes conduct outside the scope of Second Amendment protections because it prohibits firearm possession by non-law-abiding individuals. The law is also sufficiently analogous to historical regulations to be deemed "longstanding."

## A. The Second Amendment, *Heller* and *Bruen*

The Second Amendment to the Constitution provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia* v. *Heller*, 554 U.S. 570 (2008), the Supreme Court held that the Amendment protects an individual right of law-abiding, responsible citizens to possess a handgun in the home for lawful purposes, like self-defense. The Court thus held unconstitutional two District of Columbia laws that effectively banned handgun possession in the home and required all firearms within homes to be kept inoperable and so unavailable for self-defense. *Id.* at 628–34. In *McDonald v. Chicago*, 561 U.S. 742 (2010), the Court held that this right is incorporated against the states through the Fourteenth Amendment.

"Like most rights," however, *Heller* emphasized that "the right secured by the Second Amendment is not unlimited." *Id.* at 626. It is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id. Heller* made clear that the opinion should not "be taken to cast doubt on

4

longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626–27; *see also McDonald*, 561 U.S. at 786. *Heller* described these regulations as "presumptively lawful" measures. 554 U.S. at 627 n.26. Over the next decade, courts of appeals applied a two-step test to determine the constitutionality of firearms regulations, which required both an examination of whether such statutes were consistent with the history of firearm regulation and application of intermediate, means-end scrutiny. *Bruen*, 142 S.Ct. at 2125-26.

In *Bruen*, the Court "made the constitutional standard endorsed in *Heller* more explicit," holding that the two-step test applied by the courts of appeals was inconsistent with *Heller*'s holding, which only provided for analysis of the historical question, not means-end scrutiny. 142 S.Ct. at 2125-27, 2134. It elaborated on the test *Heller* and *McDonald* set forth to determine whether a government regulation infringes on the Second Amendment right to possess and carry guns for self-defense: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129–30. Applying that standard, the Court held unconstitutional a New York licensing law that allowed an applicant to obtain a license to carry a gun outside his home only upon proving existence of

5

"proper cause." *Id.* at 2123. First, the Court held the Second Amendment's plain text covered the conduct at issue. *Id.* at 2134–35. The petitioners were "ordinary, law-abiding, adult citizens" who sought to carry handguns publicly for self-defense. *Id.* at 2134. This conduct, the Court concluded, fell within "the right to keep and bear arms" guaranteed by the Second Amendment. *Id.*

The Court then surveyed historical data from "medieval to early modern England" through "the late-19th and early-20th centuries" to determine whether the New York licensing law squared with historical tradition. *Id.* at 2135–56. After a "long journey through the Anglo-American history of public carry, [the Court] conclude[d] that respondents ha[d] not met their burden to identify an American tradition justifying the State's proper-cause requirement." *Id.* at 2156. "Apart from a few late-19th-century outlier jurisdictions," the Court summarized, "American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense" or required a showing of special need to do so. *Id.*

1. **The Second Amendment does not protect an unlawful drug user in possession of firearms.**

Just as *Heller* defined the right to bear arms as belonging to "law-abiding, responsible citizens" (554 U.S. at 635), *Bruen* focuses exclusively on the rights of law-abiding citizens. The *Bruen* court stated no fewer than fourteen times that the Second Amendment protects the rights of "law-abiding" citizens. *See, e.g.*, *Bruen*, 142 S.Ct. at 2122 ("[T]he Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense.");

6

*id.* ("[O]rdinary, law-abiding citizens have a similar right to carry handguns publicly for their self-defense."); *id.* at 2124-25 ("[P]etitioners . . . are law-abiding . . . citizens."); *id.* at 2131 ("The Second Amendment . . . elevates . . . the right of law-abiding, responsible citizens to use arms for self-defense." (internal citations omitted)); *id.* at 2132-33 ("*Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense."); *id.* at 2134 ("[O]rdinary, law-abiding, adult citizens . . . are part of 'the people' whom the Second Amendment protects."); *id.* at 2135 n.8 ("State[s] may not prevent law-abiding citizens from publicly carrying handguns because they have not demonstrated a special need for self-defense."); *id.* at 2138 n.9 ("[N]othing in our analysis should be interpreted to suggest the unconstitutionality of . . . 'shall-issue' licensing regimes . . . designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens."); *id.* at 2150 ("None of these historical limitations . . . operated to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose."); *id.* at 2156 ("American governments [have generally not] required law-abiding, responsible citizens to demonstrate a special need for self-protection." (internal citations omitted)); and *id.* ("New York's proper-cause requirement violates the Fourteenth Amendment in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms."). The majority opinion says nothing about non-law-abiding citizens like Defendant, or about the

scope of the Second Amendment as it might pertain to any of them.

The *Heller* court referred to at least some restrictions upon firearm possession by certain individuals with approbation. 554 U.S. at 626-27 ("[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings...."). In a concurring opinion joined by the Chief Justice, Justice Kavanaugh explained that "the Second Amendment allows a variety of gun regulations" and reiterated the *Heller* court's reassurances that the decisions did not "cast doubt on" numerous such regulations, including "longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id.* at 2162 (Kavanaugh, J., concurring) (internal quotation marks and citation omitted). Unlawful users of controlled substances are per se not law-abiding citizens and are thus not the type of persons repeatedly referred to throughout the *Bruen* opinion as individuals who enjoy unburdened Second Amendment rights.

A person like Defendant, who violates Section 922(g)(3) is, by definition, not a law-abiding, responsible citizen. The statute applies only to a person who "is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802))." 18 U.S.C. § 922(g)(3). For Section 922(g)(3)'s prohibition to apply, a defendant's illegal drug use must occur sufficiently consistently, be prolonged and close in time to his gun possession. *United States v. Edwards*, 38 Fed.Appx. 134, 138 (4th Cir. 2002) (unpublished); *see United States v.*

8

*Jackson*, 280 F.3d 403, 406 (4th Cir. 2002) (finding district court did not err in requiring the government to prove a pattern of drug use and recency of drug use). An unlawful, current, and regular user of a federally controlled substance can hardly be termed "law-abiding" or "responsible." *Bruen*, 142 S.Ct. at 2131.

"Placed in the wrong hands, firearms present a grave threat to public safety, and for this reason, the Anglo–American right to bear arms has always recognized and accommodated limitations for persons perceived to be dangerous." *United States v. Carter*, 669 F.3d 411, 415 (4th Cir. 2012). Unlawful users of intoxicating substances known to cause impairment of the ability to safely handle firearms are dangerous. *United States v. Yancey*, 621 F.3d 681, 686-87 (7th Cir. 2010) (discussing studies which demonstrate the connection between chronic drug abuse and violent crime). Chronic drug users are neither law-abiding nor responsible and they are not afforded the Second Amendment protections enjoyed by responsible, law-abiding individuals.[1]

Indeed, *Bruen* endorsed the "shall issue" license-to-carry provisions of 43 states, a number of which specifically exclude those who unlawfully use or are addicted to controlled substances. *See, e.g.*, MISS. CODE ANN. § 45- 9-101(e); TEX.

---

[1] In a post-*Heller* decision examining the constitutionality of 18 U.S.C. § 922(g)(3), the Fourth Circuit assumed, without deciding, that a drug user's possession of a firearm implicates the Second Amendment. *Carter*, 669 F.3d at 416. However, the court also noted that, "[t]he weight of the right to keep and bear arms depends not only on the purpose for which it is exercised but also on relevant characteristics of the person invoking the right." *Id.* at 415. Consistent with that holding, in a decision issued later the same year, the Fourth Circuit found that the Second Amendment's protections did not extend to illegal aliens because they are not "law-abiding members of the political community." *United States v. Carpio-Leon*, 701 F.3d 974, 981 (4th Cir. 2012).

9

GOV'T CODE ANN. § 411.172(a)(6); OHIO REV. CODE § 2923.125(o); ARK. CODE § 5-73-309(7)(A). *Bruen* explained that "nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes." *Bruen*, 142 S.Ct. at 2138 n.9. The Court said those regimes, "which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id*. And Justice Kavanaugh, joined by the Chief Justice, explicitly said that such "shall-issue licensing regimes are constitutionally permissible." *Id*. at 2162 (Kavanaugh, J., concurring). *Bruen*'s endorsement of those licensing schemes would make little sense if the Second Amendment in fact prevented states from disarming unlawful users of controlled substances.

2. **Even if the Court finds that the Second Amendment applies to unlawful drug users, Section 922(g)(3) is consistent with historical tradition.**

Defendant's claim that disarming unlawful drug users is not deeply rooted in this country's history is incorrect. There exists a long history and tradition of disarming dangerous individuals, including intoxicated persons, the mentally ill and those considered dangerous. While 18 U.S.C. § 922(g)(3) was passed in the mid-20th century, it rests on a history and tradition of analogous legislation stretching back to the time of the founding and is thus constitutional.

Even if Section 922(g)(3) is deemed to burden the rights of "law-abiding, responsible citizens," it should pass constitutional muster because it is consistent

10

with the Nation's historical tradition of firearm regulation. Courts have overwhelmingly rejected Second Amendment challenges to Section 922(g)(3), both before and after *Bruen*. No circuit has ruled otherwise. And although some circuit decisions applied the means-ends test *Bruen* eschewed, *see, e.g., Carter*, 669 F.3d at 414, others rest on the analogy between Section 922(g)(3) and the "longstanding prohibitions" that *Heller* endorsed, 554 U.S. at 626, and upon which *Bruen* does not cast doubt. *See, e.g.,* 142 S.Ct. at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring); *see United States v. Dugan*, 637 F.3d 998, 999 (9th Cir. 2011); *United States v. Seay*, 620 F.3d 919, 925 (8th Cir. 2010).

Consistent with these authorities, ten of eleven district courts to confront facial challenges to Section 922(g)(3) after *Bruen* have repudiated them.[2] The lone outlier proceeded primarily not by distinguishing Section 922(g)(3) from the longstanding prohibition disqualifying felons, but by questioning the constitutionality of that prohibition as well, *see United States v. Harrison*, 2023 WL 1771138 (W.D. Ok. Feb. 3, 2023)—a result which no other federal court has embraced, *see United States v. Posey*, 2023 WL 1869095, at \*9 n.9 (N.D. Ind. Feb. 9, 2023) (recognizing that *Harrison* represents a "dramatic departure from existing

---

[2] *See United States v. Beverly*, No. 2:21cr36 (N.D.W.Va. Jan. 3, 2003); *United States v. Black*, —F.Supp.3d—2023 WL 122920 (W.D. La. Jan. 6, 2023); *United States v. Connelly*, 2022 WL 17829158 (W.D. Tex. Dec. 21, 2022); *United States v. Kelley*, No. 5:22cr395 (W.D. Okla. Jan. 13, 2023); *United States v. Lewis*, 2023 WL 187582 (W.D. Okla. Jan. 13, 2023); *United States v. Posey*, 2023 WL 1869095 (N.D. Ind. Feb. 9, 2023); *United States v. Sanchez*, 2022 WL 17815116 (W.D. Tex. Dec. 19, 2022); *United States v. Seiwert*, 2022 WL 4534605 (N.D. Ill. Sept. 28, 2022); *United States v. Stennerson*, 2023 WL 2214351 (D. Mont. Feb. 24, 2023); *United States v. Veasley*, No. 4:20cr209 (S.D. Iowa Sept. 22, 2022).

precedent").

Section 922(g)(3)'s prohibition on firearm possession by unlawful users of controlled substances is analogous to "longstanding prohibitions on the possession of firearms by … the mentally ill" and the intoxicated. *Heller*, 554 U.S. at 626. In England, justices of the peace could lock up dangerous lunatics and seize their property. *See The Origin of Insanity as A Special Verdict: The Trial for Treason of James Hadfield (1800)*, 19 LAW & SOC'Y REV. 487 (1985). Similarly, "in eighteenth-century America, justices of the peace were authorized to lock up lunatics who were dangerous to be permitted to go abroad." *Yancey*, 621 F.3d at 685 (internal quotations and citation omitted). As the Third Circuit reasoned in a decision vacated on other grounds, these severe restrictions on the liberty of the mentally ill made any specific restrictions on firearm possession unnecessary at the time. *Beers v. Attorney General of the United States*, 927 F.3d 150, 157 (3d Cir. 2019), *vacated*, 140 S.Ct. 2758 (2020). But, as *Heller* recognized, it was beyond dispute that the mentally ill could be disarmed. 554 U.S. at 626.

Although being under the influence of a controlled substance is not tantamount to mental illness, both conditions can render a person incapable of safely and responsibly possessing a firearm. The founders placed intoxicated individuals in the same category as the mentally ill, criminals, and others subject to disarmament. Benjamin Rush, a signer of the Declaration of Independence and a prominent physician, equated drunkenness with a "temporary fit of madness."

12

BENJAMIN RUSH, AN INQUIRY INTO THE EFFECTS OF ARDENT SPIRITS ON THE MIND AND BODY, 2 (1784). And other eighteenth-century observers likewise designated "habitual drinking" as a form of "insanity." CARL ERIK FISHER, URGE: OUR HISTORY OF ADDICTION 47 (2022) (citing Roy Porter, *The Drinking Man's Disease: The Pre-history of Alcoholism in Georgian Britain*, 80 BRITISH J. OF ADDICTION 385, 390 (1985)). As the Seventh Circuit observed, "habitual drug abusers, like the mentally ill, are more likely to have difficulty exercising self-control, making it dangerous for them to possess deadly firearms." *Yancey*, 621 F.3d at 685; *and see United States v. Patterson*, 431 F.3d 832, 836 (5th Cir. 2005) (observing that "unlawful users of controlled substances pose a risk to society if permitted to bear arms").

Section 922(g)(3) is also analogous to historical laws that prohibited carrying a firearm while under the influence of alcohol. For example, in 1655, Virginia prohibited "shoot[ing] any gunns at drinkeing." 1 Hening, Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature 401-02 (1823). In 1771, New York prohibited firing guns during the New Year's holiday, a restriction that "was aimed at preventing the 'great Damages … frequently done on [those days] by persons … being often intoxicated with Liquor.'" *Heller*, 554 U.S. at 632 (quoting Ch. 1501, 5 Colonial Laws of New York 244–46 (1894)). And a 1746 New Jersey statute authorized militia officers to "disarm" any soldier who "appear[ed] in Arms disguised in Liquor." Acts of the General Assembly of the Province of New-Jersey 303 (1752).

13

Similarly, in the era following ratification of the Fourteenth Amendment in 1868, which extended the Second Amendment to the states, *see McDonald*, 561 U.S. at 749-50, many states enacted statutes prohibiting intoxicated persons from possessing, using, or receiving firearms. *See, e.g.*, Kansas Gen. Stat., Crimes & Punishments § 282 (1868); 1878 Miss. Laws 175-76 § 2; 1883 Mo. Laws 76, § 1; 1883 Wis. Sess. Laws 290, Offenses Against Lives and Persons of Individuals, ch. 329 § 3; 1890 Okla. Sess. Laws 495, art. 47, § 4; 1899 S.C. Acts 97, No. 67, § 1; *see also State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886). As a Missouri Supreme Court decision explained, these laws comport with the right to bear arms because they mitigate the "mischief" that may result "from an intoxicated person going abroad with fire-arms." *Shelby*, 2 S.W. at 469.

Drugs other than alcohol were not widely used as intoxicants in the United States until the late nineteenth and early twentieth centuries. *See, e.g.*, David F. Musto, *The American Experience with Stimulants and Opiates*, 2 PERSP. ON CRIME & JUST. 51, 63 (1997-98). Prohibitions on controlled substances accordingly did not emerge until around the 1880s and the early twentieth century. *See* U.S. Treasury Dep't, STATE LAWS RELATING TO THE CONTROL OF NARCOTIC DRUGS AND THE TREATMENT OF DRUG ADDICTION (1931) 1-9 (describing development of state-level laws); Richard J. Bonnie & Charles H. Whitebread, II, *The Forbidden Fruit and the Tree of Knowledge: An Inquiry into the Legal History of American Marijuana Prohibition*, 56 VA. L. REV. 971, 985, 1010 (1970).

14

As new and often more potent substances proliferated, so too did associated firearms regulations. For example, a Pennsylvania statute established that "[n]o person shall deliver a firearm . . . to one who he has reasonable cause to believe … is a drug addict." 1931 PA. LAWS 499, no. 158, § 8. Following Pennsylvania's lead, jurisdictions across the country—including the District of Columbia, Alabama, California, South Dakota, and Washington—all passed laws barring the sale of firearms or pistols to "drug addict[s]." 47 Stat. 652, § 7 (1932) (D.C.); *see* 1936 Ala. Laws 52, no. 82, § 8; 1935 S.D. Sess. Laws 356, ch. 208, § 8; 1935 Wash. Sess. Laws 601, ch. 172, § 8.

In a testament to the strength of this historical tradition, prohibitions on firearms possession by drug users remain prevalent today. In recent times, at least twenty-six states and the District of Columbia "have restricted the right of habitual drug abusers or alcoholics to possess or carry firearms." *Yancey*, 621 F.3d at 684 (collecting examples). Section 922(g)(3) thus stands in stark contrast to the "outlier[]" laws the Supreme Court invalidated in *Bruen* and *Heller*. *Bruen*, 142 S.Ct. at 2156; see *id.* at 2161 (Kavanaugh, J., joined by Roberts, C.J., concurring) (emphasizing the "unusual" nature and "outlier" status of the New York law in *Bruen*); *Heller*, 554 U.S. at 629 (noting that "[f]ew laws in the history of our Nation have come close to the severe restriction of the District's handgun ban"). Unlike those exceptional laws, Section 922(g)(3) reflects a historical tradition that stretches from the founding to the present, and it therefore comports with the Second

15

Amendment. Although none of the pre-twentieth century historical analogues are a "dead ringer" or "historical twin" for 18 U.S.C. § 922(g)(3), *Bruen*, 142 S.Ct. at 2133, they nevertheless show that § 922(g)(3) is "analogous enough" to historical laws "to pass constitutional muster." *Id.*

The "historical evidence" shows that "the legislature may disarm those who have demonstrated a proclivity for violence or whose possession of guns would otherwise threaten the public safety." *Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, J., dissenting). This historical disarmament of individuals deemed to be dangerous or risky was implicitly recognized by *Bruen*. *See Bruen*, 142 S.Ct. at 2152 & n.26 (citing General D.E. Sickles's 1886 decree barring any "disorderly person, vagrant, or disturber of peace" from bearing arms). Here, § 922(g)(3)'s prohibition on firearm possession applies only to persons in present or very recent violation of federal drug laws. Societal risk was a key consideration in Congress's adoption of the statute which was aimed at keeping guns out of the hands of illegal drug users. *See Yancey*, 621 F.3d at 683-84 (Congress's goal in passing § 922(g) was "to keep guns out of the hands of presumptively risky people" and to "suppress[ ] armed violence."). Accordingly, the burdens imposed by Section 922(g)(3) and the referenced historical analogues are "comparably justified." *Bruen*, 142 S.Ct. at 2133. As a result, Defendant's claim that § 922(g)(3) unconstitutionally infringes on a Second Amendment right should be denied.

16

## II.   TITLE 18 UNITED STATES CODE SECTION 922(n) IS CONSTITUTIONAL.

The defendant also challenges the constitutionality of 18 U.S.C. § 922(n), arguing that its prohibition of firearms receipt by indictees is not deeply rooted in this nation's history and tradition. Again, this facial challenge faces a steep burden, because to prevail, the defendant "must establish that no set of circumstances exists under which the Act would be valid." *Salerno*, 481 U.S. at 745. Because Defendant's conduct in possessing a firearm as an indicted person falls outside the protections of the Second Amendment and because the prohibition against receipt of firearms by those under indictment is consistent with this nation's history and tradition of firearms regulation, this Court should deny Defendant's motion.

### A. The Second Amendment Does Not Protect Receipt of a Firearm by a Person Under Felony Indictment

As discussed in parts (I.A.) and (I.A.1), supra, Second Amendment rights are "not unlimited." *Heller*, 554 U.S. at 626. The Second Amendment "'elevates above all other interests the right of *law-abiding, responsible citizens* to use arms for self-defense." *Bruen*, 142 S. Ct. at 2131, quoting *Heller*, 554 U.S. at 635 (emphasis added). That interest and the Second Amendment generally, however, do not restrict "longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id.* at 626-627 & n.26; see also *McDonald*, 461 U.S. at 786 (repeating *Heller*'s "assurances" that governments may, consistent with the Second Amendment, prohibit felons and the mentally ill from possessing arms). These groups of people are excluded

17

from the Second Amendment's protection because the Amendment codified a "right," belonging to "law-abiding, responsible citizens." *Heller*, 554 U.S. at 635; *see also Bruen*, 142 S. Ct. at 2111 (describing the "right of an ordinary law-abiding citizen to possess a handgun" both publicly and in the home "for self-defense"). As previously discussed above, throughout *Bruen*, including in its concurring opinions, the Supreme Court repeatedly described the Second Amendment right as belonging only to "law-abiding citizens." See *Bruen*, 142 S. Ct. at 2122, 2125, 2131, 2133, 2134, 2138, 2150, 2156; see also *Id.* at 2157, 2158, 2159, 2161 (Alito, J., concurring); *Id.* at 2161 (Kavanaugh, J., joined by Roberts, C.J., concurring).

In applying the framework it announced in *Bruen*, the Supreme Court addressed whether petitioners were "ordinary, law-abiding adult citizens" in the section of its opinion addressing the Second Amendment's textual scope. *See Bruen*, 142 S. Ct. at 2134-2135; It further noted that the two key metrics for assessing whether firearms regulations comply with the Second Amendment are "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133; see also *Wrenn v. District of Columbia*, 864 F.3d 650, 663 (D.C. Cir. 2017) (suggesting laws comply with *Heller* if they "leave responsible, law-abiding citizens some reasonable means of exercising" the right to keep and bear arms); *but see United States v. Rahimi*, ___ F.4th ___, 2023 WL 1459240, *3-*4 (5th Cir. Feb. 2, 2023) (concluding the phrase "law-abiding, responsible citizens" was mere "shorthand," and that all members of the "political community," including lawbreakers, have a presumptive right to bear arms).

18

*Bruen* took specific care to clarify that nothing in the opinion was meant to cast doubt on the legality of the "shall-issue" licensing regimes then in place in 43 states that included background checks and other "narrow, objective and definite" requirements "designed to ensure only that those bearing arms in the jurisdiction are in fact 'law-abiding, responsible citizens.'" *Bruen*, 142 S. Ct. at 2138 n.9 (quoting *Heller*, 554 U.S. at 635); *see also Id.* at 2161 (Kavanaugh, J., concurring). Many of these state regimes expressly disqualify those under indictment or information. *See, e.g.,* Ariz. Rev. Stat. § 13-311(E)(3); Ill. Comp. Stat. 66/25(4); Ind. Code § 35-47-2-3(i)(5); Ky. Rev. Stat. § 237.110(4)(a); La. Stat. § 40:1379.3(C)(1); Tenn. Code § 39-17-1351(c)(7). By indicating that these regimes remain broadly constitutional (unless abused through "lengthy wait times .. or exorbitant fees [that] deny ordinary citizens their right to public carry," see *Bruen*, 142 S. Ct. at 2138 n.9), the Court reinforced that the Second Amendment's protections do not extend to people who are not law-abiding. Otherwise, each of the 43 "shall-issue" regimes could survive only if all of their many objective disqualifying criteria survive a case-by-case, historical inquiry. Such exacting scrutiny is flatly contrary to the Supreme Court's express declaration that it was casting no doubt on these regimes.

The conclusion that the Second Amendment's text covers only law-abiding citizens is also consistent with a host of pre-*Bruen* appellate court decisions. For example, *Medina v. Whitaker*, 913 F.3d 152, 157-158 (D.C. Cir. 2019), rejected a nonviolent felon's "as applied" challenge to the federal felon in possession statute. To

19

determine the "public understanding" of the Second Amendment at the time of ratification, the D.C. Circuit considered evidence that the founders understood the right to bear arms to exclude "those who were not (or could not be) virtuous members of the community." *Id.*at 158-159. The court of appeals held that felons—violent or not—"are not among the law-abiding, responsible citizens entitled to the protections of the Second Amendment." *Id.* at 154; *accord United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010) (holding that "felons are categorically different from the individuals who have a fundamental right to bear arms").

Courts have reasoned similarly for other groups classified as irresponsible or non-law-abiding. For instance, *United States v. Bena*, 664 F.3d 1180, 1184 (8th Cir. 2011), rejected a challenge to 18 U.S.C. § 922(g)(8), which prohibits gun possession by people subject to domestic violence restraining orders. Relying on *Heller*'s description of the right to bear arms as protecting law-abiding citizens, the Eighth Circuit observed that the Supreme Court most likely viewed restrictions on gun possession by felons and the mentally ill "as presumptively lawful because they do not infringe the Second Amendment right." *Id.* at 1183. This rendered Section 922(g)(8) "consistent with a common-law tradition that the right to bear arms is limited to peaceable or virtuous citizens." *Id.* at 1184. Consistent with this interpretation, in *United States v. Carpio-Leon*, 701 F.3d 974, 979 (4th Cir. 2012) the Fourth Circuit refused to apply Second Amendment protections to illegal aliens "because illegal aliens are not law-abiding members of the political community". Like the above prohibitions, Section 922(n) does

20

not contravene the Second Amendment because it places no burden on the rights of an "ordinary, law-abiding citizen."

A citizen cannot be arrested on felony charges absent a showing of probable cause to believe he has not abided by the law. *Beck v. Ohio*, 379 U.S. 89, 91 (1964); *United States v. Watson*, 423 U.S. 411, 415-416 (1976). Once probable cause is established, however, the suspected lawbreaker "may face substantial liberty restrictions." Salerno, 481 U.S. at 749. He may be searched incident to arrest. *United States v. Robinson*, 414 U.S. 218, 224-226 (1973). He may be strip-searched once taken to jail. *Florence v. Board of Chosen Freeholders*, 566 U.S. 318, 322-323 (2012). He may be temporarily jailed pending arraignment based upon the government's "strong interest" in protecting the public from those "reasonably suspected of having engaged in criminal activity, even where there has been no opportunity for a prior judicial adjudication." *County of Riverside v. McLaughlin*, 500 U.S. 44, 52 (1991). In some circumstances, a person charged with a crime can be denied bail and detained pending trial with his assets frozen, precluded from hiring Sixth Amendment counsel of choice. *Salerno*, 481 U.S. at 739; *Kaley v. United States*, 571 U.S. 320 (2014). Despite the First Amendment freedoms of speech and the press, those detained can be prohibited from receiving books and magazines from private parties. *Bell v. Wolfish*, 441 U.S. 540, 549-552 (1979).

Given that the needs of the criminal justice system can justify all these substantial restrictions and outweigh a criminal defendant's First, Fourth, Fifth, and

21

Sixth Amendment rights, they can likewise outweigh a criminal defendant's Second Amendment rights. *See Bruen*, 142 S. Ct. at 2130 ("Th[e] Second Amendment standard accords with how we protect other constitutional rights."); *id.* at 2156 (emphasizing the Second Amendment is subject to the same "body of rules" as "other Bill of Rights guarantees"). Thus, if an indictment found to be supported by probable cause is sufficient to trigger detention, *see Salerno*, 481 U.S. at 739; a seizure of assets, *see Kaley*, 571 U.S. at 327-328; and First Amendment restrictions, *see Bell*, 441 U.S. at 550; it is also sufficient to temporarily restrict the right to acquire firearms.

One district court applying *Bruen* to a charged defendant reached just that conclusion. *See United States v. Fencl*, No. 21-CR-3101, JLS, 2022 WL 17486363, at *2 (S.D. Cal. Dec. 7, 2022), *aff'd*, No. 22-50316 (9th Cir. Jan. 26, 2023) (opinion to follow). *Fencl* held that a pretrial release condition barring gun possession, 18 U.S.C. § 3142(c)(1)(B)(viii), does not violate the Second Amendment. *Id.* The court reasoned the defendant fell outside the amendment's scope because "he has been charged with unlawful possession of firearms based on a finding of probable cause." *Id.* It rejected an appeal to the presumption of innocence, explaining this presumption "does not deprive the government of the ability to place significant, but temporary, restrictions on an accused's constitutional rights in order to further its interest in community safety." *Id.* (citing *Salerno*, 481 U.S. at 748). This Court should hold the same. Because Alston and others facing pending felony charges are not ordinary, law-abiding citizens,

the Second Amendment does not preclude the government from imposing firearms restrictions on that class of individuals.

## B. Section 922(n) is Consistent with the Nation's Historical Tradition of Gun Regulation

Even if the Second Amendment's text were thought to cover defendants charged with felonies, 18 U.S.C. § 922(n) would still survive constitutional challenge under *Bruen* because it squares with historical tradition. When comparing modern and historical gun laws, courts often must "reason[ ] by analogy," which "requires a determination of whether the two regulations are relevantly similar." *Bruen*, 142 S.Ct. at 2131 (quotation marks omitted). *Bruen* offered no "exhaustive survey of the features that render regulations relevantly similar," but it established as the central inquiry: "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2133. In conducting this historical inquiry, the Court must give greatest weight to the laws of "the Colonies and early Republic," as well as to the period of English law between 1660 and 1688. *Bruen*, 142 S. Ct. at 2140-2142. "[A]nalogical reasoning" is not "a regulatory straightjacket." *Id.* It "requires only that the government identify a well-established and representative historical analogue, not a historical twin." *Id.* (emphasis in original); *see also National Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 196 (5th Cir. 2012), *abrogated in part on other grounds by Bruen*, 142 S. Ct. at 2111 ("*Heller* demonstrates that a regulation can be deemed 'longstanding' even if it cannot boast a precise founding-era

23

analogue."). "So, even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Bruen*, 142 S. Ct. at 2133.

*Bruen*'s guidance forecloses simply "comparing the modern law under review with the laws of a couple of centuries ago, like a redline comparison in a word processing application." *United States v. Kelly*, No. 3:22-CR-00037, 2022 WL 17336578, *2 (M.D. Tenn. Nov. 16, 2022) (upholding § 922(n)). This is "because a list of laws that *happened to exist* in the founding era, as a matter of basic logic, is not the same thing as an exhaustive account of what laws would have been theoretically *believed to be permissible* by an individual sharing the original public understanding of the Constitution." *Id.* (emphasis in original). Multiple historical analogues to Section 922(n)'s prohibition exist. In *Bruen*'s wake, several district courts have held historical laws sufficiently analogous to establish a tradition supporting the imposition of modern gun restrictions on indicted defendants. *See United States v. Rowson*, 2023 WL 431037, at *21-*24 (S.D.N.Y. Jan. 26, 2023); *Fencl*, 2022 WL 17486363, at *3; *United States v. Perez-Garcia*, No. 22-CR-158-GPC, 2022 WL 17477918, at *4-5 (S.D. Cal. Dec. 6, 2022); *Kelly*, 2022 WL 17336578, at *5; *United States v. Slye*, No. 1:22-MJ-144, 2022 WL 9728732, at *2-3 (W.D. Pa. Oct. 6, 2022); *United States v. Kays*, No. CR-22-40-D, 2022 WL 3718519, at *4-5 (W.D. Okla. Aug. 29, 2022).

24

### 1. Section 922(n) is analogous to historical laws detaining indicted defendants prior to trial.

Consistent with the Constitution, legislatures can deprive indicted defendants of their liberty. A "fundamental right to bail was not universal among the colonies or among the early states." *United States v. Edwards*, 430 A.2d 1321, 1327 (D.C. 1981). While the Eighth Amendment forbids excessive bail, it "fails to say all arrests must be bailable." *Carlson v. Landon*, 342 U.S. 524, 546 (1952). Rather, it "was lifted with slight changes from the English Bill of Rights Act," which was never "thought to accord a right to bail in all cases." *Id.* Legislatures thus retain the power to "defin[e] the classes of cases in which bail shall be allowed." *Id.* Indeed if it chose, "Congress may ban bail in an entire class of cases." *United States v. Stephens*, 594 F.3d 1033, 1039 (8th Cir. 2010).

American legislatures have always provided for pretrial detention of some indicted defendants. "Capital defendants have been excluded from bail"— and thus detained—"since the colonial days, and there is some evidence that this exclusion was a public-safety measure." Sandra G. Mayson, *Dangerous Defendants*, 127 YALE L.J. 490, 502 (2018); *Slye*, 2022 WL 9728732, at *2 ("The precedent for denial of pretrial release to those accused of crimes dates to the early days of the Republic—indeed to English common law."). The Judiciary Act of 1789—passed two years before the Second Amendment's ratification—embraced this principle. It provided that a defendant accused of a federal crime could "be arrested, and imprisoned or bailed, as the case may be, for trial." Act of Sept. 24, 1789, ch. XX, 1 Stat. 73, § 33 (1789). Bail

25

was allowed "except where the punishment may be death, in which case it shall not be admitted but by [a court or judge] who shall exercise his discretion therein, regarding the nature and circumstances of the offence, and of the evidence, and the usages of law." *Id.*

At the founding, capital cases encompassed a broad swath of criminal conduct. Capital crimes "included nonviolent offenses that we recognize as felonies today, such as counterfeiting currency, embezzlement, and desertion from the army." *Medina*, 913 F.3d at 158; *Furman v. Georgia*, 408 U.S. 238, 355 (1972) (Marshall, J., concurring) (listing capital crimes in colonial New England, including "idolatry," "blasphemy," "assault in sudden anger," "adultery," "perjury in a capital trial," and "rebellion"). "Capital punishment for felonies was 'ubiquit[ous]' in the late Eighteenth century and was 'the standard penalty for all serious crimes.'" *Medina*, 913 F.3d at 158, quoting *Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., concurring).

The historical tradition of detaining those charged with serious crimes supports Section 922(n)'s restriction on those individuals' right to receive guns. The power to detain necessarily encompasses the power to impose some lesser liberty restrictions. Thus, for example, the Supreme Court has reasoned that "'it would be odd to conclude'" that the government cannot seize forfeitable assets on a grand jury's probable cause finding when that showing is "often sufficient to 'restrain *persons*.'" *Kaley*, 571 U.S. at 330 (quoting *United States v. Monsanto*, 491 U.S. 600, 615 (1989)) (emphasis in original); *see also Stephens*, 594 F.3d at 1039 (reasoning that Congress's

26

power to ban bail implies the power to impose "the Adam Walsh Act's much less restrictive mandatory release conditions" of a curfew and electronic monitoring). In the same way, it would be odd to conclude that being charged with a crime can justify pretrial detention and the freezing of forfeitable assets but cannot justify a temporary restriction on receipt of a firearm.

Thus, applying *Bruen*, some district courts have upheld gun restrictions placed on charged felony defendants based on the nation's historical tradition of pretrial detention. In *Slye*, the district court rejected a Second Amendment challenge to a "standard condition" prohibiting a pretrial releasee from possessing a gun. *Slye*, 2022 WL 9728732, at *2-3. The court explained that "[i]t would be illogical to conclude" that it had authority to detain the defendant "but lacks the authority to impose far less severe restrictions, such as ordering his release on bond with a firearms restriction." *Id.* at *2; *see also Fencl*, 2022 WL 17486363, at *3 (upholding 18 U.S.C. § 3142(c)(1)(B)(viii) based partly on "this Nation's historical tradition of pretrial detention (and its attendant restrictions on an individual's Second Amendment rights)").

As a constitutional matter, Defendant could have been held without bail pending trial on his state AWDWIKISI offense. Under many colonial statutes, his breach of the peace would have justified disarming him as dangerous, untrustworthy, or a threat to the public. Nothing in the Second Amendment suggests that Section 922(n) cannot be applied to defendants who have been charged with violent felonies

but granted bail pending trial. *See Kanter,* 919 F.3d at 454 (Barrett, J. dissenting) ("Legislature[s] may disarm those who have demonstrated a proclivity for violence or whose possession of guns would otherwise threaten public safety). It would make little sense if a complete deprivation of an indictee's liberty (which would naturally include deprivation of arms while in custody) is constitutional, but the less-restrictive, temporary prohibition of receipt of firearms by a person, like Alston, who is at liberty pending trial, is unconstitutional. This Court should deem Section 922(n) sufficiently analogous to historical laws allowing pretrial detention and uphold its constitutionality.

### 2. Section 922(n) is analogous to historical laws disarming dangerous or untrustworthy people.

Both England and early America restricted the gun rights of some to protect the safety of all. In 1662, England empowered officers to "seize all Arms in the custody and possession of any person" whom they "judge[d] dangerous to the Peace of the Kingdom." Militia Act of 1662, 13 & 14 Car. 2, c.3 § 13 (1662). "[B]y the time of American independence, England had established a well-practiced tradition of disarming dangerous persons—violent persons and disaffected persons perceived as threatening to the crown." Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Firearms*, 20 WYO. L. REV. 249, 261 (2020); *see also id.* at 259-261 (detailing this history). Early America inherited the English tradition. "The historical record shows that gun safety regulation was commonplace in the colonies." *National Rifle Ass'n*, 700 F.3d at 200.

28

Noteworthy among "revolutionary and founding era gun regulations are those that targeted particular groups for public safety reasons." *National Rifle Ass'n*, 700 F.3d at 200. During the Revolutionary War, at least six "jurisdictions passed laws that confiscated weapons owned by persons who refused to swear an oath of allegiance." *Id*; *see* 5 The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 479 (1886) (1776 law); 7 Records of the Colony of Rhode Island and Providence Plantations, in New England 567 (1776 law); 1 The Public Acts of the General Assembly of North Carolina 231 (1804) (1777 law); 9 Statutes at Large; Being A Collection of All the Laws of Virginia 282 (1821) (1777 law); Rutgers, New Jersey Session Laws Online, Acts of the General Assembly of the State of New Jersey 90 (1777 law); 9 Statutes at Large of Pennsylvania 348 (1779 law).

Accounts of the ratification debates confirm the founders' belief that "disarming select groups for the sake of public safety was compatible with the right to arms specifically and with the idea of liberty generally." *National Rifle*, 700 F.3d at 200. "*Heller* identified … as a 'highly influential' 'precursor' to the Second Amendment the Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents." *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (quoting *Heller*, 554 U.S. at 604). That report recognized the government could disarm the potentially dangerous, stating that "citizens have a personal right to bear arms 'unless for crimes committed, or real

29

danger of public injury.'" *Skoien*, 614 F.3d at 640 (quoting 2 Bernard Schwarz, *The Bill of Rights: A Documentary History*, 662, 665 (1971)).

Similarly, Samuel Adams offered an amendment at the Massachusetts ratification convention recommending "that the said Constitution be never construed to authorize Congress to … prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." Schwarz, *The Bill of Rights*, 674-675, 681 (emphasis added). Some groups were "almost universally excluded" from exercising certain civic rights like gun rights, including "the idiot, the lunatic, and the felon, on obvious grounds." Thomas M. Cooley*, A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 29 (1st ed. 1868). The tradition of disarming dangerous or untrustworthy persons supports Section 922(n)'s ban on indicted defendants' receipt of firearms.

Section 922(n) is "relevantly similar" to these historical precursors under the "two metrics" *Bruen* offered: "how and why the regulations burden" Second Amendment rights. *Bruen*, 142 S. Ct. at 2132-2133. As to "how" the statute operates, Section 922(n), like those precursors, uses an objective criterion to categorically restrict a specific group's gun rights. As to "why," Section 922(n) seeks "to combat violence and promote public safety" by "keeping firearms out of the hands of categories of potentially irresponsible persons." *United States v. Laurent*, 861 F. Supp. 2d 71, 82 (E.D.N.Y. 2011) (ellipses omitted). Section 922(n) thus represents a

permissible legislative judgment that a person's status as an indicted felon warrants temporarily precluding the person from acquiring new firearms. Because Section 922(n) is analogous to historical restrictions on other classes of individuals deemed dangerous or untrustworthy, it is a constitutional exercise of Congressional power.

## III. CONCLUSION

*Heller* and *Bruen* are clear that the Second Amendment protects possession and use of firearms and ammunition for lawful purposes by law-abiding, responsible citizens. The Constitution does not protect the conduct prohibited by 18 U.S.C. §§ 922(g)(3) and (n). Moreover, even if such conduct were covered, the statutes are consistent with the nation's historical tradition of firearm regulation. Sections 922(g)(3) and 922(n) are thus facially constitutional, and Defendant's motion to dismiss should be denied.

Respectfully submitted this 28th day of March, 2023.

MICHAEL F. EASLEY, JR.
United States Attorney

BY:   /s/ Sarah E. Nokes
SARAH E. NOKES
Assistant United States Attorney
Criminal Division
150 Fayetteville Street, Suite 2100
Raleigh, North Carolina 27601
Telephone:   (919) 856-4054
Facsimile:   (919) 856-4487
E-mail:   sarah.nokes@usdoj.gov
VA Bar No. 82472

31

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 47.2(f)

This is to certify that this Response to Defendant's Motion to Dismiss complies with Local Criminal Rule 47.2(f) and the applicable word limit. Based upon a word count generated by word processing software, this brief is 7,899 words.

/s/ Sarah E. Nokes
Sarah E. Nokes
Assistant United States Attorney
Criminal Division

## CERTIFICATE OF SERVICE

This is to certify that I have this 28th day of March, 2023, served a copy of the foregoing response upon the defendant in this action by CM/ECF to:

Edward D. Gray
Attorney for Defendant

/s/ Sarah E. Nokes
Sarah E. Nokes
Assistant United States Attorney
Criminal Division

32