UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NORTH CAROLINA

|  |  |
|---|---|
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | DOCKET NO. 5:23-CR-21-FL-RN |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| CARLOS ALSTON, ) | |
| ) | |
| Defendant. ) | |

TRANSCRIPT OF HEARING ON MOTION TO DISMISS INDICTMENT
BEFORE MAGISTRATE JUDGE ROBERT T. NUMBERS, II
WEDNESDAY, MAY 31, 2023; 1:37 PM
RALEIGH, NORTH CAROLINA

**FOR THE PLAINTIFF:**
     United States Attorney's Office - EDNC
     By:  Sarah E. Nokes, AUSA
     150 Fayetteville Street
     Suite 2100
     Raleigh, NC 27601


**FOR THE DEFENDANT:**
     Federal Public Defender's Office
     By:  Edward D. Gray, Esq.
     150 Fayetteville Street
     Suite 450
     Raleigh, NC 27601

Audio Operator:                Clerk's Office Personnel

eScribers, LLC
7227 N. 16th Street
Suite 207
Phoenix, AZ 85020
973-406-2250
www.escribers.net

Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

Colloquy

1                    P R O C E E D I N G S

2          THE CLERK:  All rise.  This Court is now in session.

3    Honorable Judge Robert T. Numbers, II presiding.  Be seated

4    and come to order.

5          THE COURT:  Good afternoon, everyone.

6          THE CLERK:  Good afternoon, Judge.

7          MR. GRAY:  Afternoon, Your Honor.

8          MS. NOKES:  Good afternoon.

9          THE COURT:  We're here in the United States District

10   Court for the Eastern District of North Carolina sitting in

11   Raleigh for a hearing in the case of United States v, Carlos

12   Alston, case 523-CR-21.

13          I'd like to begin by asking counsel to identify

14   themselves for the record, beginning with counsel for the

15   United States.

16          MR. GRAY:  Sarah Nokes, Your Honor, on behalf of the

17   United States.  This is John Gibbons.  He is in our appellate

18   division, also on behalf of the United States.

19          THE COURT:  Good afternoon.

20          MR. GRAY:  Edward Gray, Assistant Federal Public

21   Defender on behalf of Mr. Alston.

22          THE COURT:  Good afternoon, Counsel.

23          UNIDENTIFIED SPEAKER:  Good afternoon, Your Honor.

24          THE COURT:  And I'll note for the record Mr. Alston

25   is present as well.  So Mr. Alston has filed a motion seeking

Colloquy

1  to dismiss his indictment on the argument, more or less that

2  if the Supreme Court's Bruen decision last term the Second

3  Amendment to the Constitution prohibits the United States from

4  pursuing these charges against him. I appreciate the briefing

5  from the parties on the issue of fraud. I appreciate the

6  briefing on the 925 issue as well.

7       This is obviously Mr. Alston's motion, but under

8  Bruen the government has the burden here. So Ms. Nokes, I'm

9  happy to hear from you first.

10       MS. NOKES: Thank Your Honor. The government has its

11  agent here if the Court needs to hear the facts that underlie

12  the indictment. Otherwise, I think both parties' briefs set

13  forth the facts pretty similarly. If the Court is satisfied

14  with that, then we'll just move to the substance of the Bruen

15  argument.

16       THE COURT: I think moving to the substance is fine.

17       MS. NOKES: Okay. Thank you. Your Honor, before we

18  embark on the historical analysis that is contemplated by

19  Bruen, that sort of sea change that came about by Bruen, the

20  Court has to answer a threshold question, which is, is this

21  defendant and his conduct covered by the Second Amendment. So

22  in Heller, the Supreme Court held that the Second Amendment

23  protects the right of law-abiding, responsible citizens to use

24  arms in defense of hearth and home. And this question -- this

25  threshold question of whether the defendant and his conduct

Colloquy

1   are covered by the Second Amendment is still part of the

2   analysis post-Bruen.  So --

3          THE COURT:  You said -- you mentioned that there are

4   two things, whether the defendant's covered and whether his

5   conduct is covered.  I think those are two separate questions

6   that I hope you address individually.

7          MS. NOKES:  Sure.  Certainly, Your Honor.  So let's

8   turn first to the question of person.  Is Mr. Alston a person

9   who is protected by the Second Amendment?  The Bruen court

10  addressed that question in the Bruen decision, talked about

11  the fact that the petitioners in that case were ordinary, law-

12  abiding citizens, and moved on pretty quickly to the

13  historical analysis.  So the language stressing that the

14  Second Amendment is enjoyed by a law-abiding citizen is in the

15  majority opinion.  It's also stressed in Justice Alito and

16  Justice Kavanaugh.  It's a -- which was joined by Justice

17  Roberts' concurrences that the point is that the Second

18  Amendment applies to law-abiding, responsible citizens.  There

19  would be no majority without that language.

20         THE COURT:  Well, so is the position here -- well,

21  your position is that the defendant is excluded from the

22  Second Amendment because he is not a law-abiding individual.

23  I'll accept that for the sake of argument that -- the nonlaw-

24  abiding portion of this.  I guess my question is in Heller and

25  Bruen -- I mean, I certainly do say that the Second Amendment

Colloquy

1    applies to law-abiding individuals.  And what I'm trying to

2    figure out is at any point did they say that it does not apply

3    to anyone other than law-abiding individuals?

4         MS. NOKES:  Your Honor, in both Heller and Bruen, the

5    Court cites with approbation restrictions on felons, for

6    example, and the mentally ill.  And the Court does not -- of

7    course, in Bruen, the Court said that the means end scrutiny

8    that the circuits had been applying post-Heller was bunk, that

9    they weren't going to do that anymore.  But the Court did not

10   say that we were not to consider this threshold question of

11   whether this individual before the Court is someone who was

12   covered by the Second Amendment.  And in fact, the Court in

13   Bruen specifically addresses that before moving on, like I

14   said, pretty quickly to the historical analysis, because in

15   the Bruen decision, there's no question that the two

16   petitioners before the Court were just ordinary, law-abiding

17   folks.

18        THE COURT:  Well, right.  So I guess that's kind of

19   the point.  And interestingly, as you get into more of the

20   nuance of the Second Amendment questions, you see that Bruen

21   and Heller perhaps weren't the most complicated cases from a

22   historical standpoint.  These are much stickier issues.  My

23   concern is that the government in this case, and in others,

24   puts a lot of weight on the recitation of the fact that the

25   Second Amendement applies to law-abiding citizens.  And I

1    don't quibble with that point.  What I'm trying to figure out

2    is, is that where it stops?  And if so, what is the

3    justification for saying it stops with law-abiding citizens?

4         MS. NOKES:  Your Honor, so in post-Heller decisions,

5    the Fourth Circuit actually addressed this question, right?

6    So applying the Chester framework post-Heller, the Fourth

7    Circuit said that the first question that needed to be

8    answered was, was the defendant or petitioner a part of "the

9    people" that is covered by the Second Amendment?  And

10   defendant has made an impassioned argument in the motion to

11   dismiss that's supported largely by dissenting opinions from

12   Judge, now Justice, Barrett and Cantor (ph.) and Judge Bevis

13   (ph.) and Fullytar (ph.) and some case law from other circuits

14   talking about how the Court shouldn't carve out individuals

15   from the Second Amendment's guarantee.  But in this circuit --

16   in the Fourth Circuit and precedent that is binding on this

17   Court, that is what the Fourth Circuit has done.

18        THE COURT:  Hasn't the Fourth Circuit just punted on

19   the question each time and assumed for the sake of argument

20   that the person is subject to Second Amendment?

21        MS. NOKES:  I assume you're talking about Carter.

22        THE COURT:  Every case that I've read, and maybe you

23   can point me to it, where they've said that -- made the point

24   that you're making.

25        MS. NOKES:  Right.  So in Carter, they did punt on

1    this question.  Carter was a case looking at 18 U.S.C.

2    922(g)(3), the drug user and possession statute that is before

3    the Court today.  And they did punt on the issue there.  They

4    talk about how Carter was not a law-abiding citizen.  In fact,

5    they said that Carter or drug users like him flunk that test.

6    But what the Court said in Carter was, listen, we don't

7    actually have to decide that the Second Amendment doesn't

8    apply to this drug user because we're going to apply a means

9    and scrutiny test.  And every circuit who has applied a means

10   and scrutiny test has decided that this statute is a-okay.

11          So in the first Carter decision, they sent the case

12   back to the district courts for some additional findings so

13   that then they could apply that means and scrutiny and do what

14   their sister circuits had done and find that based on that

15   scrutiny, the statute was okay.  But the Fourth Circuit

16   distinctly said that a drug user is not someone who is law-

17   abiding and that that person flunks that test.  But in --

18          THE COURT:  So hold on -- okay.

19          MS. NOKES:  Go ahead.

20          THE COURT:  Sorry.  Go ahead.

21          MS. NOKES:  Carpio-Leon, the Fourth Circuit found

22   that the Second Amendment's protections do not extend to

23   illegal aliens because they're not law-abiding members of the

24   political community.

25          THE COURT:  But I think that's an important

1    distinction, right?  Because this -- there's this question

2    that "the people" who are subject to the Second Amendment are

3    the political community, and that's not been fleshed out.  But

4    it's a -- you have a harder argument if you're not a citizen

5    that you're part of the political community than if you're a

6    citizen who happens to have committed crimes.

7          MS. NOKES:  See, I don't think we pull noncitizens

8    out of other Bill of Rights guarantees, right?  Like, a

9    noncitizen driving down the road does not have no Fourth

10   Amendment right a reasonable stop or an -- right, against an

11   unreasonable stop just because they're a noncitizen.  I don't

12   think that the fact that that person's not a citizen is the

13   deciding factor here.  I mean, the courts could have said that

14   as a non-citizen, he's not a part of the political community,

15   he's not part of "the people" that are covered by the Second

16   Amendment, but the Court specifically pressed on the law-

17   abiding issue, says he's not -- a noncitizen is not a law-

18   abiding member of the political community.

19         THE COURT:  All right.

20         MS. NOKES:  The Court --

21         THE COURT:  I mean, that's also, I think, factually

22   correct, right?  I mean, if you're not -- if you are

23   illegal -- if it's illegal for you to be present in this

24   country, then you're not law-abiding.  So you would by -- yes,

25   you would not be a law-abiding member of the political

(973) 406-2250 | operations@escribers.net | www.escribers.net

Colloquy

1     community.  But I don't know how that answers this question.

2           MS. NOKES:  Right.  Well, because someone who's a

3     chronic drug user is not a law-abiding member of our political

4     community.

5           THE COURT:  Okay.

6           MS. NOKES:  So --

7           THE COURT:  Let's assume I accept that.

8           MS. NOKES:  Okay.

9           THE COURT:  Okay?  Where do you draw the line?  If I

10    drive seventy-five miles per hour on 540 on my way home today,

11    I'm not a law-abiding individual.  So do I then lose my Second

12    Amendment rights?

13          MS. NOKES:  There is no statute that would take your

14    Second Amendment rights away in that circumstance.

15          THE COURT:  Could Congress -- does Congress have the

16    power to take away my Second Amendment rights if I speed on my

17    way home from work?

18          MS. NOKES:  Your Honor, there is no similar situation

19    to that.  I mean, the statutes that we have that take away

20    Second Amendment rights take them away for very serious

21    reasons.  I mean --

22          THE COURT:  But --

23          MS. NOKES:  -- a drug user who uses drugs just once,

24    someone who smokes one blunt, is not subject to (g)(3)'s

25    prohibitions.  The statute requires the kind of regular,

(973) 406-2250 | operations@escribers.net | www.escribers.net

Colloquy

1    chronic drug use, recency of drug use, that sort of thing.

2         THE COURT:  Okay.  I speed home on 540 and I crash my

3    car and kill some innocent individuals.  Does Congress then

4    have the power to take away my Second Amendment rights?

5         MS. NOKES:  Once you're indicted for, I guess,

6    involuntary manslaughter, at that point, then yes.

7         THE COURT:  So any person charged with -- Congress

8    has the authority to make it a federal crime to have every

9    person charged with involuntary manslaughter barred from

10   possession a firearm?

11        MS. NOKES:  Yes.

12        THE COURT:  Okay.  Well, we're getting a better feel,

13   but I don't know if it's historical basis for that, but --

14   there weren't cars back then, either.  But I guess I'm

15   trying -- what's the line that is drawn?  Anyone who breaks

16   any law, Congress can prohibit them from possessing a firearm?

17        MS. NOKES:  Your Honor, the statutes as it's written

18   are that somebody who's under indictment for a felony is not a

19   law-abiding citizen or someone who has been convicted of a

20   felony previously, not a law-abiding citizen.  They are not

21   covered by, as the Fourth Circuit said in Moore and Pruiss

22   (ph.), the core Second Amendment right.  So if you've been

23   convicted of a felony, if you've been convicted of

24   manslaughter, no, you are not covered by the Second Amendment.

25        THE COURT:  What if I'm convicted of DWI?

Colloquy

1       MS. NOKES:  That's a misdemeanor offense, and you

2   wouldn't have the indictment prohibition.  You wouldn't have

3   the felon in possession prohibition.  You'd still have your

4   right to possess a firearm.

5       THE COURT:  What we're looking at here is

6   governmental power, right?  The Second Amendment restricts

7   governmental power.  Does the government have the power to bar

8   everyone who is charged with DWI from possessing a firearm?  I

9   mean, that's -- I'm trying to find a line drawn here what

10  makes someone -- to exclude them from the Second Amendment,

11  right?  Because you're saying by being nonlaw-abiding, you are

12  not entitled to the Second Amendment's protection at all.  So

13  how do we draw the line between where someone loses those

14  protections and where they don't?

15      MS. NOKES:  Well, I think Congress has reasonably

16  drawn that line at the commission of a felony or pending

17  indictment for an alleged commission of a felony.

18      THE COURT:  Okay.  But how -- I mean, the Second

19  Amendment takes certain policy choices away from Congress.

20  How do we draw the Constitutional line of where the Second

21  Amendment allows it and where the Second Amendment doesn't

22  allow it?

23      MS. NOKES:  Your Honor, that seems like a pretty

24  bright line rule to me, misdemeanor conduct versus felony

25  conduct.  For a felony, you can be imprisoned for a term

Colloquy

1    exceeding one year.  For a misdemeanor that's not the case.

2    You could be jailed for a term up to twelve months, right?

3    The Congress has decided that people who are not law-abiding

4    include those who have committed these serious crimes, who

5    have alleged to have committed these serious crimes.  And I

6    think that the fact that nonlaw-abiding citizens are not

7    covered by the Second Amendment is pretty clear throughout

8    both Heller's and Bruen's opinions.

9         THE COURT:  So Congress has the ability to determine

10   who is entitled to Second Amendment rights is what you're

11   telling me?

12        MS. NOKES:  So Congress has the ability to make

13   statutes that reflect who is covered by the Second Amendment,

14   and the court has told us that the Second Amendment covers

15   those who are law-abiding.

16        THE COURT:  Because I mean, if you look back at the

17   debates on the Second Amendment, even Elbridge Gerry was

18   opposed to some of the proposed language of the Second

19   Amendment because it allowed Congress to exclude religious

20   objectors, and there was a lot of upset because the feeling

21   was Congress may then say, well, everyone's a conscientious

22   objector and therefore no one has a right to the gun.  So

23   there are concerns here over the power of government to, by

24   passing a law exclude a giant portion of the population, or a

25   substantial portion of population, from the Second Amendment's

Colloquy

1    protections just writ large.  But I hear your point on this,

2    so you can move on, if you like, or if it's anything else on

3    this point you'd like to --

4        MS. NOKES:  Well, like, Your Honor, I'd just like to,

5    again, push on the fact that in in both Heller and Bruen, the

6    majority opinions and concurrences talk about how the Court is

7    not casting doubt on the fact that felons are constitutionally

8    prohibited from possessing firearms.  So the Court is saying

9    that these folks who are not law-abiding, who have been

10   convicted of felonies, it's absolutely okay to

11   constitutionally prohibit them from possessing firearms.

12       THE COURT:  Mr. Alston's not charged with being a

13   felon in possession of a firearm, is he?

14       MS. NOKES:  Right.  You're absolutely right.  I'm

15   just pressing on your law-abiding issue and saying what the

16   Court has said, that at least as to felons, that's perfectly

17   okay.

18       THE COURT:  And if we're looking at historical

19   tradition on this point, were there exclusions from the right

20   to -- from bear arms -- kind of a complete exclusion from the

21   political community or from the Second Amendment's protections

22   on this sort of basis that you've identified?

23       MS. NOKES:  Your Honor, I would argue that statutes

24   that precluded people from possessing firearms because they

25   would not swear a loyalty oath to the country, they were

Colloquy

1    disloyal people, they could be dispossessed of their guns, and

2    that that is similar.  They're not -- I mean, that's even --

3    that's sort of less onerous than a restriction on -- or less

4    serious than a restriction on someone who's got a felony

5    conviction or is under felony indictment or is a chronic,

6    absolute person who dismisses the law regarding controlled

7    substances.  I mean, this is just somebody who won't swear an

8    oath of loyalty to the country and they dispossess them of

9    their gun rights.

10           THE COURT:  So this is a bit of a nuanced point, and

11   it came up in then Judge Barrett's concurrence.  What we're

12   talking about there is those people still have Second

13   Amendment rights, the -- I mean, it was all the grounds we

14   find abhorrent today, right?  It was Indians and -- or Native

15   Americans and they referred to them as Indians, Catholics, and

16   enslaved people, right?  Those are the folks who weren't

17   allowed to have guns because they were considered dangerous or

18   whatever.  But as you noted, there are exemptions to that

19   disqualification for many of those groups by swearing a

20   loyalty oath and other disqualifications over time had -- the

21   disqualification ran out or could be cured.

22           So -- and this was Judge Barrett's point that she

23   made in her dissent was that, one, we're talking people who

24   don't -- who lose their Second Amendment rights entirely and

25   have none of them.  The other one -- the other thing we're

1    talking about is whether folks have these rights, but Congress

2    has the ability to restrict them in a certain way.  And those

3    are two slightly different things.  And so I just want to make

4    sure we're kind of focusing on the right things here.

5         MS. NOKES:  Right.  Your Honor, I would agree with

6    that.  I would say that we still have to answer this threshold

7    question of whether the defendant is someone who's covered by

8    the Second Amendment.  And the government's position is that

9    he is not so long as he's a chronic drug user, so long as that

10    recency of drug use, that regularity of drug use apply.  And

11    he's not as long as he's under felony indictment.  Now, this

12    pushes on an interesting point with respect to these two

13    statutes, which is that both of them are temporary

14    restrictions, right, and that the defendant has at least some

15    of the ability to gain his rights back, because as soon as a

16    defendant stops using drugs regularly, as soon as the

17    government couldn't prove that he was a regular user of drugs,

18    that that recency of drug use applied, he has his rights under

19    (g)(3) back.  It's a temporary restriction for as long as the

20    defendant could be considered a chronic drug user.

21         Similarly, the prohibition on possession -- or

22    receipt, excuse me, of firearms by a person under indictment

23    is only temporary to the time that that indictment is

24    outstanding.  Now, it may result in a longer-standing

25    prohibition of a felon in possession prohibition.  But the

Colloquy

1  922(n) prohibition is, by its very nature, temporary.  That

2  indictment will be resolved in some way at some point.

3       THE COURT:  I agree with you.

4       MS. NOKES:  Okay.  Your Honor, the other issue that

5  the Court addressed as a threshold question was whether

6  defendant's conduct in carrying the gun or using the gun for

7  whatever purpose the defendant used it for was covered by the

8  Second Amendment.  And the government would argue the

9  defendant's purpose here carrying the gun while he's got a

10 bunch of drugs on him, pointing that gun at a police officer,

11 that's not conduct protected by the Second Amendment.

12      THE COURT:  Oh, but -- so I guess the two statutes at

13 issue here deal with different types of conduct, right?

14      MS. NOKES:  Um-hum.

15      THE COURT:  Possession under the (g)(3).  And

16 possession -- I mean, can you argue that under current

17 precedent that the possession of a firearm is not an activity

18 that falls within the Second Amendment?

19      MS. NOKES:  Possession of firearm generally no, but

20 possession of a firearm by someone who's a chronic drug user,

21 who has drugs on them, who is then committing other crimes by

22 dint of the fact that he's a chronic drug user, yes.

23      THE COURT:  But the crime he's charged with here --

24 and I mean, I don't countenance pointing firearms to anybody,

25 particularly a law enforcement officer, but what he's charged

Colloquy

 1   with here is being a chronic -- among other things, being a

 2   chronic drug user or a drug user in possession of a firearm.

 3   He's not charged with what we see on other cases brandishing

 4   or use of a firearm in connection with a certain crime.  So I

 5   mean, isn't the activity we're looking at here just the simple

 6   possession of the firearm?

 7           MS. NOKES:  I don't think we can divorce the

 8   possession from the prohibition, from the fact of the chronic

 9   drug use.  So we're talking about conduct that is by statute

10   connected, that that person is a chronic drug user, that

11   person is possessing a firearm.  So I agree with you to the

12   extent that the Second Amendment covers someone's ability to

13   possess a firearm.  Obviously, Heller told us that the Second

14   Amendment gives an individual an individual right to possess a

15   firearm.

16           However, here we're discussing not just someone who

17   possessed a firearm, but a chronic drug user who possessed a

18   firearm, and that shouldn't be divorced in this context.

19           THE COURT:  I mean, does the precedent bear out that

20   nuanced analysis?  I mean, it certainly sounds like a very

21   helpful argument to the government.  But I mean -- and again,

22   the defendants -- or I'm sorry, the plaintiffs in Heller and

23   McDonald and Bruen are not by accident they're there, right?

24   They're chosen in part because they're law-abiding nature and

25   all that.  But is there anything in the cases that supports

Colloquy

1  the idea that you're putting forward that we're supposed to

2  get that granular about the particular activity at play?

3      MS. NOKES:  Your Honor, I think this is all part of

4  that threshold question analysis.  So the questions about what

5  makes the person prohibited from possessing that firearm are

6  integral to the question of whether the Second Amendment's

7  going to apply to them.  And I agree with the Court that the

8  Fourth Circuit has punted on that some, has given some

9  essentially dicta on issues related to whether a person or the

10  conduct is covered by the Second Amendment and then said,

11  yeah, okay, but we're going to apply the means on scrutiny and

12  find that this is okay anyway.  But I can't point the Court to

13  a specific case that says the threshold question for a drug

14  user in possession, those two things cannot be divorced.  And

15  so we ask not only is the person covered by the Second

16  Amendment, but is the conduct of possessing a firearm while

17  being a drug user covered under the Second Amendment.

18      THE COURT:  I think the more puzzling question,

19  perhaps, is the question about 922(n), right?  That doesn't

20  criminalize possession of a firearm by someone under

21  indictment.  If Mr. Alston had a house full of firearms prior

22  to being indicted, he could possess them as much as he wanted.

23  It makes it illegal, among other things, to receive firearms,

24  what he's charged with here.  And what's your argument as to

25  why receipt of a firearm under indictment is or is not Second

Colloquy

1    Amendment-protected conduct?

2        MS. NOKES:  Your Honor, at the point when someone is

3    under indictment, they know that they're under indictment, I

4    think that the statute reflects that they pose an extra danger

5    not just because of the fact that a grand jury has found

6    probable cause to believe that they've committed some serious

7    crime, but also because there may then be a motivation to go

8    after a witness, go after maybe a victim, or a prosecutor, a

9    judge, somebody like that.

10       THE COURT:  Well, what I want to focus on Second

11   Amendment's protections.  I mean, setting aside this law, the

12   Second Amendment protects that right to self-defense and, to

13   some extent, the militia aspects of it, too.  And the Supreme

14   Court said possession is part of that right, the right to

15   possess those firearm, to keep and bear arms, right?  That's

16   the text of the amendment.  So is receipt part of that?  Is

17   receipt of a firearm by anyone part of the Second Amendment's

18   protections?

19       MS. NOKES:  Yes, Your Honor.  I think that the Second

20   Amendment does cover receipt generally, yes.

21       THE COURT:  Okay.  And so would you say that in this

22   case the Second Amendment protects Mr. Alston's receipt of the

23   firearm or why not?

24       MS. NOKES:  Your Honor, I don't think the Second

25   Amendment protects Mr. Alston's receipt of the firearm because

Colloquy

1    he is a person who has been charged with a serious felony

2    crime and is under indictment. Because he has that indictment

3    pending, he doesn't have the protection of the Second

4    Amendment that law-abiding citizens would.

5         THE COURT: Right. Okay. So -- and again, hate to

6    belabor this, but I think it goes back to what I mentioned

7    earlier, "the people", right, "the people" as a whole have a

8    Second Amendment right to receive firearms; do you agree with

9    that?

10        MS. NOKES: Yes.

11        THE COURT: Okay. And there are some people, perhaps

12   Mr. Alston, perhaps not, Congress has said you, because of

13   your conduct or the fact you've been indicted, are excluded

14   from that portion of the right. And you're saying he falls

15   into that --

16        MS. NOKES: Yes.

17        THE COURT: -- that category?

18        MS. NOKES: Yes. Yes, sir.

19        THE COURT: Okay.

20        MS. NOKES: So in sum the government would say, at

21   least as to this threshold question, that defendant, not a

22   law-abiding citizen. As Helen said and Bruen reiterated, the

23   Second Amendment protects the right of law-abiding,

24   responsible citizens to use arms in defense. It doesn't

25   protect the nonlaw-abiding. And then I just cite that Heller

Colloquy

1  and Broun both cite with approbation these prohibitions on

2  felons and the mentally ill.

3      THE COURT:  When they say they're presumptively

4  lawful, but again, Mr. Altman isn't really charged with those

5  particular items, so I question how much that language is

6  worth here, given that he's not charged with those.  And

7  they're saying that a challenge against those would have a

8  harder time, right, is what they're saying.  So I don't know

9  what it has to say about the question we have here.

10      MS. NOKES:  I think what they're saying is that a

11  challenge against, for example, the felon in possession

12  statute is dead in the water.  And the government is aware of

13  no court that has found otherwise.  And at this point, there

14  have been many challenges to 18 U.S.C. 922(g)(1).  That the

15  Court is saying in both Bruen and Heller that this applies to

16  law-abiding citizen.  And if you're -- citizens.  And if

17  you're not a law-abiding citizen, like a felon, it doesn't

18  apply to you.

19      THE COURT:  I mean, there's some academic debate

20  about this.  But I mean, felons were typically or regularly

21  put to death, right?  And after that, there was no need for a

22  firearm and no ability to get one.  So again, I -- and I have

23  not seen in my research, nor has anyone cited anything to me,

24  showing that folks who use intoxicating substances back around

25  the founding era were subject to the same sort of harsh

Colloquy

1   penalty for their use.  So again, I don't know that it's an

2   exactly a one-for-one analogy there between the two types of

3   crimes.

4         MS. NOKES:  And that's fair, Your Honor.  I'm just

5   saying that the Court in making that distinction of law-

6   abiding citizens and saying that felons are not part of that

7   group and thus that there's no problem with dispossessing them

8   of firearms, the court is saying that the Second Amendment

9   applies only to those law-abiding citizens.

10        THE COURT:  Okay.

11        MS. NOKES:  Okay.  May I turn to the historical

12  analysis?

13        THE COURT:  Sure.

14        MS. NOKES:  Okay.  So the Bruen court recognized that

15  courts can't compare modern statutes to statutes from 100

16  years ago or 200 years ago or at the time of the founding

17  like, as they say, a red-line comparison in a word processing

18  application.  The court's merely just asking us to analogize

19  our statutes -- our modern statutes against those statutes

20  from a couple hundred years ago.  And I think the Bruen court

21  goes back even further than that.

22        So as this Court looks at analogous statutes, I think

23  the Court needs to keep in mind that even if the Court does

24  not find a one-to-one comparison between a founding era

25  statute and the modern statute, that does not mean that modern

Colloquy

1    law is unconstitutional.  It's only, as Bruen said, relevant

2    evidence.  That is because, as other courts have recognized,

3    some restrictions that the founders would have believed to be

4    permissible would fail just because they happened not to exist

5    at the time of the founding era.

6         So the idea is that there -- you can think about it

7    as like a cloud of permissible laws that the founders

8    understood could be -- were constitutional, could be imposed

9    constitutionally.  Just because that the entirety of

10   everything up in that cloud hadn't been written in the statute

11   book doesn't mean that the law itself or its descendant a

12   couple hundred years later is unconstitutional.

13        So if we look at 922(g)(3), first of all, the

14   government would note that drug use of the type that's seen in

15   modern life was not present or at least not prevalent at the

16   time of the founding.  And so it's not a question that was

17   directly confronted by the founders.  And there's no statute

18   in the founding era related to the type of controlled

19   substance use that we see today, the marijuana use, the

20   fentanyl use, things like that.

21        THE COURT:  I guess this is a thread that runs

22   through a lot of this discussion, and that is at what level

23   generality do we approach this analogy?  Because again, I

24   haven't -- nothing's been cited to me nor have I found a

25   statute like you're talking about, but perhaps that's too high

Colloquy

 1    of a level of generality.  But again, that's a difficult

 2    question to answer.

 3         MS. NOKES:  You're right, Your Honor.  And that's why

 4    I cite to the fact that drug use has changed over the course

 5    of the past 200-plus years.  It doesn't look the same as it

 6    did at the time of the writing of the Constitution.  So we

 7    have to look at statutes that are a little bit more general,

 8    that look at things like dispossessing individuals because

 9    they are drunkards or intoxicated by alcohol, and

10    dispossessing individuals who are mentally ill.  I think those

11    are the two best historical analogues in this context.  So --

12         THE COURT:  Well, let's start with -- well, go ahead.

13    I have a question.  But go ahead.  I want to hear --

14         MS. NOKES:  Sure.  Okay.  Turning first to statutes

15    that disarmed drunkards, founders were certainly familiar with

16    intoxicating drink.  And it was, I think, as defendant pointed

17    out, important at the time of the founding, liquor in the

18    United States.  But they also recognized that possession of

19    guns by drunkards posed a danger to the community.  And they

20    understood that that danger could be mitigated by taking away

21    those guns.

22         THE COURT:  Is that what they did, though?  Didn't

23    they just prohibit folks from using fire, from shooting off

24    firearms, excepting weddings and funerals?

25         MS. NOKES:  Your Honor, I don't think so.  I think

1    that some of the statutes, and they're cited in the

2    government's brief, talk about not just shooting off firearms

3    but actually taking guns away from intoxicated individuals or

4    drunkards, actually preventing individuals from having guns

5    for certain occasions where people were likely to be

6    intoxicated, because they recognized that danger and did not

7    see it as a problem under the Second Amendment to impose those

8    restrictions.

9         THE COURT:  We're talking about the founding era

10   restrictions?

11        MS. NOKES:  Yes, Your Honor, founding era and into

12   the Reconstruction era in the 1800s.  And the government would

13   argue that drunkenness is analogous to drug addiction,

14   obviously not a one-to-one comparison, but analogous.  Both

15   someone who's drunk or a drunkard and the drug user have

16   diminished capacity and are dangerous, especially around

17   firearms.  Founders and Reconstruction-era legislators

18   understood that guns could be taken away from those folks in

19   order to protect the public safety, just as legislators in the

20   mid-20th century understood that guns can and should be taken

21   away from chronic drug users in order to protect the rest of

22   the public.

23        THE COURT:  So I'm looking at page 13 of your

24   response brief, which I think is the relevant portion of this.

25   And if there's not, feel free to point me to the right

Colloquy

1    portion.  You talk about the 1655 Virginia law that prohibited

2    shooting any guns at drinking, a 1771 New York law prohibiting

3    firing guns during the New Year's holiday, and then a 1746 New

4    Jersey statute that allowed military officers to disarm

5    soldiers who appeared drunk; is that correct?

6           MS. NOKES:  Yes, sir, Your Honor, page 13.

7           THE COURT:  So we've got three cases there.  And

8    assuming I find those cases persuasive, I've still got to

9    confront the language in Bruen on page 2,142 of the Supreme

10   Court Recorder.  It says, "In the colonial era, respondents

11   point to only three restrictions on public carrying.  For

12   starters, we doubt that three colonial regulations could

13   suffice to show a tradition of public carrier regulation".

14   And so even if I find those three cases to be one hundred

15   percent on point, is that enough under Bruen?

16          MS. NOKES:  Your Honor, the government would argue

17   that it is because what it shows is that at the time of the

18   founding -- prior to the founding, then at the time of the

19   founding and then into the 1800s, there was this evolution of

20   disarming individuals who were intoxicated, who were drunkards

21   from having firearms because they were considered to be

22   dangerous.  And that evolution just continued.  As

23   intoxicating substances became more potent, became something

24   other than just alcohol, became the marijuana and the cocaine

25   and the fentanyl and the meth that we see today, those

Colloquy

1    statutes had evolved along with them.  And because the Court

2    can look at this entire timeline and see statutes from prior

3    to the founding all the way up until today, following this

4    evolutionary timeline and following along with the evolution

5    of use of substances in this country, the government would

6    argue that that that is absolutely consistent with the

7    historical tradition of firearm regulation in this country.

8         THE COURT:  So two of those three colonial era cases

9    that you cited talked about firing firearms.  And the one

10   about the military officers seemed to involve disarming

11   someone.  But it seemed like the historical tradition outside

12   of the military was more to prohibit use as opposed to

13   possession of the firearms.  So why should -- I mean, and

14   that is a distinction that the law recognizes in a bunch of

15   different contexts.  So why should I not find that, again, if

16   I accept those cases as sufficient that the historical

17   tradition was actually one of possessing -- of prohibiting

18   using a firearm as opposed to merely possessing one?

19        MS. NOKES:  Your Honor, I think that the Second

20   Amendment covers both firing firearms, certainly in a

21   noncriminal context, not firing at somebody, not firing in a

22   sensitive place, those sorts of things.  Second Amendment

23   covers firing firearms just as much as it does cover

24   possession of firearms.  So the fact that those are two

25   different activities shouldn't matter in the Court's analysis

Colloquy

1    because we can show this historical tradition.

2         THE COURT:  The core of the Second Amendment is self-

3    defense, and we're looking at how that's impacted here.  There

4    is self-defense value in an open carrying a firearm and I

5    guess to the carrier's concealed carrying a firearm.  And

6    there's certainly some deterrent value in brandishing a

7    firearm, which are not restricted by two of the three cases

8    that you've cited.  So why is historical tradition one of

9    disarmament as opposed to disallowing use?

10        MS. NOKES:  Your Honor, I would argue that the

11   historical tradition shows that the Second Amendment right,

12   whether that's firing or possessing the firearm, can be

13   burdened because the person poses a danger, because of the use

14   of substances, and not that it matters necessarily exactly

15   which piece of conduct that is covered by the Second Amendment

16   that person was actually engaged in.

17        THE COURT:  So Judge Wyrick in Oklahoma wrote a

18   lengthy opinion kind of really diving into these various

19   statutes and found to his satisfaction that they did not --

20   that the reason, the why, right -- Bruen talks about the how

21   and the why -- the why did not match up with our current-day

22   whys.  One of the no firing firearms drunkenly is because we

23   need to use firearms to alert us when there's -- our enemies

24   are approaching.  And if you're always firing off firearms, we

25   won't be able to distinguish between real threats and drunken

Colloquy

1   discharges of firearms.  So do I -- do these -- does the why

2   of these various statutes comport with the why of the ban on

3   Mr. Alston's possession?

4       MS. NOKES:  Your Honor, I believe that it does.  In

5   the government's brief page 12, we cite to a -- and I guess an

6   article by Benjamin Rush, a signer of the Declaration of

7   Independence, who talked about habitual drinking being a form

8   of insanity.  In the Yancey decision from the Seventh Circuit,

9   Seventh Circuit talks about the danger that persons under

10  substances pose to the rest of society.  And I think that

11  thread is present throughout these statutes, not just showing

12  that they needed to have a Paul Revere moment and alert other

13  folks when there was some sort of issue, but also that these

14  statutes were important to protect the public.

15      THE COURT:  I think Mr. Rush's statements are what

16  they are.  But I mean, are you -- I'm looking -- you cited

17  these three colonial-era laws -- I mean, does the why of those

18  particular laws provide support for your argument here?

19      MS. NOKES:  Your Honor, I don't have any statements

20  upon the promulgation of any of those laws that show that in

21  1655 the legislature of the Colony of Virginia was primarily

22  or solely concerned with the public safety in passing a law

23  preventing someone from possessing a firearm while drinking.

24  But I think the evolution of these statutes, dispossessing

25  folks who are under the influence of substances, shows that it

Colloquy

1    is about danger to the community.

2            Your Honor, we also argue that 922(g)(3) is analogous

3    to disarmament of the mentally ill.  Of course, the Bruen and

4    the Heller courts say that their decisions don't cast any

5    doubt on regulations that prohibit firearm possession by

6    felons or persons who are mentally ill.  As we know today,

7    drug addiction is actually a mental illness.  Substance use

8    disorder is recognized in the DSM-5.  And interestingly, in

9    the DSM-5, there are several different categories for

10   substance use disorder.  One of them is cannabis use,

11   marijuana use, and another is alcohol use, and then there are

12   several others opioids and things like that.

13           But habitual drug users, like others with mental

14   illness, are more likely to have difficulty exercising self-

15   control and making it so that it's a dangerous proposition for

16   someone like that to have a weapon.  So given that drug

17   addiction is, in fact, a mental illness and that chronic drug

18   use has at least some of the same effects of mental illness,

19   reducing inhibitions, preventing that person from being able

20   to exercise an ordinary level of self-control, making them

21   dangerous to society, the government would argue, as it has in

22   its brief, that drug users are at least analogous to the

23   mentally ill for purposes of restrictions on possession of

24   firearms, which again, the Bruen and Heller courts say are

25   just fine.

Colloquy

1    THE COURT:  Sorry, point me to the laws about -- that

2    you've cited in here about disarming the mentally ill.

3    MS. NOKES:  I'm sorry?

4    THE COURT:  You're talking about that there were laws

5    about disarming the mentally ill and all that.  Where in your

6    brief are those laws?  Just like what -- the -- as we sit

7    here?

8    MS. NOKES:  Your Honor, the government cited opinions

9    discussing longstanding prohibitions on possession of firearms

10   by the mentally ill; that's from Heller.  We cited Yancy for

11   the proposition that in 18th century America justices of the

12   peace were authorized to lock up lunatics who were

13   dangerous -- too dangerous to be permitted to go abroad.  We

14   didn't, as in the situation with disarming drunk individuals,

15   cite specific statutes from 1600 or 1700s so.

16   THE COURT:  Well, I mean, the justice of the peace

17   manuals are an interesting thing, right?  They go through -- I

18   was looking at this yesterday -- I mean, they go through and

19   they define mental illness in different ways.  Kind of a

20   short-term episode would not necessarily be considered mental

21   illness, but a longer term one might be.  So again, that sort

22   of nuance may be relevant here.  I mean, if it's -- in

23   determining whether it's -- chronic use of a drug qualifies

24   closely enough as a mental illness so --

25   MS. NOKES:  Your Honor, I agree, actually, that that

Colloquy

```
1    nuance is relevant and that that is why it's important that
2    for 18 U.S.C. (g)(3) the government has to be able to prove
3    that that use this chronic, that it is regular, that it is
4    recent.  It is not someone who smokes a blunt, gets high, and
5    is off their gourd for a day.  It's not that.  We're talking
6    about someone who is a chronic user of controlled substances
7    in the way that someone who has a mental illness has a long-
8    term issue, which the founders and statutes, legislators
9    throughout the 1800s did not have a problem dispossessing from
10   possession of firearms.
11           THE COURT:  All right.
12           MS. NOKES:  Okay.  So turning, then, to 18 U.S.C.
13   922(n), the prohibition against receipt of a firearm while a
14   person is under indictment, the government argues that that
15   statute is consistent with the nation's history and tradition
16   of firearms regulation in three ways; two of them are fully
17   expanded in our brief -- I'll go over them briefly -- but then
18   also surety statutes.  So we talk about the fact that this
19   burden on Second Amendment rights, when someone is facing a
20   felony indictment, is similar to other pre-trial burdens on
21   rights.  We talk about the fact that 922(n) is analogous to
22   prohibitions against dangerous individuals possessing
23   firearms, and then the fact that this is analogous to some of
24   the surety laws that the Court actually took a look at in
25   Bruen.
```

Colloquy

1            So speaking first about the Second Amendment's burden

2      on -- or excuse me, the 922(n)'s burden on Second Amendment

3      rights being similar to burdens on other pre-trial rights, the

4      Court is, of course, aware that a person can be completely

5      locked up prior to trial.  They can have a burden on their

6      liberty that's so extreme that they're sitting in a jail cell.

7      Obviously, they don't have access to guns while sitting in a

8      jail cell.  And from the time of the founding, that has been

9      completely constitutionally appropriate.  At the time of the

10     founding the founders were familiar with the English Bill of

11     Rights Act, which was not understood to afford bail in all

12     cases.  Some people who have been arrested are subject to a

13     search of their person, incidental arrests burdening a Fourth

14     Amendment right.  They can even be strip searched, again,

15     burdening a Fourth Amendment right.  Someone who's got pending

16     felony indictment, like I said, could be locked up and in

17     being locked up could have restrictions on their First

18     Amendment right, could have restrictions on the kind of

19     materials that they're able to get while in custody.  And they

20     can also have restrictions on their Sixth Amendment right as

21     the government can seize potentially for finable assets and

22     prevent that person from hiring counsel of their choosing. So

23     there are there are a slew of rights that are in the Bill of

24     Rights that the government can accurately, adequately,

25     constitutionally burden when someone is facing a felony

Colloquy

1    indictment.

2         And in the Bruen opinion, Justice Thomas talks about

3    the fact that the Second Amendment is not a second class

4    right.  But he does not say that the Second Amendment is more

5    important than every other right in the Bill of Rights.  So if

6    it is constitutional to burden the Fourth Amendment, the First

7    Amendment, the Sixth Amendment, it is logical to understand

8    that it is also constitutional to burden that Second Amendment

9    right.

10        THE COURT:  So a lot of what you say makes sense.

11   The one kind of question that I have in my mind about -- or

12   one of them, about this issue is obviously every day here we

13   go through the exercise of determining whether someone's let

14   in or out of custody.  And if they're let out, almost always,

15   we say they can't have a firearm, right?  And that seems to

16   have been upheld by the courts.  And it makes sense because

17   the alternative was -- is that you go to prison and are

18   deprived of all of your liberty pending your trial.  That all

19   makes sense to me.

20        But not every defendant is -- some defendants are

21   aware they're under indictment before they're arrested, before

22   they show up in a court.  So does the same argument apply if

23   they're not facing that burden of I need -- I could be in jail

24   or -- but I'm not, so I have slightly fewer rights, but at

25   least I'm not in jail, does that still apply to someone who

Colloquy

1   hasn't gone through that formal process, hasn't being arrested
2   and gone through all that?

3          MS. NOKES:  Your Honor, I'm not familiar with
4   circumstances in which individuals have been charged with
5   possessing firearms while under indictment when they haven't
6   actually been served with their indictment and appeared before
7   a court.

8          THE COURT:  We hear -- at least we hear all the time
9   of defendants or groups who monitor the docket to see if
10  people have been indicted for either their own knowledge or
11  for the knowledge of others and -- or maybe someone's aware
12  that your office calls them and says, we've got you under
13  indictment, you should turn yourself in or come talk with us
14  otherwise.  So there are circumstances people can be aware
15  they're under indictment and thus 922(n) would come into play,
16  but they're not going through -- they're not yet going through
17  all the formal steps that occur here in the courthouse.  So is
18  the same argument apply with the same strength?

19         MS. NOKES:  So there's two things there.  I guess
20  what I'm saying is I'm not aware of anyone having been charged
21  with 922(n) without having first at least been served with the
22  indictment.  But what I would say there is that, yes, once
23  that person is under indictment, they are subject to being
24  arrested.  Once they're arrested, they're subject to a search
25  and to arrest.  So they don't have the same Fourth Amendment

Colloquy

1    search protections of their person that you and I have because

2    we're not subject to an indictment.  They could be strip

3    searched upon their arrest.  All those other prohibitions or

4    burdens, I should say, on Bill of Rights rights could apply

5    even if that person has not yet been served with their

6    indictment.  So I don't think it's a problem that that burden

7    could also apply to the Second Amendment.

8          THE COURT:  Okay.

9          MS. NOKES:  And Your Honor, I just note that the

10   Ninth Circuit has looked at this issue not as it relates to

11   922(n), but as it relates to 18 United States Code Section

12   3142(c)(1)(B)(VIII), the provision that allows for courts to

13   impose a restriction on a defendant's ability to have a

14   firearm while they're on pre-trial release.  And the Ninth

15   Circuit said, yeah, that's not a problem because these other

16   burdens on Bill of Rights rights could apply, that we could

17   absolutely lock that person up.  Obviously, they wouldn't have

18   access to a firearm.  We can also say you can't have a firearm

19   while you're pending indictment.  So similar code section and

20   similar analysis, the government believes, to a 922(n)

21   scenario.

22         The government also believes that 922(n) is analogous

23   to prohibitions that existed at the time of the founding

24   against dangerous individuals possessing firearms.  The

25   court -- the Fifth Circuit in the National Rifle Association

1    v. the Bureau of Alcohol, Tobacco, and Firearms said that

2    there are historical records of the ratification debates that

3    confirm the founders' belief that disarming select groups for

4    the sake of the public safety was compatible with the right to

5    arms in the Second Amendment.  And as we have briefly

6    discussed, there were founding era statutes that disarmed

7    dangerous individuals.  Dangerous here at least sometimes

8    equated to disloyalty.  And that may seem odd in our today

9    understanding of disloyalty, but at the time, the country had

10   just gone through this Revolutionary War where you had

11   colonists who were loyal to the states and colonists who were

12   loyalists to the crown.  And once that war is over, they've

13   got to live next to each other.  And the fact that you have

14   someone who's still loyal to the crown or may foment a

15   rebellion would have been seen as a significantly dangerous

16   person.  It makes sense that that person posed danger in the

17   context of the time.  So we're talking about the founders'

18   understanding that those persons could be dispossessed of

19   their firearms for the sake of the public safety of other

20   loyal colonists.

21          THE COURT:  Well, is it really a question of the

22   public safety in that context?  I mean, I don't disagree with

23   what you've laid out about why those laws are there, but it

24   seems to be more of a national security issue, really.  And

25   that's what we'd call today, right?  We have people who may

Colloquy

1    invade us and we don't want them having guns, so we're going

2    to take those away from those people.  We have the Catholics

3    they thought would be loyal to the pope as opposed to the

4    government, and we don't want that because they might try to

5    overthrow our country.  And enslaved people, they thought, had

6    reason, rightfully, so, to be upset at the current state of

7    affairs and might try to overthrow things, too.  And so it

8    seems to be more national security than these people are going

9    to go out and commit crimes.

10         MS. NOKES:  At a more granular level, though, they

11   pose a risk to people who are loyal to the new government,

12   their neighbors who are loyal to their new government, the

13   kinds of people that they can affect in their daily lives

14   rather than the entire national security.  We're not talking

15   about today's world where it's easy to hop a flight or get in

16   a car, drive three hours, find like-minded individuals,

17   organize on social media, figure out your cause, do all that

18   kind of thing.  We're talking about people who were mostly

19   confined just by circumstances of transportation and

20   technology to their, like, little spheres of influence.  And

21   those people posed a danger -- an immediate danger to their

22   neighbors who were loyal to the new country.  I would say more

23   than they posed a danger, any one individual posed a danger to

24   the entire national security.

25         In 922(n), we have a group of dangerous individuals

Colloquy

1    whom a grand jury has found probable cause to believe have

2    committed some serious crime, some crime for which legislators

3    have determined that the appropriate punishment is prison --

4    or the maximum punishment is prison, some term of imprisonment

5    exceeding one year.  That's a serious crime.  And so the

6    legislature -- so the statute allows the burden on their

7    Second Amendment right to the extent that they cannot receive

8    new firearms.  It doesn't even say that they can't possess

9    firearms because if they had a shotgun in the closet when they

10   got indicted, they could still have that shotgun in the closet

11   once they get home from court.  But they can't go out and get

12   another gun once they've been indicted.

13          And it seems to the government that that is a pretty

14   clever way of threading the needle of making of a burden on

15   the Second Amendment right that is not a full taking away of

16   that right, just burdening the potentially dangerousness of

17   someone arming themselves with a fresh arsenal once they've

18   been indicted for a crime.  So it's an --

19          THE COURT:  Isn't that kind of the means to an end

20   argument, though, Bruen told me I can't consider?

21          MS. NOKES:  Well, you know, it's interesting because

22   you're right, we can't consider means ends.  But in

23   analogizing, we have to consider that as Bruen talks about the

24   how and the why of why these statutes were promulgated and how

25   modern day statutes are similar to olden days statutes, right?

Colloquy

1   So some of that analysis is going to look similar, but the

2   Court tells us we have to do that in the historical context.

3          So the government would submit that this burden on

4   Second Amendment rights for folks who have been found to be

5   nonlaw-abiding, have been found to be dangerous, at least to a

6   probable cause level by a grand jury, is similar to the

7   dispossession of firearms by folks considered to be dangerous

8   at the time of the founding.

9          We'd also analogize 922(n) to surety laws.  As

10  discussed in Bruen, starting in the mid-1800s there were

11  security laws that began to proliferate, which generally

12  provided that an individual's Second Amendment right could be

13  burdened if another person could make out a specific showing

14  of reasonable cause to fear an injury or a breach of peace.

15  They would have to provide some sort of -- essentially like

16  bail money in order to get their right to possess a firearm

17  back because someone else had accused them of being a

18  potential danger, being a potential breacher of the peace.

19         So 922(n) is somewhat similar there in that it

20  obviously imposed a burden on people considered to be

21  dangerous because they're facing a serious crime.  But it's

22  less restrictive than these surety laws.  It requires, first

23  of all, legitimate criminal justice process in order to take

24  effect.  A prosecutor has had to go to a grand jury, has had

25  to present probable cause, has had to get the issuance of an

Colloquy

1    indictment, and then only restricts the receipt of the firearm

2    and is only a temporary restriction, right?  It only lasts so

3    long as that indictment lasts.

4         THE COURT:  So I mean, you say it's less onerous, but

5    from where I sit it seems much harder to make an indictment go

6    away than to pay a bond to go to prison or satisfy a surety

7    requirement.  I mean, the fact that it can do that itself,

8    right?  Let's say we had a surety bond process here, right?

9    Mr. Alston could have paid that money, found a bondsman, found

10   some family and paid that.  There's no equivalent process to

11   make you all dismiss the indictment, right?  It's going to be

12   there until process completes itself.  So it seems much more

13   onerous, actually.

14        MS. NOKES:  Your Honor, I would argue that it's --

15   the person can pay that surety bond if it is possible for them

16   to pay.  So first of all, not everyone had means, I assume, to

17   pay a surety bond once that was required of them.  But second

18   of all, this is a process that is backed up by the criminal

19   justice system, that is backed up by the prosecutor presenting

20   that case to a grand jury, that is backed up by the finding of

21   probable cause, that is backed up by the issuance of an actual

22   indictment, not just some random person saying, I think Joe

23   Schmo is a breacher of the peace and should be required to pay

24   some surety in order to carry a firearm.  So it is more

25   onerous in the fact that the defendant does not have complete

Colloquy

1    control over whether that indictment is dismissed or when that

2    indictment is dismissed.  But it is -- requires a lot more

3    from the government than would have been required just by

4    someone saying, I think he's a danger to us, so we got to make

5    him pay.

6         THE COURT:  But the majority of thing in Bruen seems

7    to not find the surety lost to be all that compelling.  I

8    mean, I understand they're on the books and they existed, but

9    they didn't seem to feel like the existence of surety laws

10   really provided a meaningful remedy -- whatever the innovation

11   of the Second Amendment rights.  So should I afford any weight

12   to this particular argument in light of the Supreme Court's

13   attitude toward them?

14        MS. NOKES:  Your Honor, I absolutely agree with you

15   that the Bruen court seems skeptical of the surety laws being

16   analogous to New York's requirement that folks actually

17   provide some reason why they had to have a gun.  But I don't

18   think that the Supreme Court in saying, look, the analogy

19   isn't strong enough here, we're not going to give this a whole

20   lot of weight, it is quite as strong when you look at the fact

21   that it is more factually similar to the circumstance we have

22   before us in 922(n) than New York's scheme for forcing people

23   to provide reasons for why they needed a gun before they could

24   actually go get a gun.  So I think that it is more meaningful

25   here than it was in Bruen, though I understand that the Bruen

(973) 406-2250 | operations@escribers.net | www.escribers.net

Colloquy

1    court kind of looked askance at those surety laws, did not

2    find them to be particularly compelling.

3           But I will tell the Court that other courts who have

4    looked at 922(n) in the wake of Bruen have found the surety

5    laws to be compelling.  To cite just one, United States v.

6    Jackson.  This is 2023 Westlaw 2242873.  In that the court

7    talks about many of the things that we've already discussed,

8    but does find that in amongst those things that the surety

9    laws are more analogous or that are analogous to 922(n)

10   perhaps in a way that the Supreme Court did not feel the New

11   York statute was in Bruen.

12          So Your Honor, I'll just say to sum up, defendant as

13   a nonlaw-abiding citizen is not covered by the Second

14   Amendment, which applies to law-abiding citizens.  And even if

15   his conduct did fall within the scope of the Second Amendment,

16   the restrictions at issue here, 922(g)(3) and 922(n), are

17   analogous to a historical disarmament of dangerous individuals

18   and the other statutes that we've cited, which makes them

19   consistent with this nation's history and tradition of

20   firearms regulation.  We feel that these statutes are thus

21   constitutional.

22          THE COURT:  Thank you.  One final question.  You've

23   described this in your briefs as a facial challenge, and that

24   seems to be a fair characterization of what's going on here.

25   And I'll hear from Mr. Gray in a moment about that issue.  But

Colloquy

1    Bruen seemed to change the mode of analysis here.  I mean,

2    it's not the standard facial challenge.  It's the government

3    must affirmatively prove that this is constitutional, which

4    seems to be a change.  And so does that matter here?

5         MS. NOKES:  Your Honor, I don't think we have any law

6    to say that the standard way of looking at a facial challenge,

7    which is that no facial challenge can survive if there is any

8    circumstance which it could be constitutional under the

9    statute -- we don't have any law to say that that's not how

10   we're to look at these facial challenges post-Bruen.  I mean,

11   that would be a huge sea change, I think, that I haven't seen

12   addressed in by any other court.  And the fact that once the

13   threshold question is answered about whether the defendant and

14   his conduct are covered by the Second Amendment, the

15   government has to come up with some historical analogies, I

16   don't think changes the entire analysis of how we look at a

17   facial challenge and says that we basically treat them as

18   applied challenges now.  I don't think that mixing has

19   happened.

20        THE COURT:  Thank you.

21        MS. NOKES:  Thanks.

22        THE COURT:  Mr. Gray.

23        MR. GRAY:  Thank you, Your Honor.  And Your Honor, I

24   want to say thank you for giving us the opportunity to talk

25   about this case because when all of us went through law

Colloquy

1    school, we all had a chance to see a bunch of cases that came

2    out where we had to sit there and wonder, what in the world

3    was the Supreme Court thinking?  How did they get to this

4    reasoning?  How did they get this ending?  What was the

5    analysis?  And I can say very comfortably that in this case

6    with Bruen, this is one of the most clear-cut cases that we've

7    seen the Supreme Court put out because it said very simply

8    this, who does this apply to?  At page 2,156, all Americans.

9    All Americans.  When is a statute going to be constitutional

10   with regard to regulating the Second Amendment?  If it existed

11   prior to that.

12           We're talking about -- and I know the government said

13   it was a sea change, but it really is.  We saw a court that

14   ultimately took a line of analysis that was at Heller where we

15   saw the means ends analysis really permeate through how courts

16   were looking at these sort of statutes.  Bruen was the big

17   change where the Court ultimately said, listen, this isn't

18   that complicated.  The right to bear arms for self-defense or

19   other lawful purposes is absolute, period, dot.  We wrote it

20   in the second -- it's written in the Second Amendment.  The

21   next part is pretty simple, who does this apply to?  All

22   Americans.  There is no restriction as to law-abiding, and we

23   discussed in our brief how the government was going to latch

24   on to that idea of law-abiding.  But if you start to go down

25   that rabbit hole of what is law-abiding and what do they mean

Colloquy

1    by that parsing through all of the various layers of that

2    onion, not only are we dismantling what the Court was trying

3    to put across in Bruen, but we ultimately start walking down

4    this area where we are eventually right back at the means ends

5    analysis, which was destroyed by Bruen.  And I don't mean just

6    overlooked, it was destroyed.

7            If we use the government's line of analysis, that

8    circular reasoning, which is that Mr. Alston can't own a

9    firearm because there's a statute that says that he can't own

10    a firearm, we really start to walk down a pathway of whether

11    or not we're interpreting this amendment in the appropriate

12    way.  As we take a look at what was said in the Bruen court,

13    let's take a look at Heller, and let's take a look and see

14    whether or not that analysis was clear enough.  They said no,

15    the clarity is here.  Did this statute exist before the

16    founding of the passage of the Second Amendment?  Government

17    will concede yeah.

18            The next question is, using a historical analysis, is

19    this going to be the same type or similar statute?  And the

20    government can't say that it is.  When we start looking at

21    things that are covering "law-abiding persons", we've really

22    got to ask ourselves two real questions:  What do we mean by

23    law-abiding in that context?  Well, it seems pretty clear that

24    the Court said law-abiding means those who have committed and

25    been convicted of an offense.

Colloquy

1      In this case but for the fact that he's charged under
2  these two statutes, Mr. Alston wouldn't be here.  There is no
3  challenge as to whether or not he could have possessed the
4  firearm, because he's not a felon.  He could possess firearms.
5  The only thing that restricts him from possessing a firearm is
6  the statute that says that you can't possess it while under
7  indictment.  And when we take a look at that analysis, that
8  portion of the analysis clearly wasn't there and we don't see
9  any citations asked of that existing in our pre-Second
10  Amendment era.

11      THE COURT:  On the law-abiding point, right?  The --
12  and if you -- what's been submitted to me is that the
13  defendant has admitted that he's a regular marijuana user,
14  which under federal law, whatever states it's done, under
15  federal law, that's illegal.  So that makes them a nonlaw-
16  abiding person under federal law.  And he's been indicted,
17  which doesn't necessarily make him -- I mean, he's got a
18  presumption of innocence, but it's certainly not exactly as --
19  if law-abiding's on scale, perhaps, it's not -- we're not
20  quite at one hundred percent, but at least the drugs indicates
21  not necessarily law-abiding as far as the federal government
22  is concerned.  So isn't there some -- and there is some
23  restriction, and we talked about Heller, talking about these
24  presumptively lawful areas.  I mean, there are some people who
25  don't get to enjoy these rights as fully as others.  So why is

Colloquy

1    it not -- and there was lots of emphasis on law-abiding both

2    in the majority and in the concurrences, and so why is it

3    not -- why don't I take into account the fact that there is

4    evidence of nonlaw-abiding conduct here?

5          MR. GRAY:  And Your Honor, you are walking exactly

6    down the line of analysis that got us to Bruen in the first

7    place, because there's clearly an idea that there are certain

8    types of persons that we feel should not be able to own

9    firearms.  And if we look back historically, you know who

10   those persons were?  If you look at what we've cited in pages

11   15 and 16 in our brief or in pages 11 and 12 of their brief,

12   you're going to see kind of two types of statutes that govern

13   drug users or people who are intoxicated.  People who are

14   about to go off and shoot that firearm while intoxicated -- we

15   don't have that in this case.  But that's a pro act of saying,

16   you know what, using the mends (sic) -- the ends-means

17   analysis, yeah, we can all think that a person with a gun

18   who's drunk probably shouldn't be around firing.  However,

19   unless it's a wedding or a funeral, somewhere where we need

20   fireworks, it's all good.  But when we take a look at that

21   line of analysis, once again, we've walked ourselves right

22   back into the means-ends analysis.

23         THE COURT:  Well --

24         MR. GRAY:  And --

25         THE COURT:  -- aren't you somewhat running into the

Colloquy

1    language in Bruen about Second Amendment not being a

2    regulatory straitjacket, and it doesn't need to be an exact

3    match?  I mean, it seems like, obviously, as I mentioned,

4    there are benefits to having a firearm if you're confronted,

5    even if you can't shoot it for one reason or another.  But the

6    ultimate power of the firearm is being able to use it.  And if

7    that's restricted, why is it not analogous, although not a

8    one-for-one match, with some of the things we're talking about

9    here?

10          MR. GRAY:  No, I completely understand where you're

11   going at with that, Your Honor.  But once again, that's the

12   ends-means analysis.  That's where we're -- where it's

13   sitting.  And the court in Bruen said, all right, we're not

14   going to do that.  Clearly, the court in Bruen was like, okay,

15   listen, those who have been felons, that's something that

16   we're comfortable with saying that may be an area for

17   regulation.  But then when we look at where the court

18   ultimately landed, it was take a look and see whether or not

19   this was a pre-Second Amendment issue.

20          THE COURT:  Well, I mean, but Heller -- or Bruen asks

21   me and all judges to look at the how and why of the

22   restriction on Second Amendment rights.

23          MR. GRAY:  Um-hum.

24          THE COURT:  And that's distinct from means end.

25   Means ends is it's a bad idea for drug users to have guns

Colloquy

1   because they're going to go -- they're more likely to lose

2   control and commit crime, right?  That means end, right?  This

3   is how and why is we take the gun away from someone perhaps

4   because of the threat they pose to the public.

5        MR. GRAY:  Well, Your Honor, I'm going to argue that

6   how and why is actually embodied in Justice Thomas' statement

7   that you look and see whether or not this existed before the

8   enactment of the Second Amendment, because that's your how and

9   why.  To use as an example, the government's arguing that Mr.

10  Alston is an addict.  Okay?  But if we use their how and why

11  analysis, it fails.  What do we know about addiction to

12  marijuana?  Absolutely nothing.  The reason why we know

13  nothing about addiction to marijuana is because the federal

14  government for years didn't allow anybody to go into the study

15  of this.  The DSM-5 identifies substance abuse disorders.  And

16  within its commentary, it talks about addictions to various

17  drugs.  But I think it's also important to note that in 2012

18  when the American Psychological Association was asked the

19  question about, hey, how do we feel about the enactment -- and

20  at this point, we're at thirty-six, and currently in North

21  Carolina we're arguing whether or not medicinal marijuana use

22  is appropriate -- where on that scale do we try to figure out

23  what's the addictive problems of marijuana, what's the

24  problems of marijuana that make it different than alcohol.

25  And in that case, the American Psychological Association said,

Colloquy

1    we'd love to be able to answer that, but there just hasn't

2    been enough study.

3         So if we want to look at this in an analogous sort of

4    way, which the government wants you to do, it's looking at it

5    from the standpoint of alcohol.  And here's the real question.

6    Under the statute, if you had a beer, does that mean that you

7    can't have a firearm ever again?  I would say that's

8    ridiculous.  You had ten beers; would that mean that you're no

9    longer eligible to fall under the Second Amendment

10   protections?  Once again, everybody else would say that's

11   ridiculous.

12        THE COURT:  Well, I mean, I guess there's ambiguity,

13   right?  Like, the law prohibits firing guns while drunk.  And

14   that's going to depend on -- your tolerance might be different

15   from mine one way or the other, so there is ambiguity and

16   vagueness there.  But I want to go back.  I'm sorry.  I want

17   to go back and I want to cover here -- we covered in somewhat

18   of an ordered way with me take taking a field every once in a

19   while, but I want to try to do the same thing here.

20        As we talk about whether the defendant's entitled to

21   Second Amendment protections, we've talked a bit about the

22   law-abiding question, the actions he was taking.  What I hear

23   from the government is the defendant's actions are not

24   protected by the Second Amendment because he was pointing the

25   gun at a law enforcement officer and doing other things we

Colloquy

1    generally frown on.  Is that the level of analysis I should

2    take or is it the more generalized he was possessing a firearm

3    here?

4         MR. GRAY:  Your Honor, in this case, the conduct is

5    possession of a firearm; that's all.  If he had been charged

6    with assault on a federal law enforcement officer, different

7    analysis.  If he had been charged with firing on a law

8    enforcement officer, completely different analysis.  If we had

9    been charged with any of those sort of similar offenses, the

10   analysis is different.  But in this case, when we look at the

11   conduct, the conduct is simple:  Did he possess it and did he

12   receive it?  Possession while under indictment, receipt while

13   an addict.  And --

14        THE COURT:  The other way.

15        MR. GRAY:  -- both of those --

16        THE COURT:  The other way.

17        MR. GRAY:  Oh, I'm sorry.  Yeah.  Thank you, Your

18   Honor.  But when we look at that issue, when we look at that

19   issue, the real question still stops us right back to the

20   analysis of Bruen, which is, was that a prohibition that

21   existed prior to the enactment of the Second Amendment?

22        THE COURT:  Well, so I mean that is a question.  I

23   mean, the question is, is the possession and receipt of a

24   firearm for anyone, are those things the Second Amendment

25   protects?  Is that part of the keeping and bearing of arms?

Colloquy

1    And that's I think that's one of those threshold questions.

2    And I think obviously the possession of a firearm is,

3    undoubtedly.  Is the statute dealing with receipt of a

4    firearm, is that implicating the keeping and bearing arms?

5         MR. GRAY:  I think that is directly bearing on the

6    bearing of arms.  So when we're talking about both of these

7    aspects, the Second Amendment is being directly implicated.

8         THE COURT:  It seems to implicate it --

9         MR. GRAY:  I think --

10        THE COURT:  -- less --

11        MR. GRAY:  -- it's clear --

12        THE COURT:  -- less in the context of receiving

13   because, again, if Mr. Alston had all the firearms he ever

14   wanted, there was no -- I mean, unless he came in here and

15   there were conditions put on him, there was no prohibition on

16   him possessing those.  I mean, it's receipt, right, under

17   922(n).  So does that -- that seems like a lesser limitation,

18   although still a limitation.  And if -- and you can push back

19   on that if you want.  And does that fact impact anything I do

20   down the line with the analysis, meaning is there somewhat of

21   a different standard when the restriction on the Second

22   Amendment right is a lesser one?

23        MR. GRAY:  I think that argument and that line of

24   analysis would have held prior to Bruen.  That is a classic

25   Heller analysis right there.  That is exactly the sort of

Colloquy

1   means-ends analysis that was rejected by the court.  And

2   that's why the arguments get very circular when we start to

3   listen to the government's argument with regard to why we're

4   prohibiting this.  Well, is he a law-abiding person?  Well,

5   the -- the court was pretty clear, the Second Amendment

6   guaranteed to "all Americans the right to bear commonly used

7   arms in public, subject to reasonable, well-defined

8   restrictions".

9            THE COURT:  Then why all the ink spilled on law-

10  abiding citizens?  They say that tons of times in all these

11  opinions, so why are we spilling all the ink on that if it

12  doesn't matter?

13           MR. GRAY:  You want the real answer, Your Honor?

14           THE COURT:  I want your answer.

15           MR. GRAY:  Because my answer is going to be the real

16  answer.  There are certain people that we don't want to have

17  firearms, and we need to come up with a way to keep them from

18  having firearms.  So we're going to come up with that

19  analysis.  However, I do think that's really, really important

20  to understand when we look at the thread that is consistent

21  from Heller to Bruen and other similar cases.  It's really

22  kind of up front when we look at what Justice Thomas was

23  asking us to do, which is it is not up to the courts to

24  legislate this issue.  If you want to keep people from having

25  those firearms, there's a legislative process.  And when we

Colloquy

1    look at why we get rid of ends -- the means-ends, that really

2    takes the courts and puts them back into a position where

3    they're able to make the analysis in a clean way.  Because

4    it's a simple proposition at that point in time.  Did that law

5    previously?  If it did, then it holds up.  The Second

6    Amendment is essentially a filter that filters through

7    legislation that says, hey, we have the ability to still have

8    well-reasoned and well-defined restrictions but to determine

9    the how and the why of what a well-defined and reasonable

10   restriction is, that's where you look back to the founding

11   eras.

12            THE COURT:  So you've mentioned a couple of times we

13   need to look at -- we look whether it existed prior to the

14   Second Amendment.  And obviously it'd be very helpful to the

15   government if they could point to exact duplicates of the

16   current laws.  But the Supreme Court didn't freeze us in 1791.

17   They did say we can look at things going forward.  And the

18   further you get from the ratification of the Second Amendment,

19   the less weight to be accorded to those laws.  So what do I

20   make of the fact that as our -- in the late 18th century,

21   we're looking at a country that's a nascent country, brand

22   new, just fought a war, has no money, no form of government,

23   threats from all around.  They're trying to do certain things.

24   And perhaps gun regulation wasn't at the top of the list,

25   right?  As things get more stable and move forward in the

Colloquy

1    1800s, pre-Civil War, you see more and more regulation.  So I

2    don't think Bruen requires me to throw all that in the dust

3    bin, but why should I not consider that in determining what

4    the scope of the Second Amendment is?

5        MR. GRAY:  Well, I think that it should be

6    considered.  I mean, when we take a look at the statute under

7    which Mr. Alston is charged, being an addict of marijuana,

8    there's no analogous statute.  The government couldn't find

9    one that said that pre-founding era there was a prohibition on

10   folks from possessing firearms while using or being addicted

11   to marijuana.  But they cite that, well, we can't really look

12   at marijuana because drug use is different now, things are

13   different, and things have changed.  We had opiates back then.

14   We had cocaine back then.

15       What really is happening here, and I think this is

16   quite frankly the genius of the opinion, is there's a

17   recognition that from your standpoint the decision as to who

18   gets their rights -- I mean, we're talking constitutional

19   rights -- restricted falls on you.  So let's make this burden

20   easier.  Get rid of the means; get rid of the ends; get back

21   to what's really here.  And it doesn't mean that you toss it

22   all to the dustbin.  It does mean that those are things that

23   you got to factor within the analysis ultimately to get to the

24   conclusion.  But when we start asking ourselves the threshold

25   questions, who does this apply to?  Certainly will apply to

Colloquy

1    Mr. Alston.  Second Amendment applies that.  There's no

2    statement that he has surrendered his Second Amendment rights

3    or has done anything like commit treason or any other felony

4    or any other constitutionally articulated thing that citizens

5    can do to renounce their rights.  He hasn't done any of those

6    things.  So we know this applies to him.

7            Then the next step is pretty simple.  The two

8    statutes which he's she's been charged with, is there an

9    analogous statute?  Felon in possession?  There's analogous

10   statutes.  We've seen those.  Those are cited not only within

11   this brief by the Department of Justice, but many others.  But

12   when we start asking ourselves as to what's the analogous

13   statute for the possession by a marijuana addict, that's where

14   the how and why analysis from this Court comes into play.

15   Because then we take a look back and say, all right, under

16   Bruen, the question isn't that complicated; it's quite simple.

17   Was there an analogous statute?  Was there something that said

18   back then we wanted to restrict certain people from being able

19   to get that right?  Because we've already established it

20   applies to everybody, so we got to figure out who it is that

21   it doesn't apply to.  That's not that difficult of an analysis

22   to make once you start looking at these things from the Bruen

23   analysis, because now it's a question of, all right, what's

24   the pre-Second Amendment discussion and analysis.  This isn't

25   that complicated because Your Honor's already figured it out,

Colloquy

1   because you asked the question which is always on my mind,

2   which is we talk about law-abiding all day, but if someone has

3   been speeding, whether they've been caught or not, we all

4   would say that that person is not law-abiding.  I feel like

5   that's an argument that even the Supreme Court recognized when

6   it was using the term "law-abiding", which is why they didn't

7   explicitly say law-abiding means X, Y, or Z.  What they were

8   doing was they were saying, yes, we understand that there's

9   going to be restrictions, but those restrictions need to be

10  viewed from the historical lens of what existed in the pre-

11  Second Amendment era.  That's the only distinction.

12          And we all have the fear of things going really bad.

13  But that is a fear that ultimately has been entrusted to

14  Congress, state legislatures to try to address.  Because the

15  one thing that everybody keeps forgetting is that you can

16  amend the Second Amendment.  We did it with alcohol, then we

17  undid it with alcohol.  It can be done.  This isn't a problem

18  without solution.  What we are saying is that the solution is

19  something that's already been written.  And now that we're

20  basically going through the analysis that is as textural as it

21  gets, the question is, did this statute exist prior to the

22  adoption of the Second Amendment?  And the historical record

23  shows that the adoption of marijuana as a drug for the

24  purposes of being an addiction, that's not there.

25          THE COURT:  I mean, so what we talked about was the

Colloquy

1  mental illness prohibitions and some limitations on the

2  ability of those who are intoxicated to use or possess

3  firearms, right?  And those get to issues of capacity, right?

4  You don't have the capacity to do this, and so we're not going

5  to let you.  And if that's the question, why is Congress

6  not -- if they were regulating people's capacity to possess

7  firearms and use firearms in the early days of our country,

8  then why does Congress today not have the ability to regulate

9  what it views to be people who lack the capacity to

10 appropriately use and possess firearms?

11        MR. GRAY:  I'll take that as kind of a two-step, Your

12 Honor, if you don't mind.  So with regard to the issue of the

13 capacity issue, jurisprudence since the common law has come to

14 recognize that there are some folks who, because of their

15 mental status, are not going to be subject to all of the

16 rights that everybody else would get.  And it's not because we

17 don't like them.  It isn't because they're -- as we had in the

18 late 1700s with Catholics.  It is because we have found that

19 based upon their ability to make recent decisions, that person

20 is incompetent.  But there's been no argument that what's

21 taking place here is the coverage of someone who is

22 incompetent.

23        What we have here is we've identified that there's a

24 certain group of people that we don't want to have the right

25 to possess a firearm.  So we're going to figure out how to

Colloquy

1    write the statutory language to get them there.  And I'll be

2    the first person to tell you -- and I know these words will

3    come back to haunt me one day -- the idea that the logic that

4    came out of Bruen when it first struck me was a little jarring

5    because the first thing I said was, wow, this essentially kind

6    of scrubs the mat and makes every statue that covers guns or

7    the regulation of firearms -- it makes it all subject to a

8    challenge.  But I think what was ultimately said by the court

9    was what's really at stake here is whether or not a person's

10   Second Amendment right, which they have, can be infringed

11   upon, even as the government says, for a little bit.  And the

12   answer to that was categorically no.  And we've seen this walk

13   from Heller to Bruen to other cases, and that is where we

14   stand with this.

15        I do this, Your Honor, to say it in a simplistic

16   manner, because I know that when we are looking at the nuances

17   of this, it can become quite complicated.  And I think that's

18   why the means-ends analysis is problematic, because it creates

19   those nuances that ultimately get us to various areas that

20   take us further and further and further away from the Bruen

21   analysis, for example, the government's argument with regard

22   to an addiction.  One, we have no evidence that there was an

23   addiction.  Second, we know right now that when it comes to

24   the issue of lawfulness, North Carolina is debating whether or

25   not marijuana use as a medical device is lawful.

Colloquy

1          THE COURT:  Right.

2          MR. GRAY:  We know thirty-six other states have

3     already said that it's lawful.

4          THE COURT:  I mean, that's all well and good for

5     those states.  I don't think it's really relevant to the

6     federal question here.  Congress has not seen it appropriate

7     to undo this yet.  And also, I mean, I think we're looking at

8     why did Congress enact this, what was the understanding at the

9     time they enacted this.  And for better or for worse, that may

10    not be today's understanding of it.  But I guess my point was,

11    if Congress has the power -- if the Second Amendment allows

12    Congress the power to regulate capacity -- of whether people

13    of a certain capacity can possess firearms, and it was

14    allowing it to do that in the 1790s, why is that -- why is

15    Congress not able to do that in the modern day?

16         MR. GRAY:  I think they can, as long as they're

17    looking at it from the standpoint of what was there in the

18    1790s.  If you want to do it otherwise, amend the Second

19    Amendment.

20         THE COURT:  Right.  And I -- the point I mentioned is

21    a lot of this is, what is the level of generality at which we

22    look at these practices and the analogy in a logical reasoning

23    we have to engage in.  And so I think that's one of the

24    challenges here, to figure out exactly how analogous something

25    needs to be.  Because again, we could -- you can draw -- you

Colloquy

1      can have a very broad analogy of the founding era they

2      regulated anybody they considered dangerous to possess a

3      firearm, and define that in a broad way, and that would -- if

4      you accept that, it allows Congress now to regulate people in

5      a broad way anyone it finds dangerous.  But that's probably an

6      exception that follows the rule and not one that I think the

7      Supreme Court would be comfortable with.  So I've got to find

8      the right level of analogy here to get this straightened out.

9            MR. GRAY:  Exactly, Your Honor.  That's the how and

10     why that's discussed in Bruen.  And what we're arguing is that

11     the right level of analogy is actually the statutes that we

12     put forth in pages 16 and 15 of our brief, which is they

13     restricted the person who was intoxicated from using the

14     firearm.  That is the how and why right there.  We don't have

15     that in this case.  So when it comes to the question of

16     whether it's unconstitutional as applied or just facially,

17     those two answers -- those two questions are answered when we

18     take a look at that line of questioning.  The how and why is

19     where's your analysis, where's your analogy.  It's right

20     there.

21           THE COURT:  So on this point, I mean, Justice

22     Kavanaugh's concurrence, that the Chief Justice joined, talked

23     in detail about not questioning the validity of these shall

24     issue regimes where you have to submit to certain -- answer

25     certain questions, the stated go -- some training and all

Colloquy

1    that.  Why does that not give some weight to the argument that

2    there can be these sort of restrictions on who can possess a

3    firearm?

4         MR. GRAY:  I think, Your Honor, that is much more

5    as -- for lack of a better phrase, that's a narrow application

6    based upon the fact that on Bruen, that's the application of

7    people who were like, hey, I want to be able to apply for this

8    gun.  That's separate and apart and I think factually

9    distinctive from a statute that says simply because you are

10   under indictment, without explanation as to the nature of the

11   danger that occurs with that, you are prohibited from

12   exercising a Second Amendment right.  You are an addict.  Now,

13   we don't know whether or not your addiction is any more akin

14   to being an alcoholic or whether it's been akin to a crack

15   head, but because we've said it, we're taking away your Second

16   Amendment rights.  And I think the real persistent threat from

17   Heller to Bruen is you can't just take away rights that way

18   that are embedded within the Second Amendment.

19        THE COURT:  Well, that -- is there any other point

20   you want to make on 922(g)(3)?  Okay.

21        MR. GRAY:  No, Your Honor.  I'll turn my attention

22   now just briefly to covering -- because I don't want to rehash

23   every argument that we've argued within our brief, but I do

24   want to turn our attention to the issue of -- to that

25   historical analysis.  And once again, we've noted that if you

Colloquy

1      want to take a look at the historical analysis, the provisions

2      are there.  And those are restrictions on somebody who is

3      either drunk or intoxicated and that subsequent use of the

4      firearm or subsequent going into the woods, as one of the

5      statutes said.  But when we take a look at that from the

6      historical context, that, I think, is our analogy.  It isn't

7      the mysterious trying to analogize marijuana to alcohol.  I

8      think what we have to say is, was there the ability to

9      legislate for that?  There was.  They didn't.  Your Honor, the

10     Court asked a great question about the seventy-five-mile-an-

11     hour question, if you're speeding seventy-five miles an hour

12     whether or not that would take him outside of law-abiding.

13     And I do think that when it comes to the question of the law-

14     abiding principle, the question really comes down to the real

15     issue of does he fit within the definition of all Americans?

16     Because that's ultimately the standard that was articulated by

17     the court in Bruen.

18              When it comes to the issue of whether or not his

19     conduct needs to be evaluated, the conduct is possession of

20     the firearms.  And even the restrictions that are temporary

21     have a problem -- are problematic when we look at the

22     restriction of somebody's Second Amendment rights.

23              THE COURT:  But the government talked about, I guess

24     on both points, but it's perhaps more relevant on 922(n),

25     which is why I'd like to spend a little time talking about,

Colloquy

1    but this is a temporary restriction and thus not all that

2    problematic.  Why is that -- why do you disagree -- I mean, I

3    understand it's a restriction of his rights, undoubtedly.  Why

4    is it that sort of temporary restriction akin to a time,

5    place, and manner restriction of First Amendment -- I mean, I

6    know there's a difference.  But I mean, you can restrict these

7    rights in certain ways under certain circumstances.  So why is

8    that temporary restriction while under indictment of receipt

9    not permissible?

10        MR. GRAY:  To speak specifically with regard to the

11   while under indictment, Your Honor, the government made a lot

12   of statement about this is -- we're following a criminal

13   process where the prosecutor gets up and presents evidence.

14   But in North Carolina, you don't even have to have a

15   prosecutor in a room in order to get something through a grand

16   jury.  Many times what you have is just a cop that shows up,

17   goes to the grand jury.  There'll be something that will go

18   forward as an indictment, and you'll have a prosecutor won't

19   even know it until after the fact, which is why we get a lot

20   of these dismissals after the fact as well.

21        But Your Honor, I tell you -- I use that just to help

22   illustrate that when we look at the issue of the temporary

23   restriction.  Under that regime in North Carolina, somebody

24   can go in, get an indictment, and they don't get into court

25   for years.  We're not talking about a minor inconvenience.

Colloquy

1    We're talking about where somebody can be under the guise of

2    an indictment four, five years.  That's not a minor or a

3    temporary restriction.  That's a deprivation.  When we start

4    talking about those sort of things, we're not talking about

5    just the temporal load, because I'm sure most people will say,

6    listen, being deprived of my constitutional rights for even a

7    minute is problematic.  But when we look at it in effect, the

8    problem that we have here is under indictment in North

9    Carolina means that you could be effectively waiting for

10   years.  And unfortunately, and this is why we responded to the

11   Court's query with 9 -- under 925 -- or 922 why the

12   application for reinstatement is important is he doesn't even

13   get an opportunity to ask for that right back.  There's no

14   avenue for him to be able to get a right back that's been

15   suspended for six months or a year or two years.  He's just

16   stuck without a constitutional right that applies to all

17   Americans, all on the mere accusation -- it's not a proof.

18   There's been no proof beyond a reasonable doubt -- all based

19   upon a mere accusation.  And that is problematic, Your Honor.

20         THE COURT:  So I mean, that accusation -- I mean, I

21   agree with you that it's black letter basic criminal law,

22   right, an indictment is an accusation supported by probable

23   cause.  But that accusation in a lot of ways fundamentally

24   changes the citizen's relationship with their government.  And

25   what I've heard the government tell me is that a bunch of our

Colloquy

1   rights are restricted once we are under indictment.  And

2   whatever the -- grand jury is there for a reason, and no

3   system is perfect, but the grand jury makes a decision either

4   in state or federal court to return an indictment, presumably

5   the defendant would have to know he's under indictment before

6   he's subject to criminal sanction here, but that results in

7   deprivation of many constitutional rights.  And this Second

8   Amendment rights are just another one of those, and it's no

9   different; it was that way in various shapes and forms at the

10  time of the founding, so 922(n) poses no constitutional

11  problem.  What's your response?

12          MR. GRAY:  But there are a number of constitutional

13  rights that don't actually take effect until this process gets

14  started.  Due process, right to remain silent.  So to say that

15  some rights apply and some rights don't apply, I think we have

16  to really take a look at the larger context of the

17  application.  But I think it's a little glib to say that it's

18  okay to deprive Americans of their rights, even for a little

19  bit, simply because we feel like it's okay.  And I think

20  that's a thread that's also within a lot of what we're seeing

21  in this discussion with regard to Heller and Bruen.

22          THE COURT:  So I mean, the time of the founding, I

23  mean, there were -- if you were arrested, once you were

24  indicted, you could be arrested and all of that, and you may

25  or may not have had a right to bail.  And the other -- another

1  argument is that the -- any right to bail is one of

2  legislative grace, not one of constitutional mandate.  And

3  thus, since the legislature didn't have to even let you out of

4  jail, where presumably it would seem to make sense you can't

5  have a gun, today's legislature is saying once you're under

6  indictment, you don't get to have a gun is reasonably close

7  enough of a match that it's okay.  Why is that not the case?

8         MR. GRAY:  Well, I think when we start taking a look

9  at those issues of legislative grace, I think in the end,

10  ultimately what's taking place here is these are restrictions

11  that are coming from the bench with regard to a person's,

12  quite frankly, decision.  You can give up your guns or you can

13  go to prison; which one do you want?  Now, I think, and this

14  Court is more than familiar with it, there have been instances

15  where there have been people under indictment federally where

16  the government has asked for that person to be able to use a

17  firearm or possess a firearm -- not use, possess a firearm.

18  That was accepted by the court and ultimately ruled upon by

19  the court.  To me, this is not a big, indistinguishable fact,

20  because what we're really dealing with here is an

21  interpretation of a lawful statute that the courts get a

22  chance to make their means-end analysis on.  But when we start

23  taking a look at things such as our Second Amendment rights,

24  the court's already said means-ends is not going to work

25  anymore; let's take that analysis to something simpler.

Colloquy

```
 1          THE COURT:  I guess what I want to get at, though, is
 2   I mentioned earlier, look, what we're talking about here is
 3   governmental power, what is the power of the government in
 4   this space.  And it appears that in the context of what
 5   happens to you after you're arrested, you don't have a right
 6   to bond and all that, and your right to be arrested -- or the
 7   ability to arrest you and deprive you of your liberty exists
 8   more or less at the moment of indictment.  Obviously, a little
 9   paperwork needs to be done, but generally you are then subject
10   to arrest and restriction on your rights.  And so why -- if
11   the government has the power to deprive you of your liberty
12   effectively at the moment of indictment, why does it also not
13   have the power at that moment of indictment to restrict your
14   Second Amendment rights?  If it could take away all of your
15   liberty, why can't it take away a smaller portion of it?
16          MR. GRAY:  And that is the question, Your Honor.  The
17   question really comes down to what extent can the government
18   take away somebody's rights.  And ultimately, when it came to
19   the issue of that Second Amendment right, we've seen an
20   evolution and how we've interpreted that.
21          And I think when we take a look at the Carter
22   decision from the Fourth Circuit that we've cited, that is a
23   great illustration of that tension.  It's the reason why the
24   Fourth Circuit punted on the question, because the real answer
25   is we didn't know until we got a clear analysis chain in order
```

Colloquy

1    to make that decision.  And that was done in Bruen.  And

2    that's why I started off this argument by saying we've all

3    gone through and read a number of cases where we've got to sit

4    there and pull out and divine and interpret and hold up

5    against the light to figure out what the court is saying.  But

6    Bruen actually made this one pretty simple.  Is this a right

7    that applies to everybody?  If it is, we've got to be really

8    conscious as a government to take away that right.  The way

9    that we're going to exercise that consciousness is by taking a

10   look and seeing what existed prior.  And that's why the burden

11   is on the government to show that what they're doing now

12   looked like something they did back then.  This is an

13   uncomfortable position for the government.  I completely

14   understand that.  Because now it is really in a position where

15   it's got to shift its thought process away from means-end to

16   something that's, quite frankly, a lot more bright line.

17          But that is what we have.  We have the bright line.

18   And we would ask the Court in this instance to examine the

19   issue, to examine the facts and our arguments, and ultimately

20   determine that under this line of analysis, under the

21   examination of Bruen, Mr. Alston's rights have been violated,

22   his constitutional right to possess a firearm has been

23   violated, and that these two statutes are in violation of the

24   Second Amendment of the United States Constitution.  Subject

25   to that, Your Honor, I'll take any other questions that you

Colloquy

1    have.

2         THE COURT:  Thank you.

3         I know we've been at this for a while, but Ms. Nokes,

4    I'll give you the opportunity to make any last comments or

5    responses to what Mr. Gray shared.

6         MS. NOKES:  Sure, Your Honor.  Thank you for giving

7    me that opportunity.  Let me just push first on the shall

8    issue regimes.  The Supreme Court made it clear that, "Nothing

9    in the analysis in Bruen" -- I think this is what the Court

10   was pushing on -- "should be interpreted to suggest the

11   unconstitutionality of the forty-three states shall issue

12   licensing regimes which often require applicants to undergo a

13   criminal background check and are designed to ensure only that

14   those bearing arms in the jurisdiction are, in fact, law-

15   abiding, responsible citizens."  That's in Bruen note 9, page

16   2,138, quoting Heller.  And then there's a similar provision

17   in the Kavanaugh concurrence saying that shall issue licensing

18   regimes are constitutionally permissible.

19        Defendant says that this is somehow narrow and

20   applies only to the law that the Bruen court was reviewing,

21   the New York law that said that the folks needed to have some

22   reason why they were going to have a gun and had to sort of

23   get that approved by New York before they could have a gun.

24   But that's just plain not what the opinion says.  The opinion

25   says that nothing within it is meant to cast any doubt on

Colloquy

1    these shall issue regimes.  Why is that important in this

2    context?  Well, many of those regimes actually restrict drug

3    users and those under felony indictment from possessing

4    firearms.  So if the Supreme Court says, "Nothing in this

5    analysis is casting any doubt on those regimes," which do

6    include these same prohibitions, then the Bruen court has

7    spoken on that, at least by reference.

8         THE COURT:  I'm not sure it's as open and shut as you

9    would propose there.  I don't know that challenges are going

10   to be -- simply because the State has chosen to ask a question

11   on a shall issue license, the court will consider that a

12   closed matter.  But that particular question is beyond the

13   scope of what we're doing here.

14        MS. NOKES:  Sure, Your Honor.  Thank you.  With

15   respect to the fact that it can take years to resolve an

16   indictment, speedy trial -- we all have speedy trial rights;

17   that's part of the Constitution.  And the fact that these

18   things take a long time doesn't change the fact that courts

19   can burden the other rights in the Bill of Rights, the Fourth

20   Amendment right, the First Amendment right, the Sixth

21   Amendment right.  So again, it's logical that the Court could

22   burden a Second Amendment right for however long it takes to

23   get that indictment resolved.

24        Your Honor, I would also point again to the Bruen

25   opinion here now in the Alito concurrence stating on page --

Colloquy

1  well, it's the second page of the Alito concurrence that in

2  that opinion -- in the opinion that was decided by Bruen, they

3  were holding that a state may not enforce a law that

4  effectively presents its law-abiding residents from carrying a

5  gun from this -- for this purpose. And that is all the court

6  decided. As the Court is well aware, throughout the opinion,

7  I think it's fourteen times, the court references law-abiding

8  citizens. It does speak about all Americans in another piece

9  of the opinion. But throughout the opinion, throughout the

10  concurring opinions, over and over and over again, it talks

11  about law-abiding citizens. So the government believes that

12  people who are not law-abiding do not have the same Second

13  Amendment protections as those who are.

14         One point with respect to the analogizing and the

15  historical context, if I'm hearing defendant correctly, he's

16  saying that there's no one-to-one analogy here in either

17  context, in the drug user context or in the receipt under

18  indictment context, and so that means that the modern day

19  statutes are unconstitutional. But that's just not what Bruen

20  says. Bruen asks us to do this difficult historical analysis,

21  to make these analogies that are broader in scope than just

22  looking at is there a law that looks the same as the law that

23  is in our modern day statute books? Well, if not, well, then

24  we got to throw it all out. That's not what Bruen tells us to

25  do. Bruen tells us to do this entire historical analysis, to

Colloquy

1  look at the how and the why for how restrictions were put upon

2  people's Second Amendment rights back in the day, and to

3  consider whether the current modern-day statutes are

4  consistent with that history and tradition with the founders'

5  understanding. So just as the Second Amendment covers guns,

6  covers weapons that the founders could never have imagined, an

7  AR-15, for example, that the court may find is a legitimate

8  weapon, a legitimate tool of self-defense. I think we'd all

9  agree that at this point the Second Amendment covers those

10  types of weapons. We also have to look at the Second

11  Amendment as being flexible enough as incorporating that

12  analogy where we say, yes, muskets and AR-15s look really

13  different. Well, some of the statutes restricting firearms

14  rights look somewhat different than they look in today's

15  world. But the Second Amendment is flexible enough. The

16  Constitution is flexible enough to allow us to do that

17  historical analysis, to allow us to create these analogies,

18  and to understand why restrictions existed at the time of the

19  founding and how they relate to restrictions that exist now in

20  order to say that, yes, what exists now, what exists today

21  doesn't look like exactly what was on the books at the time,

22  but it is nonetheless consistent with the history and

23  tradition of firearms regulations in this country, and that

24  these statutes, for example, are thus constitutional.

25            THE COURT: Thank you, Counsel. Thank you for the

Colloquy

1    briefing on this.  It's a very complicated issue requiring

2    different kinds of research I think we're usually used to on

3    all of our fronts.  I appreciate the work everyone's put into

4    it.  I also appreciate it that one or perhaps both sides will

5    want to take up my decision with Judge Flanagan at some point,

6    so I'm going to endeavor to get this done in the next few

7    weeks so you all can move on from here.  Certainly don't feel

8    obliged to object, but I understand one or both sides may be

9    dissatisfied with some or all of my decisions.  So that will

10   take time, and I want to make sure this resolves relatively

11   quickly, so I'll endeavor to get this done as soon as

12   possible.  But again, thank you all very much for your

13   briefing on this.  I'll take it under advisement.  We'll be in

14   recess.

15            THE CLERK:  All rise.  This Honorable Court stands in

16   recess.

17                    (Court is adjourned)

18                    *  *  *  *  *

19

20

21

22

23

24

25

1          CERTIFICATE OF TRANSCRIBER

2

3          I, Rachel Wiley, court-approved transcriber, in and

4    for the United States District Court for the Eastern District

5    of North Carolina, do hereby certify that pursuant to Section

6    753, Title 28, United States Code, that the foregoing is a

7    true and correct transcript from the official electronic sound

8    recording of the proceedings held in the above-entitled matter

9    and that the transcript page format is in conformance with the

10   regulations of the Judicial Conference of the United States.

11

12          Dated this 24th day of June, 2023.

13

14

15   /s/ _____
     RACHEL WILEY, CDLT-251
16
     COURT-APPROVED TRANSCRIBER
17

18

19

20

21

22

23

24

25