IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:23-CR-00021-FL-RN-1

| | |
|---|---|
| **United States of America**, <br><br> v. <br><br> **Carlos Alston**, <br><br> Defendant. | **Memorandum & Recommendation** |

The Second Amendment protects the people's right to keep and bear arms from improper government interference. But the contours of the Amendment's protections are hotly disputed. This dispute has only intensified since the Supreme Court ruled that a firearms regulation's constitutionality depends on its historical pedigree—not a means-ends balancing test.

This case asks the court to examine the Second Amendment's scope. In doing so, it poses two questions that are easy to ask but difficult to answer: To begin with, do drug users and those under felony indictment have Second Amendment rights? And if so, do modern federal laws limiting their exercise of that right find support in this nation's history and tradition of firearms regulation?

I.    **Background**[1]

Early in January 2023, a local police officer approached Defendant Carlos Alston as he was waiting in a restaurant drive-thru lane. The officer reportedly told Alston that there were warrants for his arrest and ordered him to put his hands up.

---

[1] The factual background comes from the parties' briefs. The parties do not appear to disagree, at least for now, about the material facts.

The government contends that Alston then grabbed a handgun and pointed it at the officer. The officer responded by shooting Alston. Alston tried to flee, but he quickly collapsed from his injuries. Authorities recovered Alston's handgun and searched his car. Inside, they found a marijuana cigarette, digital scales, plastic baggies, and about 26 grams of marijuana.

Alston was not a felon at the time of this encounter. He was, however, out on bond after a North Carolina grand jury indicted him for the felony offense of assault with a deadly weapon with intent to kill inflicting serious injury. *See* N.C. Gen. Stat. § 14–32(a) (classifying this crime as a Class C felony).

In January 2023, the United States charged Alston through a criminal complaint with possessing a firearm while being a drug addict. About two weeks later, agents from the Bureau of Alcohol, Tobacco, Firearms, and Explosives arrested and questioned Alston. Alston revealed that he used marijuana daily. He also shared that he knew he was under indictment when he received the gun he allegedly brandished at the officer.

Shortly after Alston's arrest, a federal grand jury indicted him for possession of a firearm by an unlawful user of, or person addicted to, a controlled substance, in violation of 18 U.S.C. § 922(g)(3). It also charged him with receipt of a firearm by a person under felony indictment, in violation of 18 U.S.C. § 922(n).

Alston then moved to dismiss the federal indictment.

## II.    Discussion

Alston contends that, after the Supreme Court's ruling in *New York State Rifle and Pistol Ass'n* v. *Bruen*, 142 S. Ct. 2111 (2022), § 922(g)(3) and § 922(n) violate the Second Amendment. *See* Mot. Dismiss at 31–32, D.E. 17. Alston argues that these statutes are unconstitutional because

the United States cannot identify "a robust historical tradition of firearm regulation that disarmed citizens based on drug use or being under indictment[.]" *Id.* at 7.

The United States takes a different view. It first claims that the Second Amendment does not apply to unlawful drug users or individuals under felony indictment. Resp. Opp'n Mot. Dismiss at 6, 17, D.E. 20. And even if it does, the government maintains that both § 922(g)(3) and § 922(n) are grounded in historical traditions regulating firearms. *See id.* at 10, 23. According to the United States, laws prohibiting those who are mentally ill, intoxicated, or dangerous from possessing guns provide historical support for § 922(g)(3). And § 922(n), the government contends, is analogous to historical laws detaining those under indictment before trial and disarming individuals the government found untrustworthy. The government thus concludes that each law survives a facial challenge to its constitutionality.

A.     **Second Amendment Precedent**

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. For much of this nation's history, the Second Amendment received little judicial attention. It was not until 15 years ago that the Supreme Court determined that—at the very least— the Amendment protects Americans' right to keep handguns in the home for self-defense. *District of Columbia* v. *Heller*, 554 U.S. 570, 636 (2008). At issue in *Heller* was a District of Columbia law that forbade its residents from keeping handguns in their homes. *Id.* at 628. The Court held that the District's law contravened the Second Amendment. *Id.* at 635.

In reaching this conclusion, the Court first framed its interpretive strategy: Judges must endeavor to understand the Amendment's text according to its original public meaning at the time

it was adopted. *Id.* at 576–77. The first part of the text[2]—which the Court termed its prefatory clause—announces its purpose but does not grammatically limit the words that follow. *Id.* at 577.

The rest of the Amendment[3]—its operative clause—does two things. First, it "codifies a right of the people." *Id.* at 579 (internal quotation marks omitted). Comparing the text of the Second Amendment to other provisions in the Constitution that mention "the people," the Court found that it gives rise to "a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Id.* at 581. Second, the operative clause lays out "the substance of the right: to keep and bear Arms." *Id.* (internal quotation marks omitted). Taken together, the components of the operative clause "guarantee the individual right to possess and carry weapons in case of confrontation." *Id.* at 592.

But this right is not plenary. The Court noted that historical tradition did not confer "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626 (citations omitted). Mid-19th-century evidence, for instance, suggests that the government may prohibit carrying concealed weapons in public. *Id.* (citations omitted). And although the Court did not provide an exhaustive list of permissible firearm regulations, it noted that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626–27.

That said, *Heller* establishes a floor for constitutional protection—not a ceiling. *Id.* at 635 ("And whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth

---

[2] "A well regulated Militia, being necessary to the security of a free State . . ."
[3] ". . . the right of the people to keep and bear Arms, shall not be infringed."

and home."). Considering the District of Columbia's total prohibition on personal firearm possession within the home, then, the Court had no trouble concluding that it was unconstitutional. *Id.*

Two years later, in *McDonald* v. *City of Chicago*, 561 U.S. 742 (2010), the Court held that the Second Amendment is not confined to the federal government—it applies to states as well. In *McDonald*, a handful of local ordinances produced a regulatory scheme akin to the one the Court struck down in *Heller*. *See id.* at 749. Much of the Court's analysis focused on the incorporation of the right to keep and bear arms through the Fourteenth Amendment, but it emphatically reaffirmed *Heller*'s core holding: "[T]he Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home." *Id.* at 780. Consistent with other protections guaranteed by the Bill of Rights, the Court held the right to bear arms may not be infringed by state governments. *Id.* at 791. Thus, the ordinances were unconstitutional. *Id.*

*Heller* and *McDonald* established that, at the very least, law-abiding Americans enjoy a Second Amendment right to possess conventional firearms within their homes for self-defense. In the decade that followed *McDonald*, circuit courts developed a two-step test for determining whether other firearms regulations satisfied the Amendment's command. *See generally Bruen*, 142 S. Ct. at 2126–27 (describing circuit court practice). First, the court would determine whether a challenged law fell within the historical scope of the Second Amendment. *See, e.g.*, *Kanter* v. *Barr*, 919 F.3d 437, 441 (7th Cir. 2019). If not, "the regulated activity [was] categorically unprotected, and the law" was constitutional. *United States* v. *Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (quoting *Ezell* v. *City of Chicago*, 651 F.3d 684, 703 (7th Cir. 2011)).

But if the challenged law plausibly fell within the ambit of the Second Amendment, the court would proceed to step two. There, it would apply tiered scrutiny to determine whether the law complied with the Constitution. *See Kanter*, 919 F.3d at 441–42. If the law burdened the Second Amendment's "core"—which circuit courts generally constrained to self-defense in the home—the court would apply strict scrutiny. *See, e.g.*, *Gould* v. *Morgan*, 907 F.3d 659, 671 (1st Cir. 2018). To survive this analysis, the government would have to show that the law was "narrowly tailored to achieve a compelling governmental interest." *Kolbe* v. *Hogan*, 849 F.3d 114, 133 (4th Cir. 2017) (citation omitted). But if the law did not burden the Second Amendment's core right, circuit courts would apply intermediate scrutiny and uphold the law if it was "substantially related to the achievement of an important governmental interest." *Libertarian Party of Erie Cnty.* v. *Cuomo*, 970 F.3d 106, 128 (2d Cir. 2020) (quotation omitted).

Last year, the Supreme Court prescribed a different approach. *See Bruen*, 142 S. Ct. at 2126–28. In *Bruen*, the Court reviewed New York's regulatory scheme governing public-carry pistol licenses. *Id.* at 2122. Unlike most states, New York required those who wanted to possess a handgun for self-defense in public to demonstrate that they had "a special need for self-protection distinguishable from that of the general community." *Id.* at 2123 (quotation omitted). These licenses were hard to come by, and judicial review upon the denial of a license heavily favored the government. *Id.*

Two New Yorkers applied for unrestricted public carry licenses, but the state only offered them restricted licenses because they could not show that they had a special need for self-defense. *Id.* at 2125. While the restricted licenses allowed the applicants to carry their handguns sometimes, they did not allow them to possess a handgun in public generally. *Id.* When the applicants challenged the denial of their unrestricted license applications, the district court denied their

6

claims—it found that New York's licensing regime didn't burden the core of the Second Amendment and satisfied intermediate scrutiny. *Id.* The Second Circuit affirmed. *Id.*

On review, the Supreme Court held that lower courts' two-step approach was "one step too many." *Id.* at 2127. While the first step of the analysis—assessing whether a challenged law burdens conduct protected by the Second Amendment—accords with *Heller* and *McDonald*, those cases do not endorse any form of means-ends scrutiny in determining whether the law is constitutional. *Id.* Instead, to establish that a gun law complies with the Constitution, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."[4] *Id.*

Testing a firearms restriction's historical pedigree is easier in some cases than in others. *See id.* at 2130–32. If, for instance, "a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 2131. But some cases present unprecedented problems unimaginable to those who drafted the Amendment hundreds of years ago. In those situations, courts must reason by analogy, deciding whether historical laws that regulated gun ownership are "relevantly similar" to the law before the court. *Id.* at 2132 (quotation omitted).

---

[4] Alston contends that 18 U.S.C. § 922(g)(3) and § 922(n) are unconstitutional on their face. Outside the First Amendment context, the Supreme Court has determined that litigants alleging a statute is facially unconstitutional can only succeed if they prove that "no set of circumstances exists under which the Act would be valid[,]" *United States* v. *Salerno*, 481 U.S. 739, 745 (1987), or establish that the statute has no "plainly legitimate sweep[,]" *Wash. State Grange* v. *Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (quotation omitted).

This familiar standard might conflict with *Bruen*. On the one hand, facial challengers usually bear the burden of proving that the disputed law has no constitutional application. *See Salerno*, 481 U.S. at 745. But on the other, *Bruen* places the burden on the government to establish that a firearm regulation has its roots in American history and tradition. 142 S. Ct. at 2127. Because the burden allocation in *Bruen* is clear, the undersigned will decline to apply the more traditional facial challenge standard.

7

While the Court did not exhaust the ways two laws can be "relevantly similar," it instructed lower courts to consider two factors: how and why a law burdens an individual's right to keep and bear arms. *Id.* at 2132–33. If a modern law and historical practice impose a similar burden on individuals' Second Amendment rights—and do so for similar reasons—the modern law has a greater chance of passing constitutional muster. *Id.* at 2133.

The Court stressed that "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." *Id.* Courts should distinguish modern gun laws with robust historical roots from those that trace back to outlier statutes that most Americans would not have accepted. *Id.* And the government, in meeting its burden of proving that a modern regulation fits within the traditional constitutional order, need not dredge up "a historical *twin*"— but it must "identify a well-established and representative historical *analogue*[.]" *Id.* As in *Heller*, the *Bruen* Court declined to exhaustively demarcate the bounds of historical firearms regulation. *Id.* at 2134. Instead, it expressed faith in the lower courts to assess the strength of the government's purported historical analogues using familiar tools of constitutional analysis.[5] *Id.*

Turning to the facts before it, the Court found that the "two ordinary, law-abiding" New Yorkers who were denied unrestricted carry licenses were no doubt part of "'the people' whom the Second Amendment protects." *Id.* (citation omitted). It also found that their proposed course of conduct—carrying handguns in public for self-defense—implicated the textual protections conferred by the Second Amendment. *Id.* Thus, the Court concluded, the Amendment

---

[5] Conducting historical analysis can be challenging. *See* Antonin Scalia, *Originalism: The Lesser Evil*, 57 U. Cin. L. Rev. 849, 856 (1989) ("[I]t is often exceedingly difficult to plumb the original understanding of an ancient text."). But the need for judges and lawyers to engage with history to resolve a dispute is hardly unique to the Second Amendment, *see* Sherif Girgis, *Living Traditionalism*, 98 N.Y.U. L. Rev. (forthcoming 2023), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4366019#, or constitutional analysis, *see* William Baude & Stephen E. Sachs, *Originalism and the Law of the Past*, 37 L. & Hist. Rev. 809, 812 (2019).

"presumptively guarantees petitioners . . . a right to 'bear' arms in public for self-defense." *Id.* at 2135.

Because the applicants' conduct fell within the Second Amendment, the burden shifted to the government to "identify an American tradition justifying New York's proper-cause requirement." *Id.* at 2138. In an attempt to meet this burden, the government offered evidence from five historical eras to serve as analogies for its proper-cause requirement: pre-revolutionary England, the colonies and early Republic, antebellum America, Reconstruction, and the late-19th century. *See id.* at 2135–36.

In considering this evidence, the Court noted that "not all history is created equal." *Id.* at 2136. The further a historical practice strays from 1791—the year in which the Second Amendment was adopted—the less probative it is when determining whether a law complies with the Amendment's command.[6] *Id.* Thus, "courts must be careful when assessing evidence concerning English common-law rights" because English practice "at any given time in history cannot be indiscriminately attributed to the Framers of our own Constitution." *Id.* Relatedly, they "must also guard against giving postenactment history more weight than it can rightly bear." *Id.* To the extent that evidence from the late-19th century and beyond conflicts with evidence contemporaneous with the passage of the Second Amendment, the more recent tradition "cannot provide much insight" into the Amendment's meaning. *Id.* at 2154 (citations omitted).

---

[6] The Supreme Court did not squarely address how much weight lower courts should accord historical practices near the adoption of the Fourteenth Amendment. *Bruen*, 142 S. Ct. at 2138. Though it noted the scholarly debate surrounding the effect of the Fourteenth Amendment on the freedoms guaranteed by the Bill of Rights, the Court was content to conclude that public perception of the right to carry arms in public varied little in the decades between the ratification of the Second and Fourteenth Amendments. *Id.*; *see also id.* at 2163 (Barrett, J., concurring) ("[T]he Court avoids another ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 or when the Bill of Rights was ratified in 1791. Here, the lack of support for New York's law in either period makes it unnecessary to choose between them.") (cleaned up).

After wading through the historical evidence, the Court held that the government failed to meet its burden in justifying the proper-cause requirement. *Id.* at 2156. "Apart from a few late-19th-centry outlier jurisdictions," the Court found, "American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense." *Id.* Nor did they force citizens to prove that they had a special need for self-defense unshared by the rest of the population. *Id.* Thus, New York's regulatory scheme was unconstitutional. *Id.*

In a footnote, the Court briefly discussed the other restrictions that states impose on firearm ownership. *See id.* at 2138 n.9. When the Court decided *Bruen*, 43 states maintained "shall issue" public carry licensing schemes. *Id.* at 2123–24. In these states, authorities were given little discretion—they had to issue public carry licenses so long as the applicant satisfied certain objective threshold requirements. *Id.* Six states and the District of Columbia had "may issue" schemes like New York's. *Id.* Regulators in may-issue states enjoyed more leeway in denying citizens' applications to carry in public, "usually because the applicant ha[d] not demonstrated cause or suitability for the relevant license." *Id.* at 2124.

While the Court determined that New York's may-issue licensing framework impermissibly burdened the right to keep and bear arms, it noted that "nothing in [its] analysis should be interpreted to suggest" that other states' shall-issue schemes were unconstitutional. *Id.* at 2138 n.9 (quotation omitted). This is because those schemes "do not require applicants to show an atypical need for armed self-defense" and therefore do not prevent "law-abiding, responsible citizens" from exercising their rights. *Id.* (same). Justice Kavanaugh echoed this sentiment in his concurrence. *Id.* at 2162 (Kavanaugh, J., concurring) ("[S]hall-issue licensing regimes are constitutionally permissible, subject of course to an as-applied challenge if a shall-issue licensing regime does not operate in that manner in practice." (citation omitted)).

10

Against this constitutional backdrop, the undersigned will turn to the government's arguments in favor of § 922(n) and § 922(g)(3).

**B.    Whether Alston, as an Indicted Drug User, Enjoys the Second Amendment's Protections**

The United States first contends that the Second Amendment does not apply to Alston because—as an unlawful drug user under indictment—he is not a member of "the people" who enjoy the Amendment's protections. Resp. Opp'n Mot. Dismiss at 6–10, 17–23. It offers two justifications for this conclusion: First, both *Heller* and *Bruen* focused on the rights of law-abiding citizens, and Alston falls outside that category. *See id.* at 6–9, 17–18. Second, both the majority opinion and Justice Kavanaugh's concurrence in *Bruen* noted that the Court's opinion was not intended to disturb 43 states' shall-issue public carry licensing regimes, many of which preclude drug addicts and those under indictment from obtaining firearms. *See id.* at 9–10, 19. The government is wrong.

The United States correctly notes that the majority and Justice Kavanaugh repeatedly refer to the Second Amendment rights of law-abiding citizens. But those references do not support the government's position that "the Supreme Court repeatedly described the Second Amendment right as belonging *only* to law-abiding citizens." *Id.* at 18 (citation and internal quotation marks omitted) (emphasis added). At no point in *Bruen* (or *Heller* or *McDonald*) did the Supreme Court hold that only those with an unblemished criminal record enjoy Second Amendment rights.

In fact, the Court had no occasion to consider this question in *Bruen*. Instead, it merely noted that it was "undisputed" that the petitioners were "two ordinary, law-abiding, adult citizens" who were considered "part of 'the people' whom the Second Amendment protects." *Bruen*, 142 S. Ct. at 2134 (citation omitted). From there, the Court moved on to whether the Second Amendment

11

protected their proposed conduct. So the United States cannot rely on *Bruen* to categorically exclude Alston and those like him from the Second Amendment's protections.[7]

What's more, the Supreme Court's statements on who falls within the scope of "the people" for Second Amendment purposes cut against the government's position. For example, the Court began its analysis in *Heller* "with a strong presumption that the Second Amendment right is exercised individually and belongs to *all* Americans." 554 U.S. at 581 (emphasis added). This presumption arose based on a review of similar language throughout the Constitution. The Court explained that each time the Constitution mentions "'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset." *Id.* at 580. So long as an individual is "part of [the] national community or . . . [has] otherwise developed a sufficient connection with this country to be considered part of that community[,]" the Constitution confers its individual rights—including the right to keep and bear arms—upon him. *Id.* (quoting *United States* v. *Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)).

To agree with the United States, this court would need to understand "the people" in the Second Amendment context differently than it interprets that phrase in every other section of the Constitution. But the Supreme Court has rejected this approach. *See Bruen*, 142 S. Ct. at 2156 ("The constitutional right to bear arms in public for self-defense is not a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.") (citation and internal quotation marks omitted). Courts should thus give "the people" in the Second Amendment

---

[7] Undoubtedly, being a law-abiding citizen has some benefits in the context of a Second Amendment challenge. The Supreme Court has noted that "whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller*, 554 U.S. at 635. But to say that law-abiding citizens stand at the peak of the Second Amendment's protections is not to say that they stand alone.

its most natural (and internally consistent) interpretation—as encompassing all members of the political community.

This court, in other words, must determine whether Alston's drug use and felony indictment remove him from the political community entitled to constitutional protections. The United States has provided no reason to reach that conclusion, and the Supreme Court's guidance discussed above shows that Alston enjoys the same constitutional rights as every other citizen. So the undersigned rejects the United States' argument that Alston falls outside the Second Amendment's protection based solely on his status as a drug user under indictment.[8]

The United States' second argument about Alston's eligibility for Second Amendment rights fares no better. That argument claims that *Bruen*'s approval (in a footnote in the majority opinion and in a concurring opinion by Justice Kavanaugh) of the shall-issue licensing regimes used by most states establishes "that the Second Amendment's protections do not extend to people who are not law-abiding." Resp. Opp'n Mot. Dismiss at 19.

But, once again, *Bruen*'s language does not go as far as the United States would like. The Court approved of shall-issue regimes as a general matter because they "do not require applicants to show an atypical need for armed self-defense," and therefore "do not necessarily prevent law-abiding, responsible citizens from exercising their Second Amendment right to public carry." *Bruen*, 142 S. Ct. at 2138 n.9 (citation and internal quotation marks omitted). Thus, while states cannot give regulators unfettered discretion to determine who can carry a firearm in public, they

---

[8] The conclusion that someone is a member of "the people" described in the Second Amendment does not deprive the government of the ability to restrict the rights protected by that Amendment. Then-Judge Barrett explained this point in her *Kanter* dissent. Mere membership in the national community does not automatically guarantee "the people" unfettered access to guns. *See Kanter*, 919 F.3d at 453 (Barrett, J., dissenting). "Instead," she wrote, "it means that the question is whether the government has the power to disable the exercise of a right that they otherwise possess, rather than whether they possess the right at all." *Id.* In other words, while the court may uphold a law because its pedigree traces back to the longstanding historical practices of this nation, it may not simply justify the law by stating that a class of "the people" lacks constitutional protections to begin with.

may condition an applicant's receipt of a public carry license on objective measures like passing a background check or completing a firearms safety course. *Id.* Justice Kavanaugh made similar points. *Id.* at 2162 (Kavanaugh, J., concurring) (noting that shall-issue regimes rely on objective criteria and "do not require a showing of some special need apart from self-defense").

The Court's discussion of shall-issue regimes does two things. First, it reinforces the substantial Second Amendment rights enjoyed by those who qualify as ordinary, law-abiding citizens. And second, it recognizes, in a general sense, that states can restrict the public carry rights of criminals or otherwise irresponsible citizens. It goes no further than that.

And there is no question that shall-issue regimes are subject to constitutional challenges after *Bruen*. The majority noted that individuals can still challenge shall-issue licensing regimes if they are "put toward abusive ends[.]" *Id.* at 2138 n.9 (majority opinion). And Justice Kavanaugh pointed out that "shall-issue licensing regimes are constitutionally permissible, subject of course to an as-applied challenge if" the regime does not operate constitutionally in practice. *Id.* at 2162 (Kavanaugh, J., concurring). So the Supreme Court's general approval of shall-issue licensing regimes does not mean that drug users or those under indictment are excluded from the Second Amendment's protections wholesale.

In sum, *Heller* and *Bruen* may have focused on the rights of law-abiding citizens, but the Second Amendment's protections extend to a broader political community—a community that includes Alston. So the undersigned now turns to whether Alston's particular conduct—receiving and possessing a firearm—is protected by the Second Amendment. If so, the government must establish that its restrictions on Alston's ability to engage in that conduct have a basis in our country's historical tradition of firearms regulation.

14

### C.   Whether 18 U.S.C. § 922(n)'s Restriction on Alston's Ability to Ship, Receive, or Transport Firearms while Under Felony Indictment Is Constitutional

Alston is charged with violating 18 U.S.C. § 922(n). Indictment at 1, D.E. 11. That statute makes it illegal for anyone "under indictment for a crime punishable by imprisonment for a term exceeding one year" to ship, receive, or transport a firearm or ammunition.[9]

The statute's roots trace back to the 1938 Federal Firearms Act, which barred individuals under federal indictment for a crime of violence from shipping firearms in interstate commerce.[10] 5 Cong. Ch. 850, § 2(e), 52 Stat. 1250, 1251 (repealed). The FFA aimed to "combat roaming criminals crossing state lines." *United States* v. *Quiroz*, 629 F. Supp. 3d 511, 517 (W.D. Tex. 2022) (citation omitted). Congress amended the statute in 1961, removing the requirement that the charged crime was one of violence. *See* Act of Oct. 3, 1961, Pub. L. No. 87–342, 75 Stat. 757 (repealed).

It later passed the Gun Control Act of 1968 "to provide support to Federal, State, and local law enforcement officials in their fight against crime and violence[.]" Pub. L. No. 90–618 § 101, 82 Stat. 1213, 1213 (codified at 18 U.S.C. § 921 et seq.). That statute outlawed the receipt of a firearm by any individual under felony indictment—state or federal. *See* Pub. L. No. 90–618 § 102, 82 Stat. 1213, 1216, 1220. And nearly 20 years later, "Congress combined all prohibitions against persons under indictment into what is now § 922(n)'s current form." *Quiroz*, 629 F. Supp. 3d at 518.

Alston concedes that his state indictment implicates § 922(n). *See* Mot. Dismiss at 23. And although his conduct—receiving a firearm—enjoys presumptive Second Amendment protection,

---

[9] The statute also requires that the action have a nexus to interstate or foreign commerce. 18 U.S.C. § 922(n).

[10] The FFA also made it a crime to ship firearms to individuals who the seller had reason to believe were under indictment.

the government has shown that § 922(n) is constitutional because it is part of a longstanding tradition of restricting the rights of those under indictment.

### 1. Does Alston's Alleged Conduct Fall Within the Second Amendment's Protections?

As discussed above, Alston is a member of "the people" protected by the Second Amendment. Under § 922(n), his conduct at issue is the receipt of a firearm. This conduct enjoys presumptive Second Amendment protection. As a logical matter, it is impossible to "keep" or "bear" arms without first receiving them. If the Second Amendment protects the possession and use of firearms, it must also protect their acquisition—otherwise, the Amendment would protect nothing at all. *See, e.g.*, *Teixeira* v. *Cnty. of Alameda*, 873 F.3d 670, 677–78 (9th Cir. 2017); *Ezell*, 651 F.3d at 704 ("The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use[.]"). Thus, the government must prove that this nation's historical tradition justifies the statute. *Bruen*, 142 S. Ct. at 2126.

### 2. Is the United States' Regulation of Alston's Conduct Under § 922(n) Consistent with the Nation's Historical Tradition of Firearms Regulation?

The United States points to two historical analogues to support § 922(n)'s constitutionality. First, it relies on the historical practice of detaining indicted defendants before trial. Resp. Opp'n Mot. Dismiss at 25–28. And second, it maintains that there is a historical tradition of disarming those seen as dangerous or untrustworthy.[11] *Id.* at 28–31.

*Bruen* instructs that, when considering a statute's constitutionality under the Second Amendment, courts must assess whether the government has shown that the "regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126.

---

[11] Because the government's first argument on this point is persuasive, the undersigned will not (at this point) address the dangerousness argument.

In this case, the United States has not pointed to any laws explicitly restricting the ability of those under indictment to ship, receive, or transfer firearms or ammunition.

Instead, the government argues that the burdens imposed by laws allowing pretrial detention of indicted defendants are sufficiently analogous to justify § 922(n)'s constitutionality. *See* Resp. Opp'n Mot. Dismiss at 30–31. While some defendants were allowed out on bond while they awaited trial, there is no evidence that defendants had a constitutional right to bail. And if the government had the ability to completely deprive a defendant of his liberty ahead of trial, it stands to reason that it had the ability to impose lesser restrictions on a defendant's conduct, such as restricting a defendant's right to ship, receive, or transport firearms while awaiting trial. The undersigned agrees.

Since the English Bill of Rights was enacted, the government has been able to detain those accused of serious crimes—whether violent or not—before trial. *See Carlson* v. *Landon*, 342 U.S. 524, 545–46 (1952). In England, for example, nonviolent crimes like "embezzling or destroying the king's armor or warlike stores" worth more than 20 shillings and counterfeiting certain coins were felonies punishable by death. *See* 4 William Blackstone, Commentaries on the Laws of England 94, 98–99, 101 (Cooley ed. 1871). And "[i]n felonies," Blackstone wrote, "no bail [could] be a security equivalent to the actual custody of the person." *Id.* at 296. Even in non-felony cases, Parliament had the authority to mandate that those accused of certain crimes be detained before trial. *Id.* at 297 ("Regularly, in all offences either against the common law or act of parliament, that are below felony, the offender ought to be admitted to bail, unless it be prohibited by some special act of parliament.").

English justices of the peace, therefore, had no authority to release murderers, arsonists, or those suspected of treason before trial. *Id.* at 297–98. But they had some discretion to bail

"[p]ersons charged with other felonies, or manifest and enormous offences, not being of good fame[.]" *Id.* at 298. Unlike justices of the peace, the court of king's bench could bail those suspected "of any crime whatsoever . . . according to the facts of the case." *Id.*

Taken together, English practice suggests that a person under felony indictment had no fundamental right to bail, but he could be released based on an individual assessment of his situation in some cases. And even if a presumptive right to bail for less serious crimes existed, Parliament could abrogate it by statute.

The American federal government largely inherited this tradition. The Judiciary Act of 1789 created a statutory right to bail "except where the punishment may be death[.]" Ch. 20, § 33, 1 Stat. 73, 91. In capital cases, the Act allowed judges to exercise discretion over pretrial release based on "the nature and circumstances of the offense, and of the evidence[.]" *Id.*

The Eighth Amendment's ratification in 1791 did not limit the government's authority in this area. Although the Eighth Amendment prohibits excessive bail, it "fails to say all arrests must be bailable." *Carlson*, 342 U.S. at 546; *see also Salerno*, 481 U.S. at 754 ("The only arguable substantive limitation of the Bail Clause is that the Government's proposed conditions of release or detention not be 'excessive' in light of the perceived evil."). So it was Congress—not the Constitution—that determined "the classes of cases in which bail shall be allowed in this country." *Carlson*, 342 U.S. 545.

History from both England and the founding era establish the government's authority to immediately and totally deprive someone under felony indictment of their liberty pending trial. Any right to pretrial release was a matter of legislative grace—not constitutional mandate.

But that still leaves whether this historical practice is an appropriate analogue for § 922(n).

18

To resolve this question, *Bruen* instructs courts to consider "how and why" the modern regulation and its purported historical analogue burden the right to self-defense. 142 S. Ct. at 2133. The court's "central considerations" are "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified[.]" *Id.* (cleaned up).

On the question of comparable burden on the right of armed self-defense, §922(n) fares well when compared to the historical practice of pretrial detention for serious crimes. Pretrial detention burdened an individual's right to keep and bear arms completely, though temporarily. People in prison cannot possess guns, but founding-era defendants could re-arm themselves if they were acquitted (or, often, convicted). *See* C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J. L. & Pub. Pol'y 695, 708 (2009) ("[O]ne can with a good degree of confidence say that bans on convicts possessing firearms were unknown before World War I.").

Section 922(n), on the other hand, provides a more limited restriction on a defendant's right to self-defense. While he cannot obtain new firearms while under indictment, the statute does not prohibit him from retaining a firearm he already possesses and using it for self-defense. At worst, § 922(n) imposes an equal burden on a defendant's right to armed self-defense when compared to pretrial detention. If someone comes under indictment without already possessing a gun, he will not be able to obtain one under the statute. But in the aggregate, § 922(n) imposes a lesser burden than pretrial incarceration because those who already own firearms can retain them.

And both the historical practice of pretrial detention and §922(n) find their justification from the same source: a grand jury's formal accusation that there is probable cause to believe the defendant committed a serious crime. That accusation—memorialized by an indictment—fundamentally alters the relationship between the state and the accused. The most extreme effect

19

of an indictment is that it allows the state to "immediately depriv[e] the accused of her freedom." *Kaley* v. *United States*, 571 U.S. 320, 329 (2014). And if an indictment can justify a total and immediate deprivation of liberty, it also justifies lesser deprivations—like limiting a defendant's ability to ship, transport, or receive a firearm. *See id.*

Compared to this nation's historical tradition of allowing pretrial detention for serious offenses, § 922(n) imposes a lesser overall burden on the right to armed self-defense. And like pretrial detention, § 922(n) requires a finding of probable cause by a grand jury before it can restrict an indicted individual's liberties. Put differently, the challenged statute accomplishes a similar "why" through a less restrictive "how." So while the United States has not identified a "historical twin" for § 922(n), it has established that the historical system of pretrial detention in founding-era America is "analogous enough to pass constitutional muster." *Bruen*, 142. S. Ct. at 2133 (emphasis removed). Thus, the court should deny Alston's motion to dismiss the first count of his indictment.

### D. Whether § 922(g)(3)'s Restriction on Alston's Ability to Possess a Firearm Due to His Regular Drug Use Is Constitutional

The indictment's second charge alleges that Alston violated the federal prohibition on possession of a firearm by anyone who is "an unlawful user of [or] addicted to any controlled substance[.]" Indictment at 1 (quoting 18 U.S.C. § 922(g)(3)). Federal courts have concluded that "Congress enacted the exclusions in § 922(g) to keep guns out of the hands of presumptively risky people." *United States* v. *Yancey*, 621 F.3d 681, 683 (7th Cir. 2010) (citations omitted). And in its attempt to "suppress[] armed violence[,]" Congress concluded that drug users are too risky to possess firearms. *Id.* at 684.

Although the statute does not define "unlawful user," courts of appeal have generally required the government to prove that the defendant regularly used controlled substances, did so

for a long time, and possessed a firearm near the time of drug use. *See, e.g.*, *United States* v. *Tanco-Baez*, 942 F.3d 7, 15 (1st Cir. 2019) (finding that the government must prove "(1) the defendant used controlled substances regularly, (2) that the use took place over a long period of time, and (3) that the use was proximate to or contemporaneous with his possession of a firearm") (citations omitted); *see also United States* v. *Bowens*, 938 F.3d 790, 793–94 (6th Cir. 2019) ("[T]he Government needed to prove that the defendants were regular and repeated users of marijuana[.]") (citation omitted); *United States* v. *Purdy*, 264 F.3d 809, 812 (9th Cir. 2001) (explaining that drug use must be "consistent, prolonged, and close in time to [the defendant's] gun possession") (citation and internal quotation marks omitted). *But see United States* v. *Carnes*, 22 F.4th 743, 749 (8th Cir. 2022) (requiring the government to prove that the defendant "was actively engaged in the use of a controlled substance during the time he possessed firearms").

Alston admitted to ATF agents that he uses marijuana (a controlled substance under federal law) daily. Thus, the undersigned assumes that he is an "unlawful user" or drug addict under § 922(g)(3).[12] He also does not dispute that he possessed a firearm. *See* Mot. Dismiss at 8.

Alston's conduct—possessing a firearm—implicates the Second Amendment and is entitled to presumptive protection. And the government has identified no suitable historical analogue justifying its prohibition on unlawful users of controlled substances (or drug addicts) possessing firearms.

### 1. Does Alston's Alleged Conduct Fall Within the Second Amendment's Protections?

Because Alston is a member of "the people" who enjoy Second Amendment protection, the court need only determine whether § 922(g)(3)'s prohibition on possession burdens conduct

---

[12] The conclusion that Alston is an "unlawful user" or drug addict for the purposes of his facial challenge to § 922(g)(3) does not affect whether he is an "unlawful user" or drug addict at any later stage of his case.

protected by the Amendment. It does. In both *Heller* and *Bruen*, the Supreme Court made clear that the Second Amendment protects an individual's right to possess firearms. *See Heller*, 554 U.S. at 636 (establishing that Americans have a right to keep handguns in their homes for self-defense); *Bruen*, 142 S. Ct. at 2156 ("The constitutional right to bear arms in public for self-defense is not a second-class right[.]") (citation and internal quotation marks omitted). Thus, to justify § 922(g)(3), the government must supply the court with an appropriate historical analogue.

### 2. Is the United States' Regulation of Alston's Conduct Under § 922(g)(3) Consistent with the Nation's Historical Tradition of Firearms Regulation?

The United States contends that three historical practices are similar enough to § 922(g)(3) to render the statute constitutional. First, it claims that the statute is similar to laws detaining the mentally ill. Resp. Opp'n Mot. Dismiss at 12–13. It then alleges that the statute is similar to early American laws regulating gun use while intoxicated. *Id.* at 13–16. And the government's final justification for § 922(g)(3) is a bit of a catch-all—it maintains that the legislature has long had the power to disarm "individuals deemed to be dangerous or risky[.]" *Id.* at 16. By the government's own admission, "none of the pre-twentieth century historical analogues are a 'dead ringer' or 'historical twin' for 18 U.S.C. § 922(g)(3)." *Id.* (quoting *Bruen*, 142 S. Ct. at 2133). Still, it asks the court to find that its cited sources are "analogous enough . . . to pass constitutional muster." *Id.* (quoting *Bruen*, 142 S. Ct. at 2133).

#### a) The Mentally Ill

The United States first alleges that "longstanding prohibitions on the possession of firearms by . . . the mentally ill" may serve as a proper historical analogue to § 922(g)(3). *Id.* at 12 (quoting *Heller*, 554 U.S. at 626). "Although being under the influence of a controlled substance is not tantamount to mental illness," the government contends, "both conditions can render a person

22

incapable of safely and responsibly possessing a firearm." *Id.* As historical support for this argument, it cites one piece of scholarship discussing English practice, several sources suggesting that the founders equated drunkenness with madness, and four court cases (three of which are nonbinding).

The government's analysis begins with English history. "In England," it contends, "justices of the peace could lock up dangerous lunatics and seize their property." *Id.* (citing Richard Moran, *The Origin of Insanity as a Special Verdict: The Trial for Treason of James Hadfield (1880)*, 19 L. & Soc'y Rev. 487 (1985)). Moran's article is the sole source the United States provides for this assertion. The piece centers around the trial (and successful insanity plea) of one man—James Hadfield—after he was charged with treason for attempting to murder King George III in 1800. *See* Moran, *supra*, at 492–508. Before Hadfield's trial, the criminally insane were rarely detained. *See id.* at 515. But the outrage that ensued after his acquittal prompted Parliament to pass the Criminal Lunatics Act of 1800, which "formalized the detention of alleged offenders otherwise beyond the statutory reach of the criminal law." *Id.* Among other things, the law allowed for the detention of any individual "who, upon arraignment, [was] found to be insane." *Id.* at 513.

Although the government makes no direct reference to it, Moran's article does briefly discuss at least one statute passed before the ratification of the Second Amendment: the Vagrancy Act of 1744. *See id.* at 488, 509–10. That law, passed by Parliament, provided that "it shall and may be lawful for any two or more Justices of the Peace, where such Lunatick or mad person shall be found . . . to cause such Person to be apprehended, and kept safely locked up in some secure Place" for treatment. 17 Geo. 2, c. 5, § 20.

Once a mentally unstable person was detained, the Act allowed local officials to deport the "Lunatick" to his place of legal residence. *Id.* The authorities could also seize a limited amount of

his property to pay for his removal, lodging, and treatment. *Id.* The individual could be detained only for as long "as such Lunacy or Madness shall continue[,]" and the cost of keeping, relocating, and curing him had to be "proved upon Oath" before his property could be seized. *Id.* But the Act did not mandate prison time or removal—as an alternative, it provided that "any Friend or Relation of such Lunaticks" could "take them under their own Care and Protection" if they so chose. *Id.* § 21.

The United States cites to two pre-*Bruen* circuit court cases to suggest that, like English officials, 18th-century American justices of the peace could lock up lunatics the community considered dangerous. Resp. Opp'n Mot. Dismiss at 12 (citing *Yancey*, 621 F.3d at 685; *Beers* v. *Att'y Gen. of the U.S.*, 927 F.3d 150, 157 (3rd Cir. 2019), *vacated*, 140 S. Ct. 2758 (2020)). These cases, in turn, both cite a single law review article claiming that, "in eighteenth-century America, justices of the peace were authorized to 'lock up' 'lunatics' who were 'dangerous to be permitted to go abroad.'" Carlton F.W. Larson, *Four Exceptions in Search of a Theory:* District of Columbia v. Heller *and Jud. Ipse Dixit*, 60 Hastings L.J. 1371, 1377 (2009) (quoting Henry Care, *English Liberties, or the Free-Born Subject's Inheritance* 329 (6th ed. 1774)).

*English Liberties*, which lies at the bottom of this pile of citations, does not go as far as the government suggests. The line of scholarship (and resulting caselaw) discussed above traces back to a single page in the piece, which provides a template "Warrant to Secure a Lunatic." Care, *supra*, at 329. The example warrant is not American in origin—it, alongside over 100 pages of other stock documents, was drafted by an English legal scholar named Dr. Richard Burn. *Id.* at 246. These templates were included in *English Liberties* "[f]or the help and improvement of Justices of the Peace[.]" *Id.*

24

Unsurprisingly, then, the template "Warrant to Secure a Lunatic" largely mirrors the English practice under the Vagrancy Act of 1744. Two witnesses had to swear an oath that the suspect was "by lunacy so far disordered in his senses, that he [was] dangerous to be permitted to go abroad[.]" *Id.* at 329. Upon that showing, the warrant ordered officials to apprehend the suspect and place him into the care of a third-party—not a government detention facility—"only so long as such lunacy or disorder shall continue, and no longer." *Id.* And the third party was entitled to a "reasonable allowance" from the suspect for housing him. *Id.*

The government bears the burden of identifying a historical analogue that justifies § 922(g)(3). *Bruen*, 142 S. Ct. at 2127. But neither *English Liberties* (which does not appear in the government's brief) nor the scholarship and cases that cite it show that the stock "Warrant to Secure a Lunatic" (or anything like it) saw use in the American colonies. *See id.* at 2149 (discounting the analogical value of surety laws because the government "offer[ed] little evidence that authorities ever enforced" them). Even if the colonies did import mid-18th-century English practice governing the detention of the insane, however, this tradition cannot serve as a suitable historical analogue to § 922(g)(3).

First, the laws serve different purposes. Broadly understood, both the Vagrancy Act of 1744 and § 922(g)(3) are intended to promote public safety. Beyond this highly general similarity, however, the laws address different societal problems. Most obviously, the historical practices discussed above did not attempt to regulate firearms or other weapons. Instead, the Vagrancy Act of 1744 sought to remedy the danger posed to society when someone falls victim to temporary insanity. Section 922(g)(3), by contrast, aims to disarm all individuals who regularly use controlled substances.

25

Compared to the English law, § 922(g)(3) is both over-and-underinclusive—many people who use controlled substances are not so irrational that they cannot function in society generally, and many severely mentally ill people are not unlawful users of controlled substances. Thus, the laws seek to remedy different problems and target different subsects of the people.

The United States concedes that "being under the influence of a controlled substance is not tantamount to mental illness[.]" Resp. Opp'n Mot. Dismiss at 12. It maintains, however, that "both conditions can render a person incapable of safely and responsibly possessing a firearm." *Id.*

This may be true. But the government cites no examples of early American laws or traditions that treated the intoxicated and the insane similarly. Instead, the United States cites a book written by Benjamin Rush that "equated drunkenness with a temporary fit of madness" and a more recent work that claims 18th-century commentators "designated habitual drinking as a form of insanity." *Id.* at 12–13 (citations and internal quotation marks omitted). The scattered opinions of a few founding-era observers—whose private thoughts on drinking were not codified into law— do not shed meaningful light on the historical pedigree of § 922(g)(3).

But even if the court finds that the laws serve the same purpose, § 922(g)(3)'s operation bears little resemblance to the Vagrancy Act of 1744 (or any early-American practice that traces back to it). Under English law, if a mentally ill individual imperiled the community, he could be deported to his location of origin or detained—but only until his fit of madness wore off. *See* 17 Geo. 2, c. 5, § 20; Care, *supra*, at 329. In fact, neither the Vagrancy Act of 1744 nor the template warrant in *English Liberties* mandated incarceration at all—both allowed the mentally ill individual to be placed with a willing third party rather than serve time in jail. *See* 17 Geo. 2, c. 5, § 21; Care, *supra*, at 329. And while the individual's property could be seized, the seizure was limited to assets necessary to pay back the costs of detaining, relocating, and curing him. *See* 17

26

Geo. 2, c. 5, § 20; Care, *supra*, at 329. None of the individual's possessions—including his weapons—could be taken simply because the government thought he was too dangerous to own them.

Section 922(g)(3), by comparison, punishes a broader swath of conduct and does so more severely. While English law only allowed officials to apprehend those who were experiencing a mental break, § 922(g)(3) allows the government to disarm and punish all unlawful users of a controlled substance regardless of their sobriety or mental acuity at the time they possessed a firearm. A person who uses controlled substances and owns a gun—but never mixes the two—could be convicted under the statute. Thus, even if intoxication is like a "temporary fit of madness," *see* Resp. Opp'n Mot. Dismiss at 12 (quotation omitted), § 922(g)(3) allows the government to prosecute individuals for possessing a firearm when they are not "mad." Section 922(g)(3) also imposes up to 15 years in prison for its violation.[13] *See* 28 U.S.C. § 924(a)(8). This is a far cry from the punishments contemplated by the Vagrancy Act of 1744 and the template warrant in *English Liberties*, which only authorized detention until the fit of lunacy subsided.

This is not to say that those at risk of a mental breakdown may enjoy unfettered access to firearms. But Congress has already enacted a law curbing access to firearms by the mentally unwell. The United States Code prohibits anyone "who has been adjudicated as a mental defective or who has been committed to a mental institution" from possessing a gun. 18 U.S.C. § 922(g)(4). Drug users and the mentally ill are distinct (if sometimes overlapping) subsections of the people. The legislature, in enacting both § 922(g)(3) and § 922(g)(4), recognized this difference. So even if regulations preventing the mentally ill from possessing firearms are "presumptively lawful[,]"

---

[13] If the defendant has three previous convictions for a violent felony or serious drug offence, the court must impose at least a 15-year sentence and can sentence an offender to life in prison. 18 U.S.C. § 924(e)(1).

*Heller*, 554 U.S. at 626 n.26, the government still bears the burden of showing why this lawfulness extends to § 922(g)(3). It has not done so here.

In sum, English and colonial American traditions regulating the mentally ill differ from § 922(g)(3) in both purpose and operation. The government has not identified "a well-established and representative historical analogue," *Bruen*, 142 S. Ct. at 2133 (emphasis removed), for § 922(g)(3) arising out of these regulations.

**b)        The Intoxicated**

The government next maintains that § 922(g)(3) is analogous "to historical laws that prohibited carrying a firearm while under the influence of alcohol." Resp. Opp'n Mot. Dismiss at 13. It cites three founding-era laws, a handful of Reconstruction-era acts, and several state statutes enacted since 1931. *See id.* at 13–15. The undersigned will discuss the laws from each historical era in turn.

The three founding-era laws the government offers as historical analogues for § 922(g)(3), broadly speaking, prevented people from discharging firearms or possessing them in public while drunk. *See id.* at 13. First, in 1655, colonial Virginia criminalized "shoot[ing] any gunns at drinkeing" unless the shooting took place at a marriage or a funeral. 1 William Hening, *Statutes At Large: Being a Collection of All the Laws of Virginia from the First Session of the Legislature, in the Year 1619* 401–02 (1823). A violation of this act carried with it no carceral penalty—instead, the offender had to forfeit 100 pounds of tobacco to the colonial militia. *Id.* Second, shortly before the founding, New York imposed a fine of 20 shillings on anyone who discharged a firearm in residential areas on New Year's Eve and the first two days of January, fearing that intoxicated colonists would cause damage in their revelry. Ch. 1501, 5 Colonial Laws of New York 244–46 (1984). And third, a 1746 New Jersey statute provided that soldiers could have their weapons taken

away if they showed up to training "in Arms disguised in Liquor[.]" Samuel Allinson, *Acts of the Gen. Assembly of the Province of New-Jersey* 140 (1776). If the soldier did appear intoxicated at training, he could be placed under supervision and fined. *Id.* at 141.

Taken together, these laws fail to serve as a historical analogue to § 922(g)(3) for two reasons.

First, in *Bruen*, the Supreme Court cast doubt on the notion that a few isolated colonial laws can establish a robust historical practice. *See* 142 S. Ct. at 2142 ("[W]e doubt that *three* colonial regulations could suffice to show a tradition of public-carry regulation.") (emphasis in original). Here, the government can point to only three statutes passed within a span of more than 100 years of colonial history regulating the use of firearms while intoxicated. Such a spotty historical tradition cannot form a firm foundation for § 922(g)(3).

Second—and more fundamentally—these laws did not burden conduct protected by the Second Amendment in a similar way to § 922(g)(3). At the highest level of abstraction, both the colonial laws and § 922(g)(3) get at the same "why": drugs and guns don't mix. But the similarities end there. The Virginia law was enacted to make sure colonists knew when their settlement was under attack,[14] and the New Jersey law aimed to ensure the orderly functioning of the militia.[15]

Understood broadly, § 922(g)(3) also seeks to prevent the intersection of intoxicants and firearms. But the challenged statute goes further: it attempts to promote general safety by completely disarming all individuals who frequently use drugs. Put differently, while the three

---

[14] When the Virginia law was passed, colonists warned others about impending Indian attacks by discharging weapons. The government banned "shoot[ing] any gunns at drinkeing" because it feared that colonists would be unable to differentiate between warning shots and drunken volleys. *See* Hening, *supra*, at 401. It also worried that colonists were wasting gunpowder "in vaine, that might be reserved" for conflicts with Native Americans. *Id.*

[15] The New Jersey restriction discussed above was part of a colonial statute entitled "An Act for Better Settling and Regulating the Militia of This Colony of New-Jersey, for the Repelling Invasions, and Suppressing Insurrections and Rebellions." *See* Allinson, *supra*, at 139.

29

colonial acts were passed to prevent the simultaneous use of drugs and guns, § 922(g)(3) seeks to prevent the potential combination of drugs and guns generally.

But even if the colonial laws and § 922(g)(3) strike at the same "why," the methods they employ to prevent the interaction of drugs and guns are patently different. None of the three colonial statutes prohibited intoxicated individuals—much less those who are habitually, though not presently, intoxicated—from possessing weapons. The Virginia law only criminalized firing weapons while drinking, and it made exceptions for weddings and funerals. The New York law prohibited everyone (intoxicated or sober) from firing weapons in certain locations for three days out of the year. And while the New Jersey law barred individuals from showing up to military training drunk, it only applied to soldiers. The act neither prevented the average citizen from discharging weapons while intoxicated nor prohibited soldiers from shooting guns while drinking outside of training. And not one of the three laws imposed incarceration or disarmament for violation—each, at most, carried with it a fine.

Compared to these historical regulations, § 922(g)(3)'s sweep is staggering. Unlike the colonial laws, which sought to prohibit the active combination of liquor and firearms, the challenged statute completely prohibits individuals from possessing firearms based solely on their status as an "unlawful user" of controlled substances. In other words, it doesn't matter whether the individual was intoxicated when he possessed a gun.

Section 922(g)(3) is also far more punitive—as discussed above, those who violate it can spend years in prison. *See* 18 U.S.C. § 924(e)(1). Put simply, the operation of § 922(g)(3) bears little resemblance to the colonial laws regulating the intersection of guns and intoxicants. The challenged statute applies to those who are not presently intoxicated, and it imposes a complete

ban on gun possession. The three colonial acts regulating firearm use while drinking are not "analogous enough" to § 922(g)(3) "to pass constitutional muster." *Bruen*, 142. S. Ct. at 2133.

The government next points to a handful of Reconstruction-era laws to justify § 922(g)(3). *See* Resp. Opp'n Mot. Dismiss at 14. In *Bruen*, the Court did not settle the analogical value of laws passed near the ratification of the Fourteenth Amendment. 142 S. Ct. at 2137–38; *id.* at 2163 (Barrett, J., concurring). It did, however, note that "post-Civil War discussions of the right to keep and bear arms . . . 'do not provide as much insight into [the Second Amendment's] original meaning as earlier sources.'" *Id.* at 2137 (quoting *Heller*, 554 U.S. at 614). And these discussions are of even less value here than in *Bruen* because § 922(g)(3) is a creature of federal, not state, law. The original public meaning of the Second Amendment, as applied to the federal government's actions, was fixed upon the Constitution's ratification in 1791—not the Fourteenth Amendment's ratification in 1868. *Id.* at 2132 (explaining that the Constitution's "meaning is fixed according to the understandings of those who ratified it") (citation omitted). Thus, when assessing federal laws, courts should give less weight to laws from the mid-to-late-1800s than they give to laws from the founding era.

But even if the government's proffered Reconstruction-era laws were entitled to full weight, they fail to support § 923(g)(3)'s constitutionality. The United States cites to six state laws that barred "intoxicated persons from possessing, using, or receiving firearms." Resp. Opp'n Mot. Dismiss at 14. But like the colonial laws discussed above, these statutes only targeted the *active* combination of alcohol and guns. *See* Kan. Gen. Stat., Crimes & Punishments § 282 (1868) (prohibiting "any person under the influence of intoxicating drink" from "carrying on his person a pistol, bowie-knife, dirk or other deadly weapon" in the state); 1878 Miss. Laws 175–76, § 2 (criminalizing the sale of pistols and pistol cartridges to the intoxicated); 1883 Mo. Laws 76, § 1

(outlawing the concealed carry of deadly weapons while intoxicated); 1883 Wis. Sess. Laws 290, ch. 329, § 3 ("It shall be unlawful for any person, in a state of intoxication, to go armed with any pistol or revolver."); 1890 Okla. Sess. Laws 495, art. 47, § 4 (prohibiting public officers from carrying arms while intoxicated); 1899 S.C. Acts 97, no. 67, § 1 (prohibiting intoxicated individuals—or those pretending to be intoxicated—from "discharg[ing] any gun, pistol, or other firearms while upon or within fifty yards of any public road, except upon his own premises").

Like the colonial statutes discussed above, none of the Reconstruction-era laws imposed a total ban on firearm possession for those who drink. Instead, they prohibit specific conduct *while* drunk: purchasing a firearm or carrying it in public. And while some of these laws contemplated prison sentences for their violation, none was nearly as severe as § 922(g)(3). *See, e.g.*, 1899 S.C. Acts 97, no. 67, § 1 (misdemeanor with maximum sentence of 30 days); Kan. Gen. Stat., Crimes & Punishments § 282 (1868) (misdemeanor with maximum sentence of three months); 1878 Miss. Laws 175–76, § 2 (requiring violators to pay a fine and, if they refused, to complete hard labor). Thus, the Reconstruction-era laws the government cites undermine—rather than bolster—the validity of § 922(g)(3).

Finally, the United States offers several 20th-century laws that allegedly support § 922(g)(3)'s constitutionality. *See* Resp. Opp'n Mot. Dismiss at 15–16. But the further the government strays from the founding, the less potent its examples become. The court should give little—if any—weight to state statutes passed in the 1900s if they conflict with earlier understandings of the Second Amendment. *See Bruen*, 142 S. Ct. at 2154 n.28 ("[T]he 20th-century evidence presented by respondents and their *amici* does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence.").

That is the case here. The government cites laws from five states and the District of Columbia prohibiting the sale of firearms to drug addicts—the earliest of which was passed in 1931. *See* Resp. Opp'n Mot. Dismiss at 15. It also remarks that, in the present day, at least 27 jurisdictions "have restricted the right of habitual drug abusers or alcoholics to possess or carry firearms." *Id.* (quoting *Yancey*, 621 F.3d at 684). But present practice does not necessarily inform historical understanding, and the modern laws the government offers in support of § 922(g)(3) conflict with this nation's traditions closer to the founding.

In 1931, Pennsylvania became the first state to criminalize "deliver[ing] a firearm . . . to one who he has reasonable cause to believe . . . is a drug addict[.]" 1931 Pa. Laws 499, no. 158, § 8. Within the next several years, other jurisdictions followed suit. *See* 47 Stat. 652 § 7 (1932) (D.C.) (prohibiting sale of firearms to drug addicts); 1936 Ala. Laws 52, no. 82, § 8 (criminalizing the delivery of pistols to drug addicts and habitual drunkards); 1935 S.D. Sess. Laws 356, ch. 208, § 8 (same); 1935 Wash. Sess. Laws 601, ch. 172, § 8 (same).

These laws were the first in the nation's history to condition an individual's ability to receive a firearm on his status as someone who is not addicted to drugs or alcohol. The government has provided no evidence that, before 1931, citizens could have their ability to bear arms entirely curtailed because they use intoxicants. While earlier laws might support the proposition that the actively intoxicated may be disarmed and punished, they did not wholly foreclose those who use intoxicants from possessing guns when they were sober. This is a significant departure from historical practice—the 20th-century laws sweep more broadly, and they target an individual's status as a drug user generally rather than his specific, irresponsible use of firearms themselves.

Thus, the 1931 Pennsylvania law and its progeny cannot inform the court's view on the historical protections of the Second Amendment.[16]

Surveying the government's historical record in its entirety, the undersigned cannot conclude that it has identified a tradition of disarming the intoxicated that can serve as a proper analogue for § 922(g)(3).

### c) The Dangerous

Finally, the United States contends that the court should uphold § 923(g)(3) because the government has long held the power to disarm "individuals deemed to be dangerous or risky[.]" Resp. Opp'n Mot. Dismiss at 16. This argument—which spans less than a page—does not give the court much to work with. Despite bearing the burden of identifying a discreet analogue to justify § 922(g)(3), the government makes only one passing reference to a historical source on disarming the dangerous in its discussion of the challenged statute. Instead, its argument hinges on caselaw—most of which is not binding on this court.

Later in its brief, the government cites some primary sources on regulating the dangerous to justify § 922(n). *Id.* at 28–31. It does not, however, offer any argument at all to suggest that these sources may serve as an analogue to § 922(g)(3). Out of an abundance of caution, the undersigned will look to the handful of cases the government cites in its discussion of § 922(g)(3) as well as the sources it provides when justifying § 922(n) to determine whether it has identified a historical analogue to § 922(g)(3).

Citing two pre-*Bruen* Seventh Circuit cases and *Bruen* itself, the United States contends that historical practice supports disarming of the dangerous. *Id.* at 16. The government begins by

---

[16] These laws also regulate different conduct than § 922(g)(3). While the challenged statute imposes criminal liability on drug users who receive, possess, or transfer a firearm, the 1930s laws only targeted individuals who transferred a firearm *to* a drug user. Thus, even if the court did find these statutes informative, it is unclear whether they are sufficiently analogous to support § 922(g)(3)—which targets the drug user himself.

referencing then-Judge Barrett's dissent in *Kanter*, in which she found that "the legislature may disarm those who have demonstrated a proclivity for violence or whose possession of guns would otherwise threaten the public safety." 919 F.3d at 454 (Barrett, J., dissenting). The Supreme Court allegedly recognized that the dangerous may be disarmed in *Bruen* because the Court cited a mid-1880s decree from General Daniel Edgar Sickles claiming that "no disorderly person, vagrant, or disturber of the peace, shall be allowed to bear arms." 142 S. Ct. at 2152 (quoting Cong. Globe, 39th Cong., 1st Sess., at 908–09). And to link dangerousness with drug use, the government cites *Yancey*, in which the Seventh Circuit found that Congress passed § 922(g) "to keep guns out of the hands of presumptively risky people" and prevent "armed violence." 621 F.3d at 683 (citations omitted).

But in the nation's infancy, not all sources of danger received equal legislative treatment. Upon closer inspection, founding-era laws disarming the dangerous centered around a single *type* of danger: threats to state security. *See* Marshall, *supra*, at 727–28 ("[T]o the extent that one can distill any guidance from the . . . Revolutionary disarmament, it would seem at most to be that persons who by their actions . . . betray a likelihood of violence *against the state* may be disarmed.") (emphasis added). As the government points out in its discussion of § 922(n), six of the former colonies allowed authorities to confiscate weapons owned by those who would not swear an oath of allegiance to the new nation. Resp. Opp'n Mot. Dismiss at 29 (collecting laws); *see also* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 265 (2020) ("Most disarmament efforts during the colonial period targeted disaffected persons.").

At least two colonies, following English practice, specifically targeted Catholics. *See Kanter*, 919 F.3d at 457 (Barrett, J., dissenting) (citing Robert H. Churchill, *Gun Regulation, the*

*Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & Hist. Rev. 139, 157 (2007); Alexander DeConde, *Gun Violence in America* 22–23 (2001)). But unlike in England, colonial Catholics who swore an oath of allegiance to the new nation could keep their weapons.[17] *See* Churchill, *supra*, at 157.

As then-Judge Barrett pointed out in *Kanter*, the oaths of allegiance were meant to "deal with the potential threat coming from armed citizens who remained loyal to" the crown. 919 F.3d at 457 (Barrett, J., dissenting) (quoting Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506 (2004)). Once colonial governments were satisfied that their citizens supported rule from this side of the pond, they allowed disfavored individuals to regain their right to bear arms.[18] *See id.*; Greenlee, *supra*, at 268 ("[O]nce the perceived danger abated, the arms disability was often lifted.").

Other groups were not so lucky. Slaves and Native Americans, for instance, were "disarmed as a matter of course" because early American governments feared that they might use firearms to rebel. *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting) (citations omitted). What's more, at the time of the Second Amendment's ratification, these groups may have fallen outside "the people" who receive constitutional protections altogether.[19] *See McDonald*, 561 U.S. at 822 (Thomas, J., concurring in part & concurring in the judgment) ("[The Fourteenth Amendment]

---

[17] And even while under English rule, some colonial governments allowed the potentially politically disloyal to retain enough weapons to protect themselves and their homes. *See, e.g.*, 7 William Hening, *Statutes At Large: Being a Collection of All the Laws of Virginia from the First Session of the Legislature, in the Year 1619* 35–36 (1820).

[18] In theory, 18 U.S.C. § 925(c) allows an American stripped of his Second Amendment rights under § 922 to petition for their reinstatement. That statute provides that "[a] person who is prohibited from possessing, shipping, transporting, or receiving firearms or ammunition may make application to the Attorney General for relief from the disabilities imposed by Federal [firearms] laws[.]" *Id.* And if the Attorney General denies someone's application, he may seek relief in the courts. *Id.* But Congress has prohibited the Executive Branch from using appropriated funds "to investigate or act upon applications for relief from [f]ederal firearms disabilities under" § 925(c) for more than 30 years. Consolidated Appropriations Act, 2022, Pub. L. No. 117–103, 136 Stat. 49; *United States* v. *Bean*, 537 U.S. 71, 74–76 (2002). And without the Attorney General's denial of a petition, federal courts lack jurisdiction to grant the relief § 925(c) allows. *Bean*, 537 U.S. at 75–78. Thus, while this rights-restoration provision exists in theory, it is illusory in practice.

[19] Such race- and faith-based constitutional deprivations would not pass muster today.

overruled *Dred Scott*'s holding that blacks were not citizens of either the United States or their own State and, thus, did not enjoy the privileges and immunities of citizens embodied in the Constitution.") (citation and internal quotation marks omitted); Indian Citizenship Act of 1924, Pub. L. No. 68–175, 43 Stat. 253 (1924) (granting citizenship to non-citizen Indians born within the United States).

The United States identifies no founding-era gun law that supports disarming a member of "the people" based on general public safety concerns rather than the threat of armed rebellion.[20] *Cf. Kanter,* 919 F.3d at 454 (Barrett, J., dissenting) ("The best historical support for a legislative power to permanently dispossess all felons would be founding-era laws explicitly imposing—or explicitly authorizing the legislature to impose—such a ban. But at least thus far, scholars have not been able to identify any such laws."). It does, however, contend that two ratification debates before the Second Amendment's adoption "confirm the founders' belief that disarming select groups for the sake of public safety was compatible with the right to arms[.]" Resp. Opp'n Mot. Dismiss at 29 (quotation omitted).

First is the Pennsylvania ratification convention minority's dissent,[21] which argued "[t]hat the people have a right to bear arms for the defence of themselves . . . unless for crimes committed, or real danger of public injury from individuals[.]" 2 Bernard Schwarz, *The Bill of Rights: A Documentary History* 665 (1971). Second, the government points to a proposed amendment

---

[20] While the United States does maintain that "gun safety regulation was commonplace in the colonies," Resp. Opp'n Mot. Dismiss at 28 (quotation omitted), it does not identify any colonial laws that step beyond the fledgling nation's interest in protecting itself from armed rebellion. To be sure, some public safety firearm regulations did exist near the founding—scholarship has identified Revolution-era laws governing the militia, firearms registries, and the storage of gun powder. *See, e.g.,* Cornell & DeDino, *supra,* at 505–512 (cataloguing various early American laws). And in the antebellum era, some states limited the right to concealed carry and imposed time, place, and manner restrictions on gun use. *See id.* at 512–16 (same). But these laws have no apparent nexus to § 922(g)(3), which may explain the government's decision to argue in generalities rather than cite specific regulations.

[21] In *Heller,* the Supreme Court called this proposal "highly influential[,]" but this was in the context of the Court's conclusion that the Second Amendment protects an individual right rather than one tied to militia membership. 554 U.S. at 604.

suggested by Samuel Adams at the Massachusetts ratification convention urging "that the said Constitution be never construed to authorize Congress . . . to prevent the people of the United States, who are peaceable citizens, from keeping their own arms[.]" *Id.* at 681.

Although these two proposals advocated for a more constrained reading of the Second Amendment, their historical value is murky. As then-Judge Barrett explained in *Kanter*, neither proposal made its way into the Second Amendment—they didn't even carry a majority of their conventions. *See* 919 F.3d at 455 (Barrett, J., dissenting).

What's more, "proposals from other states that advocated a constitutional right to arms did not contain similar language of limitation or exclusion." *Id.* (citing Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204, 222 (1983)). And none of the four state constitutions enacted before the Second Amendment's ratification that included a provision analogous to the Amendment contained exclusions based on dangerousness or criminal history. *Id.* (citing Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 Tex. Rev. L. & Pol. 191, 208 (2006)). Thus, while these two minority proposals indicate that some Americans viewed the Second Amendment as implicitly recognizing exceptions for the violent or the criminal, they do not suggest that this was the prevailing interpretation of the Amendment's text.

Taken together, the founding- and antebellum-era sources that the government points to can be summarized as follows: Laws that disarmed loyalists, Catholics, slaves, and Native Americans did so largely to prevent armed rebellion. Both slaves and Native Americans arguably fell outside of "the people," rendering them unable to restore their right to possess weapons. But other Americans who were divested of the right to keep and bear arms could regain that right— usually by swearing a loyalty oath. And finally, while some citizens believed that the Second

Amendment contains within it a tacit carve-out for criminals and those who pose a threat of violence, their proposals did not win the day.

This historical tradition bears little resemblance to § 922(g)(3). First, the colonial regulations serve a different purpose than the challenged statute. Revolution-era jurisdictions prohibited certain people from owning guns because they feared that those individuals might use firearms to overthrow the nascent government. Section 922(g)(3), by contrast, seeks to promote everyday public safety by preventing individuals who might have decreased self-control from possessing a firearm. Nowhere does the government contend that unlawful users of controlled substances pose a grave danger to the independence and security of the nation itself.[22]

And even if the court finds that the Pennsylvania and Massachusetts minority proposals meaningfully inform the scope of the Amendment, it is unclear how they support § 922(g)(3)'s constitutionality. Samuel Adams's proposed language, which would have limited the Second Amendment right to "peaceable citizens," does not suggest that all unlawful drug users should be disarmed. When the ratification debates took place, "peaceable" meant "[f]ree from war; free from tumult"; "[q]uiet; undisturbed"; "[n]ot violent; not bloody"; "[n]ot quarrelsome; not turbulent." *Kanter*, 919 F.3d at 455 (Barrett, J., dissenting) (quoting 1 Samuel Johnson, *A Dictionary of the English Language* (5th ed. 1773)). And although the Pennsylvania minority's provision would divest citizens of Second Amendment protection "for crimes committed, or real danger of public injury," Schwartz, *supra*, at 681, no evidence suggests that the proposal supported the disarmament

---

[22] Although both armed insurrectionists and individuals addicted to drugs may impose a greater threat to public safety than the average citizen, the former group poses a more existential threat than the latter. This difference matters—if "dangerousness" is the sole metric, the government would have an arbitrary, near-limitless power to identify a disfavored group, declare it "dangerous," and revoke its constitutionally protected rights. Such an exception to the Second Amendment would swallow the rule. *Cf. Range* v. *Attorney General United States*, 69 F.4th 96, 102 (3rd Cir. 2023) ("At root, the Government's claim that only 'law-abiding, responsible citizens' are protected by the Second Amendment devolves authority to legislators to decide whom to exclude from 'the people.'").

of *all* criminals regardless of proclivity for violence, *Kanter*, 919 F.3d at 456 (Barrett, J., dissenting).

Thus—at best—the historical record suggests that early American history supports a carve-out for violent individuals. But § 922(g)(3) sweeps much more broadly. Rather than conditioning an individual's right to possess firearms on his peacefulness, it allows the government to disarm, fine, and incarcerate a nonviolent individual based solely on his status as an unlawful drug user. In both purpose and operation, § 922(g)(3) finds only extremely attenuated support in the founding-era record.[23] The historical tradition of disarming dangerous individuals, in other words, is not sufficiently analogous to § 922(g)(3).

* * *

The government has failed to establish that historical laws regulating the mentally ill, the intoxicated, or the dangerous are sufficiently analogous to § 922(g)(3). The founding-era laws the government offers sought to remedy different problems than § 922(g)(3) does, and they did so through less-restrictive means. Taken together, the historical examples discussed above are not analogous enough to § 922(g)(3) to establish the statute's constitutionality.[24] The district court should therefore grant Alston's motion to dismiss count two of his indictment.

---

[23] Firearms regulations that bear even a passing resemblance to § 922(g)(3) did not begin to crop up until decades after the Civil War. Aside from state laws that attempted to disarm newly freed black Americans, many Reconstruction-era regulations sought to prevent men "begging for charity outside of their home county" (otherwise known as "tramps") from carrying firearms in public. Greenlee, *supra*, at 270 (collecting laws). These laws did not completely disarm their targets—they still allowed tramps to possess weapons inside their homes (or their home counties). *See id.* at 270–71.

[24] The United States' argument focused on finding a historical analogue to § 922(g)(3) in pre- and post-enactment history. But as noted in *Bruen*, there is another avenue to establishing a law's constitutionality under the Second Amendment. The Court explained that it is possible "that a regular course of practice can liquidate and settle the meaning of disputed or indeterminate terms and phrases in the Constitution." *Bruen*, 142 S. Ct. at 2136 (cleaned up).

The theory of constitutional liquidation finds it genesis in James Madison's observation that "[a]ll new laws, though penned with the greatest technical skill, and passed on the fullest and most mature deliberation, are considered as more or less obscure and equivocal, until their meaning be liquidated by a series of particular discussions and adjudications." The Federalist No. 37, at 236 (James Madison) (Jacob E. Cooke ed., 1961).

### III. Conclusion

While the right to keep and bear arms extends to all members of the political community, it is not plenary. The government may burden this right, but to do so it must "identify a well-established and representative historical analogue" that justifies a modern regulation. *Bruen*, 142 S. Ct. at 2133. The United States has only partially carried its burden—for the reasons discussed above, the district court should find that § 922(n) passes constitutional muster while § 922(g)(3) does not. Thus, it should grant Alston's motion to dismiss (D.E. 17) in part.

The Clerk of Court must serve a copy of this Memorandum and Recommendation ("M&R") on each party who has appeared here. Any party may file a written objection to the M&R within 14 days from the date the Clerk serves it on them. The objection must specifically note the portion of the M&R that the party objects to and the reasons for their objection. Any other party may respond to the objection within 14 days from the date the objecting party serves it on them. The district judge will review the objection and make their own determination about the matter that is the subject of the objection. If a party does not file a timely written objection, the party will have forfeited their ability to have the M&R (or a later decision based on the M&R) reviewed by the Court of Appeals.

---

This theory "centered around three things: an indeterminacy, a course of deliberate practice, and settlement." William Baude, *Constitutional Liquidation*, 71 Stan. L. Rev. 1, 13 (2019). Thus, when the Constitution contains a vague or ambiguous provision, subsequent congressional practice may help fill the gaps in the provision's interpretation. *See id.* at 13–16. But not all practices can liquidate the meaning of the Constitution. For the doctrine to apply, Congress must repeatedly and deliberately act in accordance with its interpretation of the provision. *Id.* at 16–18. And Congress's interpretation must be more than just a leading theory—"[s]o long as [congressional] practice was an ongoing battle between two competing interpretations, even if one had the upper hand in reality, that did not mean that the course of practice had become binding." *Id.* at 18. Instead, Congress's interpretation must receive so little pushback (or attain sufficient popular support) that it can be considered settled. *See id.* at 18–21.

But the United States has neither argued nor shown that it is appropriate to apply that theory here. Nor has it proven that post-enactment practice was uniform enough to liquidate the meaning of the Second Amendment in its favor.

Dated:  July 18, 2023

_____
Robert T. Numbers, II
United States Magistrate Judge