IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:23-CR-21-FL-RN-1

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | GOVERNMENT'S OBJECTIONS |
| v. | ) | TO MAGISTRATE'S MEMORANDUM |
| | ) | AND RECOMMENDATION |
| CARLOS ALSTON | ) | |

The United States of America, by and through the United States Attorney for the Eastern District of North Carolina, hereby files its objections to the magistrate judge's Memorandum & Recommendation (DE 27) (hereinafter "M&R") regarding Defendant's Motion to Dismiss the Indictment (DE 17). In the M&R, the magistrate judge recommended this Court dismiss Count Two of the Indictment, charging possession of a firearm by an unlawful user of, or person addicted to, controlled substances, in violation of 18 U.S.C. § 922(g)(3), as unconstitutional. M&R at 40. For the reasons stated in its Response to the Motion to Dismiss (DE 20) and Supplemental Brief (DE 24), both incorporated herein by this reference, and for the reasons stated below, the government objects to the magistrate judge's conclusion that 18 U.S.C. §922(g)(3) is unconstitutional in light of the Supreme Court's recent holding in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*. 142 S. Ct. 2111 (2022).

1

<u>**STANDARD OF REVIEW**</u>

The portions of the magistrate's M&R to which either party objects are reviewed by this Court de novo. 28 U.S.C. § 636(b)(1); *Elijah v. Dunbar*, 66 F.4th 454, 460 (4th Cir. 2023).

<u>**ARGUMENT**</u>

**I.      Alston, as a regular unlawful drug user and person addicted to illegal controlled substances, is not a person covered by the Second Amendment's rights guarantee.**

The government objects to the portion of the M&R (Section II(B), pp. 11-14) finding that Alston is part of "the people" who enjoy an individual right of firearm possession under the Second Amendment. As the court noted elsewhere in the M&R, "*Heller* and *McDonald* established that, at the very least, *law-abiding Americans enjoy a Second Amendment right* to possess conventional firearms within their homes for self-defense." M&R at 5 (emphasis added). *Bruen* did not disturb the understanding of the Second Amendment's right belonging *only* to those who are law-abiding. *See Bruen*, 142 S. Ct. at 2122, 2124-25, 2131, 2132-22, 2134, 2135, 2138, 2150, 2156 (the majority opinion repeatedly refers to the Second Amendment protecting the rights of "law-abiding" citizens, as do the Alito and Kavanaugh/Roberts concurrences). The *Bruen* holding was consistent with the *Heller* and *McDonald* precedent on the point that the Second Amendment protects rights of law-abiding citizens. And though the magistrate would have this Court hold that the Second Amendment affords its rights to all Americans (M&R at pp. 12-13), this Court is

2

bound by the Fourth Circuit's interpretation of this issue post-*Heller*, which does not go so far as to include all Americans amongst those who enjoy Second Amendment rights.

The Bill of Rights secures rights "inherited from our English ancestors, and which had from time immemorial been subject to certain well-recognized exceptions." *Robertson* v. *Baldwin*, 165 U.S. 275, 281 (1897). "In incorporating these principles into the fundamental law there was no intention of disregarding the exceptions, which continued to be recognized as if they had been formally expressed." *Ibid.* The First Amendment, for example, allows legislatures to ban true threats, even though a threat is a form of "speech." See *Counterman* v. *Colorado*, 143 S. Ct. 2106, 2114 (2023). And the Second Amendment allows legislatures to ban dangerous and unusual weapons, such as short-barreled shotguns, even though they are "arms." See *Heller*, 554 U.S. at 624-625. So too, history and tradition establish that the Second Amendment allows legislatures to disarm persons who are not law-abiding, responsible citizens, regardless of whether they are among "the people."

The magistrate judge would read *Bruen*'s analytical framework to apply to "all members of the political community" regardless of whether they are law-abiding. M&R at 12-13. Per the magistrate judge, this interpretation would square with our understanding of other constitutional provisions, which generally apply to lawbreakers and law-abiding individuals without distinction. M&R at 12-13. But the Fourth Circuit has made it clear that the Second Amendment's rights are guaranteed

3

to a narrower category of individuals. In *United States v. Carpio-Leon*, a post-*Heller* decision, the Fourth Circuit stated explicitly that unlawful aliens do not possess Second Amendment rights because they cannot be considered law-abiding. 701 F.3d 974, 979 (4th Cir. 2012) ("[I]llegal aliens do not belong to the class of *law-abiding* members of the political community to whom the Second Amendment gives protection.") (emphasis added). In that decision, a decade prior to *Bruen*, the Fourth Circuit discussed its interpretation as squaring with the founding era understanding of firearms rights belonging to those who were law-abiding and non-dangerous. *Id.* at 979-81.

Similarly, in post-*Heller* opinions examining the constitutionality of 18 U.S.C. § 922(g)(1), the Fourth Circuit held that firearms regulations which did not proscribe conduct by law-abiding citizens in defense of hearth and home were "presumptively lawful." *United States v. Pruess*, 703 F.3d 242, 245-46 (4th Cir. 2012) (citing *United States v. Moore*, 666 F.3d 313, 318 (4th Cir. 2012)). The Fourth Circuit held that "conviction of a felony necessarily removes one from the class of 'law-abiding, responsible citizens' for the purposes of the Second Amendment." *Hamilton v. Pallozzi*, 848 F.3d 614, 626 (4th Cir. 2017). The court referred to a defendant's being a law-abiding responsible citizen as a *requirement* for a successful Second Amendment challenge. *Moore*, 666 F.3d at 320. A defendant who could not show that he was law-abiding had "no right—much less a fundamental right—to bear arms." *Pruess,* 703 F.3d at 247.

4

Defendant, who possessed nearly an ounce of marijuana—a federally controlled, Schedule I substance—at the time of his arrest and who was then a *daily* unlawful user of the drug, cannot be considered "law-abiding." As a result, the Second Amendment's guarantee of a right to "use arms in defense of hearth and home" to "law-abiding responsible citizens" does not apply to him. *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008).[1] Like the defendants considered in *Pruess*, *Moore* and *Hamilton*, Alston "flunks the law-abiding responsible citizen *requirement*." *Pruess*, 703 F.3d at 246 (emphasis added). As a result, he is not amongst "the people" who enjoy Second Amendment rights.

Justice Alito stressed *Bruen*'s limited reach, saying the majority "holds that a State may not enforce a law . . . that effectively prevents its *law-abiding residents* from carrying a gun" to "defend themselves." 142 S. Ct. at 2157 (Alito, J., concurring) (emphasis added). "That is *all* we decide," he emphasized. *Id.* (emphasis added). "Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun." *Id.*; *see also id.* at 2162-63 (Kavanaugh, J., concurring) ("Going forward, . . . the 43 states that employ objective shall-issue licensing regimes for carrying handguns for self-defense may continue to do so."). The magistrate judge's finding would do exactly what Justice Alito says the Supreme

---

[1] To the extent the Court does not read *Bruen*'s law-abiding language as a limitation on the Second Amendment right itself, the government argues in the alternative that *Bruen*'s analytical framework applies only to those cases dealing with law-abiding citizens, and a different analysis applies to category-based firearms regulations, like 18 U.S.C. § 922(g)(3), that apply to non-law-abiding citizens.

5

Court did not intend, by repurposing *Bruen* to expand the categories of who may lawfully possess a firearm. This Court should decline to engage in such unintended expansion by finding that Alston, as someone who is not law-abiding, is not amongst those covered by the Second Amendment's rights provision.

## II. Alston's conduct, in possessing a firearm while a user of and addicted to controlled substances, is not protected by the Second Amendment.

The United States objects to the magistrate judge's conclusion that Alston's conduct is covered by the Second Amendment's rights guarantee (set out briefly in Section II(D) of the M&R, at pp. 21-22). The magistrate defined Alston's conduct as "possessing a firearm." M&R at 21. The government argues that Alston's conduct was, instead, *possessing a firearm while being an unlawful drug user*. The government argues that Alston's conduct in possessing the firearm cannot be divorced from the then-existing condition which made such possession inherently dangerous. Section 922(g)(3) does not proscribe possession of a gun; it proscribes possession of a gun by ongoing, long-term users of illegal drugs. Alston did not simply possess a gun. Rather, he possessed a gun while he had a raging drug use problem. This is the conduct proscribed by the statute, and it is not covered by the Second Amendment.

As the Fourth Circuit noted, in a post-*Heller* inquiry into the constitutionality of a challenged gun law, "[t]he first question is whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010) (internal citation omitted). This first step of the analysis remains in effect post-*Bruen*. 142 S. Ct. at 2127. In

6

*Chester*, the Fourth Circuit analyzed whether 18 U.S.C. § 922(g)(9) (disarming domestic violence misdemeanants) passed constitutional muster. In answering "the first question" regarding whether the conduct fell within the scope of the Second Amendment, the Fourth Circuit framed the question as "whether the possession of a firearm in the home by a domestic violence misdemeanant is protected by the Second Amendment." 628 F.3d at 680. Notably, the Fourth Circuit did *not* divorce the act (possession of a gun) from the characteristic which makes such possession unlawful (being a domestic violence misdemeanant) when making its determination of whether the conduct was covered by the Second Amendment. *See id*. This Court should do the same, finding that the conduct proscribed by Section 922(g)(3) is not *possession*, but *possession by an unlawful drug user*.

While the Second Amendment protects the rights of law-abiding individuals to possess guns within their homes for self-defense and to carry them outside the home for other lawful purposes, nothing about the Amendment's text guarantees this right to individuals who are actively engaged in long-term violation of the laws prohibiting illegal drug use. *See United States v. Le*, No. 4:23-CR-14, 2023 WL 3016297, at *5 (S.D. Iowa Apr. 11, 2023). Certainly, such conduct is not *clearly* covered by the plain text of the Second Amendment, and because it is not, the inquiry should end here – without the burden shifting to the government to prove that there is a historical statute analogous to Section 922(g)(3). *See Bruen*, 142 S. Ct. at 2127 (holding "when the Second Amendment's plain text covers an individual's conduct, the Constitution

7

presumptively protects that conduct" after which showing, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation."). Because the plain text of the Second Amendment does not cover the possession of a firearm by a regular drug user, the Court should use the standard of review applicable to all other facial constitutional challenges, which requires defendants prove "that no set of circumstances exists under which [the statute] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). Defendant has made no such showing, and thus his facial constitutional challenge should fail.

## III.  Section 922(g)(3) is consistent with historical tradition and is constitutional.

The United States objects to the magistrate's finding (set out in Section II(D) of the M&R, pp. 22-40) that 18 U.S.C. § 922(g)(3) is inconsistent with the nation's historical tradition of firearms regulation. Because Section 922(g)(3) addresses a societal problem in drug addiction and unlawful use which did not exist in widespread form until the twentieth century, there is no founding- or Reconstruction-era "historical twin" to the statute. In such cases, *Bruen* allows for reasoning by analogy to historical laws that are "relevantly similar." 142 S. Ct. at 2132. Section 922(g)(3) is sufficiently analogous, for constitutional purposes, to historical statutes disarming the mentally ill, intoxicated individuals and those believed to be dangerous. Other courts have so found. *See United States v. Seiwert,* No. 20-cr-443, 2022 WL 4534605 (N.D. Ill. Sept. 28, 2022)*; United States v. Posey,* No. 22-cr-83, — F.Supp.3d —, 2023

8

WL 1869095 (N.D. Ind. Feb. 9, 2023); *United States v. Randall,* No. 22-cr-99, —— F.Supp.3d ——, 2023 WL 3171609 (S.D. Iowa Feb. 14, 2023); *United States v. Stennerson,* No. 22-cr-139, 2023 WL 2214351 (D. Mont. Feb. 24, 2023); *United States v. Cleveland-McMichael,* No. 21-cr-119, 2023 WL 2613548 (D. Alaska Mar. 23, 2023); *United States v. Le,* No. 23-cr-14, —— F.Supp.3d ——, 2023 WL 3016297 (S.D. Iowa Apr. 11, 2023); *United States v. Costianes,* No. 21-cr-0458, —— F.Supp.3d ——, 2023 WL 3550972 (D. Md. May 18, 2023); *United States v. Hart,* No. 22-cr-114, 2023 WL 4144834 (W.D. Mo. June 6, 2023) (report and recommendation), adopted by 2023 WL 4141044 (W.D. Mo. June 22, 2023); *United States v. Ray,* No. 21-cr-57, 2023 WL 4378152 (S.D.W. Va. July 6, 2023); *United States v. Lewis,* No. 22-cr-222, —— F.Supp.3d ——, 2023 WL 4604563 (S.D. Ala. July 18, 2023); *United States v. Beaty,* No. 22-cr-95, 2023 WL 4662247 (M.D. Fla. July 20, 2023); *but see United States v. Daniels*, No. 22-60596, ——F.4th—— , 2023 WL 5091317 (5th Cir. 2023) (finding Section 922(g)(3) unconstitutional as applied to a particular defendant while "emphasizing the narrowness of [its] holding" and "not invalidat[ing] the statute in all its applications").[2]

---

[2] The *Daniels* decision, which is not binding on the Fourth Circuit or this Court, was controlled, at least in part, by the Fifth Circuit's decision in *United States v. Rahimi*, for which the Supreme Court has granted certiorari. 61 F.4th 443 (5th Cir. 2023), *cert. granted,* No. 22-915, — U.S. —, 2023 WL 4278450 (June 30, 2023). Relying on *Rahimi*, the *Daniels* court rejected the government's argument that unlawful users of controlled substances are not "law-abiding, responsible citizens." 2023 WL 5091317, at *4. The *Daniels* court also demanded too close a historical analogue for Section 922(g)(3) and incorrectly rejected the "undeniable throughline in all [cited] historical sources," that "Founding-era governments took guns away from persons perceived to be dangerous" as a historical analogue for Congress's disarmament of dangerous illegal drug users. *Id*. at *13.

**A. Drug abuse is a modern societal problem which did not exist at the time of the founding.**

The unlawful use of controlled substances was unprecedented at the founding. Through much of the 19th century there was no need for firearm prohibitions addressing drugs other than alcohol because such substances were not widely used as intoxicants in the United States until the late 19th and early 20th centuries. *See* David F. Musto, *Drugs in America: A Documentary History* 188-192 (NYU 2002); Erik Grant Luna, *Our Vietnam: The Prohibition Apocalypse*, 46 DePaul L. Rev. 483, 487 (1997) ("[N]arcotics addiction was a negligible phenomenon in the eighteenth and nineteenth centuries."). Only in 1877 did Nevada became the first state to require a prescription for the purchase of any drug (in that case, opium). Elizabeth Kelly Gray, *Habit Forming: Drug Addiction in America*, 1776-1914 25 (2023). Because of this history, "[i]llegal drug trafficking," in particular, "is a largely modern crime." *United States v. Alaniz*, 69 F.4th 1124, 1129 (9th Cir. 2023) (upholding sentencing enhancement for possessing dangerous weapon during drug offense after *Bruen*).

Marijuana is no exception. There are essentially "no accounts or reports" of "cannabis being used as an intoxicant during the period when the plant was widely cultivated as an agricultural commodity." John Rublowsky, *The Stoned Age: A History of Drugs in America* 98 (1974). Even by the 1930s, Americans lacked "any lengthy or broad experience" with marijuana, Musto, *supra*, at 192, and prohibitions did not emerge until the early 20th century. Because the widespread use of and addiction to illegal controlled substances is a modern problem not confronted in the founding era,

10

the government need only prove that there exists a relevantly similar historical analogue to Section 922(g)(3). 142 S. Ct. at 2132. For the reasons set forth below, it has done so.

### B. Section 922(g)(3) is analogous to historical statutes allowing the burdening of the rights of the mentally ill.

The government objects to the magistrate judge's finding (at Section II(D)(2)(a), pp. 22-28 of the M&R) that historical regulations disarming the mentally ill are not sufficiently analogous Section 922(g)(3). The magistrate found that, compared to laws which burdened the rights of the mentally ill, Section 922(g)(3) is "both over-and-underinclusive." M&R at 26. But this misapplies *Bruen*. Expecting Section 922(g)(3) to be a perfect match to historical examples addressing different problems indicates the magistrate was incorrectly seeking something akin to a "historical twin." *Bruen*, 142 S. Ct. at 2133. *Bruen* itself says the government need not jump through that hoop. The government need only provide regulations which are "relevantly similar," which requires analysis of "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132-33.

As the magistrate judge recognizes, English law in existence at the time of (and just after) the founding allowed for at least some detention of the acutely mentally ill. *See* M&R at 23-25. English law in existence at the time of the founding can rightly inform the Court regarding the founders' understanding of the scope of nascent American rights. *See Bruen*, 142 S. Ct. at 2139. These laws allowing for the temporary deprivations of mentally ill citizens' rights are relevantly similar to Section 922(g)(3)'s

gun rights restriction against illegal drug users. The "longstanding" burdening of the rights of mentally ill individuals was recognized in *Heller* and *McDonald*. *Heller*, 554 U.S. at 626 ("longstanding prohibitions on the possession of firearms by . . . the mentally ill" were among the constitutionally permissible regulations that the Court in *Heller* said should not "be taken to cast doubt on.").

Turning first to the *why* question, both historical regulations burdening the mentally ill and Section 922(g)(3) were crafted to protect the public. The existence of the historical regulations show that eighteenth century lawmakers were concerned with the dangerousness posed by those who were suffering from mental illness. Carlton F.W. Larson, *Four Exceptions in Search of a Theory*: District of Columbia v. Heller *and Jud. Ipse Dixit*, 60 Hastings L.J. 1371, 1377 (2009); *accord* Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations,* 60 HASTINGS L.J. 1339, 1361 n. 136 (2009). So too was Congress when, in 1968, it enacted Section 922(g)(3) "to keep guns out of the hands of presumptively risky people," including unlawful drug users. *United States v. Yancey*, 621 F.3d 681, 683 (7th Cir. 2010). As the Seventh Circuit reasoned in *Yancey*, "habitual drug abusers, like the mentally ill, are more likely to have difficulty exercising self-control, making it dangerous for them to possess deadly firearms." *Id.* at 685.

With regard to the *how* question, the statutes are undoubtedly different, but the traditional route (physically detaining the mentally ill) was necessarily more

12

burdensome than simple disarmament. As the magistrate judge noted in finding that Section 922(n) *is* constitutional, "it stands to reason" that if a statute that allows for the detention of an individual is constitutional, then the government "had the ability to impose lesser restrictions on a defendant's conduct, such as restricting a defendant's" firearms rights. M&R at 17. The magistrate judge notes that the detention of the mentally ill person was only allowed so long as the fit of madness lasted. M&R at 26. This is similar to the prohibition in Section 922(g)(3), which lasts only so long as the person is a recent, regular, long-time user of unlawful controlled substances. *Yancey*, 621 F.3d at 687. Both regulations burden rights only temporarily, and Section 922(g)(3) is *less* restrictive, because unlike the mentally ill individual, whose liberties were constrained based upon circumstances out of his ability to cease or control, a person subject to 922(g)(3)'s prohibition may regain his unfettered firearm possession rights at any time upon his choice to cease use of unlawful substances. *Yancey*, 621 F.3d at 686-87 ("[U]nlike those who have been convicted of a felony or committed to a mental institution and so face a lifetime ban, an unlawful drug user…could regain his right to possess a firearm simply by ending his drug abuse. In that sense, the restriction in § 922(g)(3) is far less onerous than those affecting…the mentally ill.").

In determining that Section 922(g)(3) is insufficiently analogous to eighteenth century statutes detaining the mentally ill, the magistrate judge notes that Section 922(g)(3) punishes an individual more severely than historical statutes temporarily

13

constraining the liberty of the mentally ill and cites the possible punishments for violation. M&R at 27. However, considering the potential punishment for the offenses is irrelevant to whether Section 922(g)(3) is constitutional under the Second Amendment. The questions for the court are whether (1) the defendant has a Second Amendment right, and (2) if so, whether it can be burdened. Straying into whether *punishment* under the laws is analogously similar to historical regulation goes beyond the question at issue.

Finally, both the *Heller* court and the Kavanaugh/Alito concurrence in *Bruen* were careful to state that the court's decisions were not meant to cast doubt on regulations disarming "felons and the mentally ill." *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J. concurring); *see* Robert Dowlut, *The Right to Arms: Does the Constitution or the Predilection of Judges Reign?*, 36 OKLA L.REV. 65, 96 (1983) ("Colonial and English societies of the eighteenth century, as well as their modern counterparts, have excluded infants, idiots, lunatics, and felons [from possessing firearms]."). Because possession of firearms by unlawful drug users is analogously dangerous to possession of firearms by the mentally ill, it stands to reason by analogy that the *Bruen* decision similarly should not cast doubt upon regulations prohibiting possession by unlawful drug users. *Yancey*, 621 F.3d at 685. Though Section 922(g)(4) disarms those found to be mentally defective, it misses wide swaths of people who are similarly dangerous as a result of their ongoing drug addictions who have not been previously committed to a mental institution. Section 922(g)(3)'s disarmament of

14

those who are current (or very recent) illegal drug users is necessary to protect the public in the same way that Section 922(g)(4) is necessary, and both are consistent with the founders' understanding that the temporary detention and rights deprivation of mentally ill persons was permissible under the constitution.

**C.   Section 922(g)(3) is analogous to historical statutes disarming the intoxicated.**

The government objects to the magistrate judge's finding (at Section II(D)(2)(b), pp. 28-34 of the M&R) that historical regulations disarming the intoxicated are not sufficiently analogous Section 922(g)(3). Regulations aimed at curbing gun use or possession by intoxicated individuals have existed since colonial days. Section 922(g)(3)'s passage in the twentieth century reflects a natural evolution of these laws to address the proliferation of illegal addictive substances while addressing the need to preserve the safety of the public that the founding-era lawmakers recognized.

The founding generation recognized that those who regularly became intoxicated threatened the social and political order. *See, e.g.*, Benjamin Rush, *An Inquiry into the Effects of Ardent Spirits Upon the Human Body and Mind* 6 (1812) (describing drunkenness as a "temporary fit of madness"). A 1658 Massachusetts law, for example, allowed constables to apprehend those "overtaken with drink" and keep them "in close custody" until brought before a magistrate. *The Charters & General Laws of the Colony and Province of Massachusetts Bay* 82 (1814). Founding-era legislatures also adopted specific measures to separate firearms and alcohol,

15

including laws regulating firearm use by individuals deemed likely to become intoxicated. A 1655 Virginia law prohibited "shoot[ing] any gunns at drinkeing [events]," regardless of whether attendees actually became intoxicated. 1 William Waller Hening, *Statutes at Large; Being a Collection of All the Laws of Virginia* 401-02 (1823). A 1771 New York law similarly barred firing guns during the New Year's holiday, a restriction that "was aimed at preventing the 'great Damages … frequently done on [those days] by persons … being often intoxicated with Liquor.'" *District of Columbia v. Heller*, 554 U.S. 570, 632 (2008) (quoting 5 *Colonial Laws of New York* 244-46 (1894)). And a 1731 Rhode Island law forbade firing guns or pistols in any tavern at night. *See Acts & Laws of the English Colony of Rhode-Island & Providence-Plantations* 120 (Hall, 1767). The M&R notes (pp. 28-32) that these laws did not restrict firearm possession outright, were short-lived, or may have been enacted for other public safety reasons. But they nevertheless show a tradition of limiting firearm use by specific groups viewed as *likely* to become intoxicated, just as Section 922(g)(3) limits firearm possession by persons with current, long-term illegal drug use problems, who are similarly likely to become intoxicated by such drugs.

Additionally, 18th-century militia laws reflected legislatures' significant authority to separate firearms and alcohol. New Jersey, Pennsylvania, and South Carolina disarmed or authorized the confinement of intoxicated militia members. *See* 2 Arthur Vollmer, U.S. Selective Serv. Sys., *Military Obligation: The American Tradition*, pt. 8, New Jersey, at 25-26 (1947) (1746 law disarming those who appeared

16

"in [a]rms disguised in [l]iquor"); *id.* pt. 11, Pennsylvania, at 97 (1780 law disarming those "found drunk"); *id.* pt. 13, South Carolina, at 96 (1782 law allowing officers to be cashiered or "confined till sober"). Many other laws forbade selling "any Strong Liquor" near the locations where militias mustered and trained, indicating again the colonial and founding-era understanding that guns and intoxicants should not mix. *See, e.g.*, 2 Vollmer, *supra*, pt. 5, Maryland, at 93 (1756 law); *id.* pt. 3, Delaware, at 13 (1756 law); *id.* pt. 8, New Jersey, at 31 (1746 law) *id.* pt. 11, Pennsylvania, at 100 (1780 law); *id.* pt. 13, South Carolina, at 30 (1721 law). Similar laws persisted into the 19th century, *see, e.g.*, James Dunlop, *The General Laws of Pennsylvania* 405-06 (2d ed. 1849) (1822 law)—by which time at least three states outright excluded "common drunkards" from the militia, *see* 1844 R.I. Pub. Laws 503; 1837 Me. Laws 424; 1837 Mass. Acts 273.

Despite the pervasiveness of alcohol at the founding, early laws understandably focused on the militia because social norms "had an important restraining effect on intemperance" and there thus was "little public outcry against alcoholism." Mark Edward Lender & James Kirby Martin, *Drinking in America: A History* 14-16 (1987). Community mores "held drinking excesses largely in bounds." *Id.* at 15. And the cumbersome nature of 18th-century firearms also mitigated the general risk created by intoxicated individuals. *See* Randolph Roth, "Why Guns Are and Are Not the Problem," *in* Jennifer Tucker, et al., *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* 116-17

17

(2019). As those circumstances changed during the 19th century, *see, e.g.*, Lender, *supra*, at 45-46, however, states and territories began imposing criminal penalties on intoxicated members of the public who carried, used, or received firearms or pistols. *See* 1867 Kan. Sess. Laws 25 (prohibiting those "under the influence of intoxicating drink" from carrying a pistol or other deadly weapon); 1878 Miss. Laws 175-76 (prohibiting selling weapons to a "person intoxicated"); Mo. Rev. Stat. § 1274 (1879) (prohibiting carrying "any kind of firearms" "when intoxicated or under the influence of intoxicating drinks"); 1883 Wis. Sess. Laws 290 (prohibiting person in "state of intoxication" from going "armed with any pistol or revolver"); 1909 Idaho Sess. Laws 6 (prohibiting "hav[ing] or carry[ing]" any "deadly or dangerous weapon" when "intoxicated, or under the influence of intoxicating drinks"). Such statutes were considered "in perfect harmony with the constitution" and "a reasonable regulation of the use of such arms" even where state constitutions were understood to secure an individual's right to bear arms. *State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886).

Despite the M&R questioning the value of Reconstruction-era laws, this 19th-century evidence remains instructive. As *Bruen* reiterated, evidence of the Second Amendment's interpretation "'through the end of the 19th century' represent[s] a 'critical tool of constitutional interpretation.'" 142 S. Ct. at 2136 (quoting *Heller*, 554 U.S. at 605). And such evidence is particularly helpful where, as here, it supplies "'confirmation of'" earlier history. *Id.* at 2137. Laws regulating the general public's firearm possession while intoxicated largely arose later, but they were consistent

18

with earlier laws regulating individuals' ability to possess guns while drunk (or at events where drinking would occur) and militia-specific laws. The M&R identifies nothing in pre-19th-century practice demonstrating that legislatures were considered to *lack* authority to preclude the intoxicated public from using firearms. *Cf. id.* at 2133 (noting lack of "disputes regarding the lawfulness of [sensitive-place] prohibitions"). Concluding otherwise would unjustifiably deem legislatures' earlier silence as reflecting a *constitutional* limit, on the unfounded assumption that founding-era legislatures invariably regulated to the outer limit of their authority irrespective of popular demand or perceived need for particular laws.

The Court need also examine the *how* and *why* questions to determine whether Section 922(g)(3) is "comparably justified" to founding-era and nineteenth century intoxication statutes. *Bruen*, 142 S. Ct. at 2133. In terms of *why* Section 922(g)(3) restricts the Second Amendment right, the provision, like intoxication statutes, limits firearm possession or use at times an individual is deemed unlikely to use them responsibly. Intoxication-related statutes were enacted to prevent the "mischief" threatened by intoxicated persons "going abroad with firearms," *Shelby*, 2 S.W. at 469, and Congress likewise enacted Section 922(g)(3) to "keep firearms away from the persons [it] classified as potentially irresponsible and dangerous," *Barrett v. United States*, 423 U.S. 212, 218 (1976). For confirmation, this Court need only consider the parity with which legislatures treated alcohol and drugs once illegal drugs proliferated in the 20th century. At least one jurisdiction, Michigan, simply extended

19

its by-then common restriction on carrying firearms while intoxicated to cover those under the influence of "any exhilarating or stupefying drug." 1929 Mich. Pub. Acts 55. Other jurisdictions elected to regulate more indirectly by prohibiting the *delivery* or *sale* of firearms to certain persons, but extended such laws to drug addicts and habitual drunkards alike. *See* 1927 N.J. Laws 745; 1931 Pa. Laws 499; 1935 Ind. Acts 161; 1935 S.D. Sess. Laws 356; 1935 Wash. Sess. Laws 601; 1936 Ala. Acts 52; 47 Stat. 650, 652 (1932).

In terms of *how* Section 922(g)(3) burdens the right to self-defense, the M&R describes Section 922(g)(3)'s prohibition as much broader than colonial and nineteenth century laws. M&R at 30. But the statute—like historical intoxication laws—is a *temporary* restriction on possession that lasts only during the period an individual is deemed unlikely to use firearms responsibly. If a person ceases unlawfully using controlled substances, he may again possess firearms. *See Yancey*, 621 F.3d at 687. The M&R notes that Section 922(g)(3) prohibits *possession* of firearms, while alcohol statutes historically were limited to prohibiting *carrying* or *use*. That difference, however, is readily explained by the fact that illegal drugs, unlike alcohol, are *unlawful* in all circumstances. An individual who regularly obtains and uses those substances likely will have connection with criminality for which gun possession presents public safety risks. Indeed, as early as 1931, California prohibited outright firearm *possession* by drug addicts, not just use during periods of intoxication. 1931 Cal. Stat. 2316-17. Other states later followed suit, *see, e.g.*, 1951

20

Ala. Acts 1379; 1955 Kan. Sess. Laws 400. Because alcohol, by contrast, has generally been lawful, laws understandably allowed alcohol drinkers to *possess* firearms, limiting their use only during periods of intoxication. Given this clear distinction between unlawful drugs and alcohol, to demand a more exact "dead ringer" for Section 922(g)(3) would be inconsistent with *Bruen*'s assurances that the Second Amendment is not "a regulatory straightjacket" for modern legislatures. *Bruen*, 142 S. Ct. at 2133. Once more, an early legislature's choice to prohibit use rather than simple possession does not itself indicate legislators believed it lacked constitutional power to regulate simple possession if they chose.

Finally, as in part II(B) of this filing, *supra*, the government objects to the magistrate judge's focus on the comparative penalties for violation of historical laws relating to firearm possession while intoxicated and those applicable to Section 922(g)(3). *See* M&R at 28. The question before this Court is whether the government can place a restriction on the gun rights of habitual illegal drug users. The Court needs to determine whether this restriction on gun rights is consistent with the nation's history and tradition of gun regulation, *not* whether the punishment prescribed for such a violation mirrors historical punishments for related statutes.

### D. Section 922(g)(3) is analogous to historical statutes disarming those considered dangerous.

The government objects to the magistrate judge's finding (at Section II(D)(2)(c), pp. 34-40 of the M&R) that historical regulations disarming individuals considered dangerous are not sufficiently analogous Section 922(g)(3). Congress's decision to

21

disarm those engaging in regular, long-term illegal drug abuse follows a tradition of disarmament of individuals and groups which legislature found to be dangerous. As a result, the statute is "comparably justified." *Bruen*, 142 S. Ct. at 2133.

English common law established the government's authority to disarm individuals posing a threat to the safety of others. Common law prohibited individuals from "go[ing] armed to terrify the King's subjects." Sir John Knight's Case, 3 Mod. 117, 87 Eng. Rep. 75, 76 (K.B. 1686); Statute of Northampton, 2 Edw. 3, c.3 (1328). The Militia Act of 1662 later authorized crown officers to seize the arms of those "judge[d] dangerous to the Peace of the Kingdom.'" 13 & 14 Car. 2, c.3, § 13 (1662). The 1689 English Bill of Rights declared subjects' right to possess arms, but limited the right to Protestant subjects, 1 W. & M. c.2, § 6, and did not purport to repeal the Militia Act, which was employed into the 18th century, see, e.g., Calendar of State Papers, Domestic: William III, 1700-1702, at 233-34 (Edward Bateson ed., 1937). Before, contemporaneous with, and after the Bill of Rights' enactment, Parliament also enacted statutes disarming Catholics in England and Ireland. 3 Jac. I, c.5, §§ 16-18 (1605-06); 1 W. & M. c.15, §§ 3-4 (1688); 7 Will. III, c.5 (1695) (Ireland). And in the first half of the 18th century, statutes disarmed Scottish persons believed to be loyal to James II. See, e.g., 1 George I, c.54 (1715); 11 George I, c.26 (1724); 19 George II, c.39 (1746).

The tradition continued in early American legislatures. Some laws disarmed those who carried arms in a manner that spread fear or terror. See 1692-1694 Mass.

22

Acts 11-12; 1696-1701 N.H. Laws 15. Others disarmed entire groups deemed dangerous or untrustworthy, including those who refused to swear allegiance to the colony[3] or the Revolution's cause;[4] enslaved persons;[5] and Native Americans.[6] These laws would be unconstitutional today under the Thirteenth or Fourteenth Amendments. But for Second Amendment purposes, they remain instructive. As repugnant as these laws are, they demonstrate that the Amendment was not historically understood to pose an obstacle to disarming, as a class, certain persons. *See, e.g., United States v. Jackson*, 69 F.4th 495, 503 (8th Cir. 2023).

Second Amendment precursors proposed in state ratifying conventions likewise confirmed that legislatures may disarm certain categories of individuals, including for "crimes committed, or real danger of public injury." 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 665 (1971) (discussing Pennsylvania proposal). Accordingly, as one early scholar wrote, the government may restrict a person's right to carry firearms when there is "just reason to fear that he purposes to make an unlawful use of them." William Rawle, *A View of the Constitution of the United States of America* 126 (2d ed. 1829). And that understanding persisted after

---

[3] 1 *Records of Governor & Company of the Massachusetts Bay in New England* 211-12 (Nathaniel B. Shurtleff ed., 1853) (1637 order disarming Anne Hutchinson's followers).

[4] *See, e.g.*, 4 *Journals of the Continental Congress* 201-06 (1906) (1776 resolution); 1775-1776 Mass. Acts 479; 1777 Pa. Laws 63; 1777 N.C. Sess. Laws 231; 1776-1777 N.J. Laws 90; 9 William Waller Hening, *Statutes at Large; Being a Collection of All the Laws of Virginia* 281-83 (1821) (1777 law); 15 *The Public Records of the Colony of Connecticut from May, 1775, to June, 1776, Inclusive* 193 (Charles J. Hoadly ed., 1890) (1775 law).

[5] *See, e.g.*, 1700-1797 Del. Laws 104; 1692-1720 Md. Laws 117-18; 1715-1760 N.Y. Laws 162; 1715-1755 N.C. Sess. Laws 64; 1731-1743 S.C. Acts 168.

[6] *See, e.g.*, 1723-1730 Conn. Acts. 292; *Charter & General Laws of Massachusetts Bay* 133 (1814) (1633 law); 6 *Statutes at Large of Pennsylvania from 1682 to 1801* 319-20 (WM Stanley Ray ed., 1898) (1763 law); 1 Hening, *supra*, at 219 (1633 Virginia law).

the Civil War. In 1866, for example, a federal Reconstruction order applicable to South Carolina provided that, although the "rights of all loyal and well-disposed inhabitants to bear arms will not be infringed," "no disorderly person, vagrant, or disturber of the peace, shall be allowed to bear arms." Cong. Globe, 39th Cong., 1st Sess. 908-09 (1866).

While at least some of the founding-era and nineteenth century laws disarming the dangerous did so in part because of the concern that certain groups would pose a threat to state security (*see* M&R at 35, 39), feared violence against the state undoubtedly meant violence against loyal soldiers or innocent civilians. The armed rebellions that the founders sought to prevent could only be effective in challenging state security if they involved violence or the threat of violence against American citizens, which means that the danger that legislators sought to prevent was not only to American sovereignty but also to its people. In passing Section 922(g)(3), Congress similarly recognized a need to protect innocent American citizens from improper gun use.

This history at a minimum "support[s] the proposition that the state can take the right to bear arms away from a category of people that it deems dangerous," *Kanter*, 919 F.3d at 464 (Barrett, J., dissenting)–although the government's authority to disarm certain groups is not *limited* to such persons. *See, e.g.*, *Range v. Att'y Gen.*, *United States of Am.*, 69 F.4th 96, 105 (3d Cir. 2023) (describing disarming "distrusted" groups); *id.* at 110 (Ambro, J., concurring) (describing disarming those

24

who "pose a threat to the orderly functioning of society"). And Congress had ample reason to conclude that gun possession by unlawful drug users, as a class, poses a serious risk of danger to others.

Because of the *unlawful* nature of their activities, drug users are more likely than law-abiding citizens to have dangerous confrontations (particularly if guns are involved) with drug dealers, law enforcement officers (as occurred in Alston's case), and others—raising a concern of danger even beyond periods of actual intoxication. It thus is no surprise that individual judges have suggested "drug dealing" is "dangerous because [it] often lead[s] to violence," *Folajtar v. Attorney General*, 980 F.3d 897, 922 (3d Cir. 2020) (Bibas, J., dissenting), and that Section 922(g)(3) aligns with a historically justified interest in "keeping guns out of the hands of those who are likely to misuse them," *Kanter*, 919 F.3d at 465-66 (Barrett, J., dissenting). The government does not refer to the dangerousness of illegal drug users to invite this Court to engage in the interest balancing *Bruen* rejected. Instead, as *Bruen* itself explained, the Second Amendment inquiry requires reasoning by analogy. 142 S. Ct. at 2132. And that "commonplace task for any lawyer or judge," *id.*, necessarily requires evaluating the similarity between the historical justification for disarming certain persons with the present-day dangers the legislature reasonably could find that a group, like unlawful drug users, poses.

Finally, in terms of *how* Section 922(g)(3) restricts the right, the statute is no more restrictive than historical laws disarming certain groups. As a *temporary*

25

prohibition, Section 922(g)(3) prohibits firearm possession only during the period users of unlawful controlled substances are considered to present a risk of dangerousness. *See Yancey*, 621 F.3d at 687. This is analogous to the historical limitations on the dangerously disloyal, which only lasted until such persons could show their loyalty to the nation. M&R at 36 (quoting Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 265 (2020).

## **CONCLUSION**

*Heller* and *Bruen* are clear that the Second Amendment protects possession and use of firearms and ammunition for lawful purposes by law-abiding, responsible citizens. The Constitution does not protect the conduct prohibited by 18 U.S.C. § 922(g)(3). Moreover, even if such conduct were covered, the statutes are consistent with the nation's historical tradition of firearm regulation. Section 922(g)(3) is thus facially constitutional, and this Court should so find.

Respectfully submitted this 15th day of August, 2023.

MICHAEL F. EASLEY, JR.
United States Attorney

BY:  /s/ Sarah E. Nokes
SARAH E. NOKES
Assistant United States Attorney
Criminal Division
150 Fayetteville Street, Suite 2100
Raleigh, North Carolina 27601
Telephone:     (919) 856-4054
Facsimile:     (919) 856-4487
E-mail:        sarah.nokes@usdoj.gov
VA Bar No.     82472

26

## CERTIFICATE OF SERVICE

This is to certify that I have this 15th day of August, 2023, served a copy of the

foregoing response upon the defendant in this action by CM/ECF to:

Edward D. Gray
Attorney for Defendant

/s/ Sarah E. Nokes
Sarah E. Nokes
Assistant United States Attorney
Criminal Division
